AO 91 (Rev. 11/11)  Criminal Complaint

**FILED**

# UNITED STATES DISTRICT COURT

### for the

### Northern District of California

AUG -1 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. |
| Andy Reanos-Moreno (a/k/a "Pelon"), et al | ) | |
| (see attachment for all defendants) | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | | |

Case No.  **3 19 71162**

**TSH**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on a date  unknown, but no later than 1/15/19, through the present,  in the counties of San Francisco and Alameda  in the

Northern   District of   California  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) | Conspiracy to Distribute Controlled Substances |

This criminal complaint is based on these facts:

See attached Affidavit of DEA Special Agent Eric J. Diamond.

☑ Continued on the attached sheet.

Approved as to form _____
AUSA Sailaja M. Paidipaty

_Complainant's signature_

Eric J. Diamond, DEA Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date:  July 31, 2019

_Judge's signature_

City and state:  San Francisco, California

Hon. Thomas S. Hixson, U.S. Magistrate Judge
_Printed name and title_

1 - MJJ

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                  NORTHERN DISTRICT OF CALIFORNIA

8                     SAN FRANCISCO DIVISION

9

10  UNITED STATES OF AMERICA,              )  CRIMINAL COMPLAINT
                                           )
11            Plaintiff,                    )
                                           )
12            v.                            )
                                           )
13  Andy REANOS-MORENO                      )
            a/k/a "Pelon";                  )
14  Karol ERAZO Reanos;                     )
    Manuel ARTEAGA                          )
15          a/k/a "Come" a/k/a "Comer";     )
    Allan Josue FUNEZ Osorto;              )
16  Brayan MARTINEZ;                        )
    Josue Natanael PERDOMO Moreno           )
17          a/k/a "Cachete";                )
    Jose Franklin Rodriguez GARCIA;        )
18  CESAR Estrada Cruz;                     )
    Arnold CRUZ Rodriguez                   )
19          a/k/a "Jose";                   )
    Christian RODRIGUEZ-VALLE;             )
20  Alex Gomez BARRIENTOS                   )
            a/k/a "Axel Gamez";             )
21  Eric MONTOYA MARQUEZ; and              )
    Kevin ARTEAGA-MORALES.                  )
22                                          )
                                           )
23            Defendants.                   )
                                           )
24  _____    )

25

26

27

28

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................2

RELEVANT STATUTES .....................................................................3

BACKGROUND OF INVESTIGATING AGENT....................................3

STATEMENT OF PROBABLE CAUSE................................................7

I.      Overview of Investigation Relevant to the Target Subjects ............................7

II.     Initiation of investigation..................................................................9

        A.      The DEA's investigation began in fall 2017, when confidential sources and an undercover officer made controlled purchases of heroin from Individual 2. ..................................................................9

III.    Identification of the REANOS-MORENO DTO, its methods of operation, and its use of redistributor houses. .......................................................10

        A.      In fall 2018, the DEA obtained a wiretap order for Individual 2's phone and conducted additional controlled purchases........................10

        B.      Agents identified REANOS-MORENO .............................................11

        C.      Calls intercepted over REANOS-MORENO's phone suggested that he was delivering drugs to multiple individuals living together at several residences in Oakland, including to PERDOMO. ..............................15

        D.      In January 2019, agents watched REANOS-MORENO make suspected drug deliveries and then seized drugs from one of the street-level dealers working for him. ...........................................................18

        E.      Further investigation showed that REANOS-MORENO was subleasing redistributor houses to street-level dealers working for him. ..................................................................31

IV.     Identification of redistributor houses maintained by REANOS-MORENO....38

        A.      One of the redistributor houses REANOS-MORENO has used to house street-level dealers is the 91st Avenue House in Oakland.........38

        B.      REANOS-MORENO also maintained redistributor houses on Foothill Boulevard and on 103rd Avenue in Oakland.....................................43

V.      Identification of Manuel ARTEAGA, REANOS-MORENO's runner ...........44

        A.      On March 27, 2019, officers saw REANOS-MORENO and ARTEAGA engage in a suspected drug transaction............................44

        B.      Agents repeatedly saw ARTEAGA make suspected deliveries of drugs to the 91st Avenue House in Oakland.................................................45

C.      In May and June 2019, interceptions over REANOS-MORENO's phone provided further evidence that ARTEAGA was working as his runner. ..............................................................................46

VI.     Identification of street-level dealers working with REANOS-MORENO ......52

A.      The street-level dealers who work for REANOS-MORENO travel from Oakland to the Tenderloin to sell drugs. .....................................52

B.      In January 2019, REANOS-MORENO repeatedly delivered drugs to ARTEAGA-MORALES. ..................................................................53

C.      In February 2019, CRUZ sold four ounces of methamphetamine to a confidential source. .............................................................................55

D.      In April 2019, officers seized heroin, methamphetamine, cocaine, and fentanyl from RODRIGUEZ-VALLE and FUNEZ near Hyde Street and Golden Gate Avenue. ...................................................................56

E.      Later in April, SFPD officers saw MARTINEZ engage in a drug transaction at Hyde and Golden Gate and then seized cocaine, heroin, and methamphetamine from him. .......................................................59

F.      In May 2019, MONTOYA-MARQUEZ sold heroin to an undercover SFPD officer near the corner of Hyde and Eddy in the Tenderloin.....60

G.      In June 2019, SFPD officers saw FUNEZ travel from the 103rd Avenue House to the Tenderloin and make suspected drug sales. ......61

H.      In June 2019, SFPD officers saw CESAR travel from the 91st Avenue House to the Tenderloin and make suspected drug sales....................63

VII.    Execution of a search warrant at the suspected redistributor house on 91st Avenue in Oakland ..........................................................................................65

A.      Officers found CESAR, GARCIA, and others at the redistributor house on 91st Avenue in Oakland along with crack and powder cocaine, heroin, and methamphetamine packaged for distribution......66

B.      Later the same night, REANOS-MORENO and ERAZO reacted to the search warrant at the 91st Avenue House. ...........................................67

VIII.   Execution of a search warrant at the suspected redistributor house on 103rd Avenue in Oakland .........................................................................................75

A.      On June 21, 2019, REANOS-MORENO and ERAZO discussed ERAZO "cooking" drugs to be given to ARTEAGA...........................75

B.      About two hours later, officers saw ARTEAGA make a suspected delivery of drugs to the 103rd Avenue House. ...................................77

C.      Officers found FUNEZ, MARTINEZ, and PERDOMO at the 103rd Avenue House along with cocaine, heroin, and methamphetamine packaged for redistribution. ..............................................................77

In Re App. for Crim. Complaint

D.      Later that night, REANOS-MORENO and ERAZO reacted to the
        search warrant at the 103rd Avenue House. ........................................78

IX.     Transfer of "independent contractor" drug distributors to another DTO. .......83

A.      After the search and arrests at the 91st Avenue House, the residents of
        that house searched for a new redistributor house to move into..........83

B.      Before accepting an offer for a new redistributor house, the residents
        of the 91st Avenue house negotiated drug prices with a representative
        of the DTO. ..........................................................................................85

CONCLUSION..........................................................................................................89

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Eric Diamond, a Special Agent of the Drug Enforcement Administration (DEA), being sworn, hereby declare as follows:

### INTRODUCTION

1.      I submit this Affidavit in support of an application for a criminal complaint charging the following persons (the "Target Subjects") with violations of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C) (conspiracy to distribute and to possess with intent to distribute controlled substances) arising from their participation in a conspiracy to sell methamphetamine, cocaine, and heroin:

      a.   Andy REANOS-MORENO a/k/a "Pelon";

      b.   Karol ERAZO Reanos;

      c.   Manuel ARTEAGA a/k/a "Come" a/k/a "Comer";

      d.   Allan Josue FUNEZ Osorto;

      e.   Brayan MARTINEZ;

      f.   Josue Natanael PERDOMO Moreno a/k/a "Cachete";

      g.   Jose Franklin Rodriguez GARCIA;

      h.   CESAR Estrada Cruz;

      i.   Arnold CRUZ Rodriguez a/k/a "Jose";

      j.   Christian RODRIGUEZ-VALLE;

      k.   Alex Gomez BARRIENTOS a/k/a "Axel Gamez";

      l.   Eric MONTOYA MARQUEZ; and

      m.   Kevin ARTEAGA-MORALES.

2.      Attachment A to this Affidavit is an index listing the Target Subjects and the paragraphs that discuss evidence of the Target Subjects' participation in the charged conspiracy.

3.      The statements in this Affidavit are based on my own investigation; information from other law enforcement agents, investigators, and individuals with knowledge of this matter; my review of documents related to this investigation; and my training and experience as a DEA

Special Agent. This Affidavit does not purport to set forth all of the evidence gathered to date in this investigation, or to name all of the persons who participated in these crimes; I have included only those facts and names that I believe are necessary to establish probable cause for the requested criminal complaint and arrest warrants.

## RELEVANT STATUTES

4.      Under 21 U.S.C. § 846, it is unlawful for a person to attempt or conspire to manufacture, distribute, or possess with intent to distribute controlled substances, including methamphetamine, heroin, and cocaine.

5.      Under 21 U.S.C. § 841(a)(1), it is unlawful for a person to knowingly or intentionally manufacture, distribute, or possess with intent to distribute, controlled substances, including methamphetamine, its salts, isomers, and salts of its isomers; cocaine, its salts, optical and geometric isomers, and salts of isomers; and a mixture or substance containing a detectable amount of heroin.

## BACKGROUND OF INVESTIGATING AGENT

6.      I am employed by the U.S. Department of Justice, DEA, as a Special Agent (SA) and have been so employed since September 2014. I am presently assigned to the Oakland Resident Office (ORO) in California.

7.      I have received formal training at the DEA Training Center in Quantico, Virginia. This twenty-week DEA Basic Agent Academy included instruction on, among other things, basic narcotic investigations, drug identification, drug detection, familiarization with United States narcotics laws, money laundering techniques and schemes, identification and seizure of drug-related assets, undercover work, and physical and electronic surveillance operations. Prior to working for the DEA, I worked as a private attorney in California for approximately three and a half years and as an Attorney for the Orange County District Attorney's Office in Santa Ana, California, for approximately five months as part of the Trial Attorney Partnership ("TAP") Program. Prior to working as an attorney, I served as a Certified Law Clerk for the Orange County District Attorney's Office. In my capacity as a TAP Attorney and Certified Law Clerk, I

received experience conducting misdemeanor jury trials and felony drug preliminary hearings.

8.      In addition to the above, I have spoken to and worked with more experienced federal and state narcotics agents and officers.  During my tenure with the DEA, I have participated in numerous investigations of illicit drug trafficking organizations, ranging from street level dealers to major traffickers, and while assigned to the ORO, I have participated in numerous investigations of illicit drug trafficking organizations and organized criminal enterprises in the Northern and Eastern Districts of California.  The investigations have involved the use of confidential sources (CSs), wire and physical surveillance, telephone toll analysis, investigative interviews, and the service of search and arrest warrants.  I have conducted investigations into unlawful possession with intent to distribute and distribution of controlled substances, laundering of monetary instruments, and the associated conspiracies involving such conduct.  These investigations have included the unlawful importation, possession with intent to distribute, and distribution of controlled substances, as well as the related laundering of monetary instruments, conducting monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses, in violation of 21 U.S.C. §§ 841(a)(1) and 846, which have resulted in state and federal prosecutions of individuals who have possessed, smuggled, received, and/or distributed controlled substances including: cocaine, heroin, methamphetamine, prescription pills (including counterfeit), and fentanyl, as well as the seizure of those illegal drugs and proceeds from the sale of those illegal drugs.

9.      In conducting these investigations, I have employed a variety of investigative techniques, including physical and electronic surveillance, analysis of telephone records and pen register data, interviewing witnesses, service of search and arrest warrants, and the drafting of criminal complaints, as well as handling informants and cooperating sources.  In the course of these investigations, I have, at various times, participated in, planned, and/or supervised numerous instances of physical surveillance and electronic surveillance.  Moreover, I have directed informants and have monitored meetings and consensual telephone conversations involving undercover agents and informants.  I have participated in over one hundred and fifty

hours of surveillance of narcotics traffickers. During surveillance, I have personally observed narcotics transactions, counter-surveillance techniques, and the methods narcotics traffickers used to conduct clandestine meetings.

10.     I have participated in more than six investigations in which court-authorized Title III interceptions were used in narcotics and money laundering investigations. During these investigations, I have listened to and deciphered conversations between narcotics traffickers in which they discussed their criminal activities in coded language or intentionally vague language and which were later corroborated by surveillance or defendants' statements, and I have participated in seizures of narcotics and narcotics proceeds that resulted from the monitoring of these types of conversations. I also have interviewed several drug traffickers after their arrest, as well as confidential sources, and discussed with them the meaning of their coded language used during the course of the commission of drug and money laundering offenses. During these interviews, the arrested drug traffickers and confidential sources have explained to me how they use coded language to conceal the true nature of their conversations from law enforcement and anyone who may be listening or overhear the conversation. As a result, a person who did not know the code or their meaning would think the individuals were having an innocent conversation or be confused by the conversation since it would not make sense to that person.

11.     In addition, I have participated in approximately two follow-up investigations concerning the concealment of assets, money, bank records, etc., and the identification of co-conspirators through the use of drug ledgers, telephone records and bills, photographs, and financial records.

12.     I have been involved in the execution of more than forty state and federal narcotics related search warrants. As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances. I am familiar with the appearance of fentanyl, marijuana, heroin, cocaine, methamphetamine, and other controlled substances. I am familiar with and aware of the

terminology used by illegal drug traffickers concerning narcotics and narcotics dealing.

13.     I have interviewed more than fifteen drug dealers, users, and confidential informants and have discussed with them the lifestyle, appearances, and habits of drug dealers and users. I have become familiar with the manner in which illegal drug traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar with the manner in which narcotic traffickers use telephones, cellular telephone technology, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

14.     I have participated in approximately ten Organized Crime Drug Enforcement Task Force (OCDETF) investigations. OCDETF is a task force comprised of law enforcement agencies that jointly investigate drug trafficking organizations. Through these investigations, I have gained expertise in the use of a variety of law enforcement techniques, including the application and use of electronic and wire interceptions, confidential informants, physical surveillance techniques including pole cameras and recorders and various other types of electronic surveillance techniques such as body wires and transmitters. Additionally, I have gained knowledge and expertise in the use of telephone toll analysis and the analysis of traditional types of records, including financial, telephone, utility records, and nontraditional records including records maintained by narcotic traffickers listing amounts of drugs delivered and amounts of money owed (pay and owe sheets). I have also gained knowledge and expertise in the collection and identification of drug evidence, and the analysis and interpretation of recorded conversations collected by the methods detailed above.

15.     I have also had discussions with other law enforcement officers and confidential informants about the packaging and preparation of narcotics, the methods of operation, and security measures that are often employed by narcotics traffickers. I have examined documentation of various methods in which methamphetamine and other illicit drugs are smuggled, transported and distributed.

## STATEMENT OF PROBABLE CAUSE

**I.     Overview of Investigation Relevant to the Target Subjects**

16.     Since late October 2017, the DEA has been investigating organized criminal networks distributing illegal drugs in the Tenderloin neighborhood of San Francisco, California ("the Tenderloin").  In about June 2018, the DEA began coordinating investigative efforts with the San Francisco Police Department (SFPD) and Richmond Police Department (RPD), which were conducting parallel investigations.

17.     The investigation, described in more detail below, shows that one of the criminal networks supplying drugs to and in the Tenderloin is a drug trafficking organization (DTO) headed by Andy REANOS-MORENO (the "REANOS-MORENO DTO"), which since at least October 2018 has distributed drugs, including cocaine, heroin, and methamphetamine, in the Tenderloin.  The Target Subjects discussed in this Affidavit are associated with the REANOS-MORENO DTO.

18.     As I explain in more detail below, I believe that the REANOS-MORENO DTO employs more than two dozen street-level dealers.  These street-level dealers live in houses and apartments in the East Bay that REANOS-MORENO and his girlfriend, Karol ERAZO Reanos, sublease to them.  Up to five street-level dealers live in each residence, sometimes with their partners and children.  I will refer to these residences as the DTO's "redistributor houses."

19.     The street-level dealers pay rent to REANOS-MORENO to live in the redistributor houses.  They also sell drugs provided to them by REANOS-MORENO.  Selling drugs for the REANOS-MORENO DTO is a requirement for being allowed to live in one of the redistributor houses.

20.     Based on the tone and context of the intercepted calls between the residents of the redistributor houses and REANOS-MORENO, I believe that the residents of the redistributor houses can be described as independent contractors who negotiate the terms of their engagement with the DTO, including housing conditions.  As I describe further below, following the execution of a search warrant at one redistributor house, the house's residents contacted a second

**In Re App. for Crim. Complaint**               7

DTO that sells drugs in the Tenderloin to offer their services and to negotiate the price of the drugs and housing that they would receive.

21.     Based on physical and electronic surveillance, which I describe below, I believe that, almost every day since at least fall 2018, REANOS-MORENO or one of his runners, including, Manuel ARTEAGA, traveled to each of the DTO's redistributor houses and supplied the street-level dealers living there with distribution quantities of drugs, including methamphetamine, heroin, and cocaine. REANOS-MORENO and ARTEAGA typically deliver only enough drugs for the street-level dealers to resell over the next day or two, which I believe is a tactic designed to minimize legal exposure if the dealers are arrested.

22.     I and other agents have seen the street-level dealers, including FUNEZ, MARTINEZ, CESAR, RODRIGUEZ-VALLE, CRUZ, GARCIA, and PERDOMO, travel to the Tenderloin to sell the drugs after they are resupplied. Oftentimes, based on surveillance, I believe the dealers carpool across the Bay Bridge together.

23.     I and other agents have seen that the street-level dealers generally conduct their drug sales in a specific part of the Tenderloin. Specifically, the dealers regularly stand along the sidewalks in or near the area bounded by Larkin Street to the west, Leavenworth Street to the east, O'Farrell Street to the north, and Market Street to the south.

24.     Based on my surveillance, and that of other officers and agents involved in this investigation, the dealers typically keep the drugs they intend to sell in a single backpack from which each of them is resupplied as necessary. In many instances, I and other agents have seen that the street-level dealers employ other individuals, who are in the Tenderloin, to hold the drugs until they are ready to be sold. I believe that this also is a tactic designed to minimize legal exposure for the street-level dealers.

25.     Based on surveillance, I believe that the street-level dealers' customers approach them on foot and in cars. Based on my research of the registration information for some of the customers in cars, I believe that some of these customers traveled from outside the Tenderloin to obtain drugs.

26.     Law enforcement has seen the street-level dealers carpool back to Oakland together when they are finished selling drugs in the Tenderloin.

## II.     Initiation of investigation

### A.     The DEA's investigation began in fall 2017, when confidential sources and an undercover officer made controlled purchases of heroin from Individual 2.

27.     In late October 2017, a DEA confidential source (CS-1[1]) told DEA Special Agents (SAs) that an individual whom I will call "Individual 1" could sell heroin to CS-1.[2]  CS-1 also noted that Individual 1 had told a second confidential source (CS-2[3]) that Individual 1's supplier for black-tar heroin was "Raphael," whom agents later identified, and whom I will call "Individual 2."  According to CS-1, Individual 1 quoted CS-2 a price of $300 to $350 for a quarter-ounce of heroin.  CS-1 said he/she believed that Individual 2 sold drugs near Turk and Larkin Streets in San Francisco.  I know that this intersection is in the Tenderloin near the Phillip Burton Federal Building.

28.     Based in part on this information, the DEA began investigating Individual 2 and

---

[1] CS-1 has a misdemeanor criminal conviction for breach of peace.  CS-1 is working with law enforcement in exchange for potential leniency at sentencing in a pending drug case.  To the best of my knowledge and belief, CS-1 is reliable, and information from CS-1 has led to at least three successful prosecutions.  For each controlled purchase that I describe in this Affidavit, agents searched CS-1 as well as his/her vehicle prior to the transaction to ensure that the CS did not possess any other drugs, weapons, money, or contraband.  Agents provided CS-1 with cash.  Agents also equipped CS-1 with a monitoring device, which created a recording and allowed agents to listen to the transaction and ensure the safety of CS-1.  After each purchase was complete, CS-1 relinquished the purchased narcotics, after which agents searched the CS for contraband.

[2] The confidential sources, such as CS-1, are not identified in this Affidavit because their personal safety would be at risk if their identities were prematurely revealed to the Target Subjects and other persons under investigation or associated with them, and these confidential sources are still actively assisting in the investigation.  In addition, certain individuals discussed in this Affidavit are only identified by the word "individual" followed by a number.  These are persons who may be the subjects of further investigations and enforcement action and premature disclosure of these individuals' true names would compromise the effectiveness and security of those law enforcement actions.

[3] CS-2 is a Confidential Source handled by the U.S. Secret Service (USSS).  CS-2 has sustained convictions for misdemeanor solicitation for prostitution and misdemeanor possession of drugs not to be introduced into interstate commerce.  CS-2 is working with law enforcement in exchange for potential leniency at sentencing in a pending drug case.  The USSS considers CS-2 to be knowledgeable, capable of working, and truthful in the information provided to investigators.

his sources of supply.  Between November 2017 and June 2018, CS-1, CS-2, and a law enforcement undercover agent (UC), acting at the direction of DEA agents, purchased heroin from Individual 2 on six occasions.

III.   **Identification of the REANOS-MORENO DTO, its methods of operation, and its use of redistributor houses.**

A.   **In fall 2018, the DEA obtained a wiretap order for Individual 2's phone and conducted additional controlled purchases.**

29.   In October 2018, the DEA (assisted by the U.S. Attorney's Office) obtained a federal court order authorizing the DEA to intercept wire and electronic communications over Individual 2's phone.  Certain relevant communications that were intercepted by DEA pursuant to this order are described below.[4]  During the interception period, agents made additional controlled purchases of drugs from Individual 2.

30.   In connection with one controlled purchase, Individual 2 told the UC about code words that Individual 2 uses to discuss drugs over the phone.  Specifically, on November 15, 2018, the UC purchased approximately four ounces of heroin and two ounces of cocaine from Individual 2 and Individual 2's sibling.  During the transaction, the UC was in a car with Individual 2 and asked what word Individual 2 used to discuss heroin over the phone, explaining that he/she did not like to use the word "heroin" on the phone.  Individual 2 said he used the word "night."  The UC then asked what word to use to order cocaine; Individual 2 said, "the day."  The UC asked if that referred to "powder or hard," which the UC informs me is common street slang to distinguish between cocaine powder and cocaine base (crack).  Individual 2 said it referred to powder cocaine.  The UC then asked what word to use if the UC was ordering

---

[4] The transcriptions and translations of conversations and quotations of language from intercepted calls set forth in this Affidavit are based on agents' current understanding of the conversations and may be amended in the future after further review and/or based on additional information.  In some cases, portions of the conversations are inaudible, slurred, faded out, or mumbled.  Unless otherwise noted, the statements from intercepted calls set forth in this Affidavit are recounted in substance and in relevant part.  Unless otherwise indicated, the intercepted conversations described in this Affidavit (other than intercepted calls with the UC) were in Spanish, and the excerpted language in this Affidavit is the preliminary English translation.  I do not speak Spanish, and I have relied on persons who are fluent in Spanish to produce the preliminary transcriptions and translations of these calls.

rock/crack cocaine; Individual 2 said there was no set term, but he referred to it as "dias" (Spanish for "days") and "dowse."

31.     Based on my training and experience, I know that "day" and "night" are code words that other drug traffickers commonly use to refer to cocaine and heroin, respectively.  I believe that these code words are based on the drugs' appearance, because heroin can be black or brown in color, and cocaine powder is white and powdery.

32.     Shortly thereafter, Individual 2 told a third party to "bring them to [him/her]."  I believe Individual 2 was telling his sibling ("Individual 3") to bring the UC the drugs he/she had ordered, because shortly thereafter Individual 3 got into the UC's car and handed him/her a clear plastic bag containing what was later determined to be approximately four ounces of heroin.

33.     The UC then asked Individual 2 if he had any "powder," and Individual 2 said it depended on how much the UC wanted to get.  The UC asked for two ounces, at which point Individuals 2 and 3 began speaking in Spanish and used the word "perico," which is Spanish for "parakeet."  Based on my training and experience, knowledge of this investigation (including listening to other intercepted calls), and discussions with other experienced law enforcement investigators, I believe that when Individuals 2 and 3 used the word "perico," they were discussing powder cocaine.  I have frequently heard the word "perico" used in connection with discussions of drugs on calls intercepted during this investigation.  The UC also informs me that s/he has heard "perico" used as a code word for powder cocaine.

34.     Later that day, Individual 3 gave the UC a clear plastic bag containing what was later determined to be about two ounces of cocaine.[5]

**B.     Agents identified REANOS-MORENO**

35.     During the interception period, in October and November 2018, agents repeatedly saw Individual 2 engage in suspected drug transactions with a then-unknown individual inside a

---

[5] A grand jury in the Northern District of California has returned a sealed Indictment against Individual 2 and Individual 3, whom I describe below, charging violations of 21 U.S.C. §§ 846 and 841.  The defendants charged in this sealed indictment have not yet been arrested.

In Re App. for Crim. Complaint                    11

Chevrolet Malibu.  Based on my knowledge of this investigation, including court-authorized interceptions of phone calls and text messages and surveillance described below, I believe that this individual was Andy REANOS-MORENO.

36.     For example, on October 23, 2018, the DEA intercepted a call to Individual 2 from a male using a phone number ending in 6753 (the "6753 Phone")[6], who I believe was REANOS-MORENO.[7] A portion of that conversation follows:

| | |
|---|---|
| Individual 2: | Can you bring me something right now, please? |
| REANOS-MORENO: | Yeah, give me about ten minutes, for me to get out of the house, I'll head out towards you from here. |
| Individual 2: | All right, then. |

37.     Based on my training and experience and knowledge of this investigation, including surveillance and additional intercepted calls described below, I believe that when Individual 2 asked REANOS-MORENO to bring him "something," Individual 2 meant drugs. Following this conversation, agents set up surveillance around Individual 2's home.

38.     About an hour later, the DEA intercepted another call between REANOS-MORENO and Individual 2.  A portion of that conversation follows:

| | |
|---|---|
| REANOS-MORENO: | I'm he-I'm here [(U/I)][8] |
| Individual 2: | Give me one of night and … two of day. |
| REANOS-MORENO: | One night one and two day ones? |
| Individual 2: | Yeah, right now, I'll be there right now, in a minute. |
| REANOS-MORENO: | All right, then. |

---

[6] In this Affidavit, telephone numbers are only identified by the last four digits.

[7] The DEA later obtained a federal court order authorizing the interception of communications over this phone.  Through surveillance connected to the intercepted calls (described below), agents later identified REANOS-MORENO as the user of this telephone. Then, through a voice comparison, agents and monitors determined that the same individual was speaking with Individual 2 on these calls.

[8] Unintelligible portions of intercepted phone calls will be referenced in this Affidavit with the designation "U/I."

39.     I believe based on my training and experience, as well as the discussion between the UC and Individual 2 on November 15, 2018 (*see* ¶¶ 30-31), that Individual 2 was asking REANOS-MORENO for one ounce of heroin and two ounces of cocaine.  I know, based on my training and experience, knowledge of this case, and discussions with other experienced law enforcement investigators that drug traffickers often do not use units of measurement, but rather will just use a number like "two" or "half".  This is because most drug dealers and their suppliers have a general understanding whether the individual purchases ounces, pounds, or kilogram quantities.  As a result, the person does not need to say the unit of measurement, rather they simply state how many of the unit of measure they want.  Because Individual 2 previously sold ounces of drugs to the UC, I believe that the quantities discussed here are also references to ounces of drugs.  Shortly after this call, agents saw Individual 2 walk out of his home and meet with an unknown individual inside a silver Chevrolet Malibu (the "Malibu") that was parked on Birch Street south of 102nd Avenue in Oakland.  I later learned that the Malibu was registered to REANOS-MORENO's girlfriend, Karol ERAZO Reanos.

40.     Approximately 30 seconds later, agents saw Individual 2 get out of the Malibu and go inside a nearby home.  A few minutes after that, agents saw the Malibu drive away.[9]  I believe, based on my training and experience and the totality of the circumstances, that Individual 2 and REANOS-MORENO were meeting inside the Malibu so that REANOS-MORENO could give Individual 2 the ounce of heroin and two ounces of cocaine that they had discussed over the phone.  I know that narcotics traffickers will often conduct drug transactions or money transfers inside cars to provide for privacy and secrecy.  This is so that anyone who may be watching will not be able to see the exchange of money and/or drugs.  In addition, a car's mobility allows its occupants to move if someone approaches the car during the transaction or if the occupants believe someone might be watching.

---

[9] Approximately one hour after this meeting, cellphone location data for Individual 2's phone showed that his phone had traveled to the Tenderloin, where I believe Individual 2 distributes drugs.

**In Re App. for Crim. Complaint**          13

41.     On November 3, 2018, the DEA intercepted another call between REANOS-MORENO and Individual 2. A portion of that conversation follows:

| | |
|---|---|
| Individual 2: | What do you have, [U/I]? Some everything or not? |
| REANOS-MORENO: | Mmmm, I have some day. |
| Individual 2: | Of everything? |
| REANOS-MORENO: | And Chiva. I don't have window. |
| Individual 2: | Uh, come over, then. Bring me some of, of day one. |

42.     I believe that when Individual 2 asked whether REANOS-MORENO had "[s]ome everything," he was asking whether REANOS-MORENO had all the types of drugs that he sold. When REANOS-MORENO said he had "some day," I believe he meant cocaine. *See* ¶¶ 30-31. When Individual 2 repeated his question about whether REANOS-MORENO had some "of everything" and REANOS-MORENO added that he had "chiva" but not "window," I believe REANOS-MORENO meant that he had heroin but not methamphetamine. I know from my training and experience, and conversations with other law enforcement agents that "windows" is a common code term for methamphetamine due to the clear, glass-like appearance of a form of methamphetamine (crystal) that is commonly sold; and "chiva" is a common code term for heroin. As a result of this conversation, agents set up surveillance near Individual 2's home.

43.     About half an hour later, the DEA intercepted another call between REANOS-MORENO and Individual 2. A portion of that conversation follows:

| | |
|---|---|
| REANOS-MORENO: | I'm arriving. |
| Individual 2: | Uh, [U/I], uh, over there then. |
| REANOS-MORENO: | What did you need, man? |
| Individual 2: | I need the night, half of the [U/I] and I don't know how much of the day, but I'm going to gather the money right now. |
| REANOS-MORENO: | Yeah, dog, because I'm going to move from here because I have-I saw a fucking cop in front of me. |

| Individual 2: | Yeah, man. |
| REANOS-MORENO: | I'm going to, I'm still going to see you on, here on Birch, but like if you are going up. |

44.     I believe that Individual 2 was asking REANOS-MORENO for heroin ("night") and cocaine ("day"). I also believe that Individual 2 was asking for half an ounce of an unknown drug; agents and monitors were unable to make out what half-unit of drug Individual 2 requested based on the quality of the telephone interception. I believe that REANOS-MORENO likely also said that he had detected law enforcement (a "cop"), possibly a police car in front of his own car, and so was moving away from where he was parked.

45.     About ten minutes later, REANOS-MORENO called Individual 2 and instructed Individual 2 to meet at the corner of 101st Avenue and Birch Street in Oakland.

46.     Shortly thereafter, agents saw Individual 2 walk out of his home and down Birch Street towards 101st Avenue and the parked Malibu. Agents saw Individual 2 get into the Malibu and meet with a then unknown male. Based on the surveillance and intercepted calls described later in this Affidavit, I believe that the driver of the Malibu was REANOS-MORENO.[10] A few minutes later, agents saw Individual 2 get out of the Malibu and walk to a nearby residence. Around this same time, agents watched the Malibu drive away. I believe, based on the totality of the circumstances, that REANOS-MORENO and Individual 2 met in the Malibu so that REANOS-MORENO could give drugs to Individual 2.

**C.     Calls intercepted over REANOS-MORENO's phone suggested that he was delivering drugs to multiple individuals living together at several residences in Oakland, including to PERDOMO.**

47.     A confidential source, CS-3,[11] provided information to law enforcement about

---

[10] Cellphone location data for the 6753 Phone showed that it was near the corner of 101st Avenue and Birch Street at this time.

[11] CS-3 is an informant for the San Francisco Police Department who is cooperating in hopes of possible judicial consideration and also for compensation. CS-3 has a criminal history. SFPD informs me that the information that CS-3 has provided has been truthful and reliable, having led to at least five arrests, seizures of large quantities of drugs and money, and at least one successful prosecution.

REANOS-MORENO, including identifying him as the user of the 6753 Phone and describing his Malibu. I and other agents then reviewed telephone toll records to identify whom Individual 2 contacted before and after receiving some of the UC's drugs. We found that Individual 2 had been in contact with the 6753 Phone.

48.    Based on this and other information, in January 2019, the DEA (assisted by the U.S. Attorney's Office) obtained a federal court order authorizing DEA's interceptions of wire and electronic communications over REANOS-MORENO's 6753 Phone. Intercepted calls and related physical and electronic surveillance suggested that he was dealing drugs to multiple individuals who lived together at multiple homes in Oakland.

49.    For example, on January 20, 2019, REANOS-MORENO spoke with a male whose phone number ended in -7127, whom REANOS-MORENO addressed as "Cachete," and who I believe was Josue Natanael PERDOMO Moreno.[12] REANOS-MORENO told

---

[12] I believe that PERDOMO was using the -7127 number because a search through a financial investigative database revealed several financial transactions in 2018 completed in the name of "Josue Natanael Moreno" (three of PERDOMO's four names) that listed the -7127 number in the contact information. T-Mobile records showed that as of January 2019 the -7127 number was subscribed to "Andy M Reanos Moreno" (i.e., REANOS-MORENO). I believe that REANOS-MORENO is PERDOMO's cousin, both based on the common surname and on a call from June 2019 on which REANOS-MORENO inquired about his "cousin," "Jose Perdomo or Moreno." T-Mobile records showed that the subscriber address for the phone ending in 7127 was 1438 44th Ave, Apt 4, Oakland, CA 94601, and the address given in connection with the aforementioned financial transactions was also 1438 44th Avenue in Oakland. I therefore believe that REANOS-MORENO allowed his cousin PERDOMO to use a phone subscribed to his account.

Additionally, on this January 20, 2019 call REANOS-MORENO addressed the user of the -7127 number as "Cachete." I know that PERDOMO was arrested by SFPD on January 25, 2019. On a call that same day, when an unidentified male using a phone number ending in -2982 (UM-2982) told REANOS-MORENO that a "narco" (which I believe was a reference to law enforcement) had gotten "Josue" REANOS-MORENO asked if UM-2982 meant "Cachete," which I believe is further evidence that the user of the -7127 number is PERDOMO, whose first name is Josue. The next day, on January 26, 2019, FUNEZ called REANOS Moreno, and the two discussed REANOS-MORENO's cousin's "case," which I believe was a reference to PERDOMO's pending criminal case. Additionally, on February 10, 2019, Andy told an unidentified male (UM-5595) to take something to "103 at Cachete's"; I believe this was a reference to one of REANOS-MORENO's redistributor houses, discussed in greater detail in this Affidavit, located at 103rd Avenue in Oakland, where PERDOMO was arrested in June 2019. Finally, when agents and officers executed a search warrant at the redistributor house on 103rd Avenue, they found a money-transfer receipt listing the sender as "Josue Natanael Moreno" and listing the -7127 as the phone number associated with the transaction.

PERDOMO to give REANOS-MORENO's new phone number to "everyone there" and to ask the others if they were going to need "work" so that REANOS-MORENO could stop by. PERDOMO could be heard asking someone in the background if he needed "work." PERDOMO then told REANOS-MORENO that "the dude" had said no. PERDOMO said that he would go ask "the other dudes." REANOS-MORENO told PERDOMO to ask the "other ones in the room," and PERDOMO told REANOS-MORENO to wait. When PERDOMO returned to the phone, he told REANOS-MORENO that the other guys had said yes. REANOS-MORENO asked if that was "both of them," and PERDOMO said yes. REANOS-MORENO said he would be by shortly.

50.     I know, based on my experience conducting narcotics trafficking investigations, from prior wiretap interceptions, and from conversations with the UC that "work" is a common word used by narcotics traffickers to mean "drugs". This is because to anyone listening to the conversation, it will simply sound as if the person is looking for legitimate work, and not illegal narcotics (and selling drugs is their "work"). I believe based on the context of this call and my knowledge of this investigation that REANOS-MORENO and PERDOMO were discussing REANOS-MORENO coming to re-supply street-level dealers with distribution quantities of drugs.

51.     Later that day, REANOS-MORENO spoke with an unidentified male with a phone number ending in 4909 (UM-4909).[13] REANOS-MORENO asked UM-4909 to "ask them if they are going to need material." REANOS-MORENO then repeated the request to "ask everyone." UM-4909 said that the "other dude" was going to need some right now. UM-4909 said that he was going to "work" right then, but that he could meet REANOS-MORENO in the evening in Daly City. REANOS-MORENO again asked whether anyone with UM-4909 needed "some." UM-4909 said not now, but that he was not sure about the "skinny girl." REANOS-

---

[13] I refer to persons whose true names are not yet known but who were participants in significant intercepted communications in this Affidavit by the letters "UM" (unidentified male) or "UF" (unidentified female) followed by the last four digits of the telephone number used by this individual.

MORENO said he did not think "she" was going to need some, because she would call REANOS-MORENO. UM-4909 then said that what he needed was "perico," but that right now he had some bags. As noted above, I know that "perico" is a common code term for cocaine. *See* ¶ 33. I also believe that REANOS-MORENO was using another common practice that I have seen in other drug investigations: using vague terms ("material") to discuss drugs. From my investigative experience, I have seen that drug traffickers who have a relationship with one another can use vague terms or improvised code words (like out-of-place nouns) to refer to drugs. Individuals who have a relationship with one another do not need to clarify what these vague terms or out-of-place nouns mean because there is an understanding between the two individuals about the coded terminology.

**D.    In January 2019, agents watched REANOS-MORENO make suspected drug deliveries and then seized drugs from one of the street-level dealers working for him.**

52.    Intercepted calls, physical surveillance, and cellphone location data for REANOS-MORENO's 6753 Phone showed that, since at least January 2019, REANOS-MORENO spent most days—often eight or more hours per day—traveling from residence to residence in Oakland and providing distribution quantities of drugs to suspected street-level dealers.

53.    The following is a sequence of intercepted calls and surveillance observations from January 24, 2019, which I believe is illustrative of how REANOS-MORENO has spent his days distributing drugs to individuals who then redistribute these drugs in the Tenderloin neighborhood of San Francisco, among other areas:

54.    On January 24, 2019, at about 10:18 am, an unidentified female who goes by the name "Katterin," called REANOS-MORENO. Their conversation follows:

| | |
|---|---|
| KATTERIN | [Background: noise] What is up?  Why are you not answering the phone? |
| REANOS-MORENO | No man, is just that I was asleep. |
| KATTERIN | Oh man!  You are not working yet? |
| REANOS-MORENO | Not yet, barely now. [Background: traffic noise] |

| KATTERIN | I do not believe you.  Why not? |
| REANOS-MORENO | Oh, is because I fell asleep.  No, but I will be right there.  I am just waiting on the day kind to arrive because it has not arrived yet. |
| KATTERIN | I believe you then. |
| REANOS-MORENO | Yes, that is why I have not moved around.  I was asleep...you understand? But, it should be arriving soon.  They told me they were about to arrive, and I am here waiting for them right now. [Background: noise] |
| KATTERIN | Oh yes, is just because my young guy also wanted to buy some of the black kind. |
| REANOS-MORENO | Yes, yes, I do have some of the night one, but just wait until I get the day kind, to...to be able to go and take care of [U/I]...[Background: car door chimes] [Voices overlap] |
| KATTERIN | Alright then. |
| REANOS-MORENO | [U/I]. |
| KATTERIN | Alright.  This is my number. |
| REANOS-MORENO | [Background: traffic noise] Alright then. |
| KATTERIN | Alright. |
| REANOS-MORENO | Alright. |

55.    I believe that when REANOS-MORENO and Katterin referred to the "day" kind and the "black" kind, they were referring to cocaine and heroin, respectively.  *See* ¶¶ 30-31.  Additionally, I know that "black" is a common code term for heroin due to its dark color.  I also believe that, when REANOS-MORENO said he was "waiting on the day kind to arrive," he meant that he was waiting on a re-supply of cocaine.  Based on the background noises, I believe REANOS-MORENO was driving, likely to deliver drugs.

56.     I also believe that this call (among others described below) shows that REANOS-MORENO delivers drugs to multiple individuals who live together, Katterin mentioned that she and the "young guy also wanted to buy."

57.     Based on this call with Katterin, agents set up surveillance at REANOS-MORENO's suspected residence on 91st Avenue in Oakland (the "91st Avenue House").[14] Agents arrived at about 11:15 am and saw the Malibu parked about two blocks from the 91st Avenue House.

58.     At about 11:50 am, Special Agent (SA) Vincent Rafe saw a white Ford Mustang pull into the driveway of the 91st Avenue House.

59.     SA Sean Manning later reviewed location data for REANOS-MORENO's 6759 phone, which showed that at about 10:20 am the phone had left the 91st Avenue House and gone to the area of the Oakland Coliseum DMV office.  Location data showed that the 6759 Phone returned to the 91st Avenue House at around the same time that SA Rafe saw the white Ford Mustang arrive there.

60.     At about 12:04 pm, REANOS-MORENO called an unidentified male whom he called "Aguacate."  Their conversation follows:

| | |
|---|---|
| REANOS-MORENO | How many will you need? |
| AGUACATE | Where are you? |
| REANOS-MORENO | I am here and just received that. |
| AGUACATE | I will call back and say what they need. |
| REANOS-MORENO | Call me back. |

61.     I believe that when REANOS-MORENO said he had "just received that," he was saying that he had just been re-supplied with the cocaine he had been waiting for.  I also believe based on my knowledge of this investigation—including intercepted calls, surveillance, and search warrants described below—that when Aguacate said he would "call back and say what

---

[14] Based on information obtained from PG&E, I know that REANOS-MORENO rents a home on 91st Avenue in Oakland.

they need," he meant that he would ask others living in the same residence what quantities of drugs they intended to purchase from REANOS-MORENO.

62.     A few minutes later, SA Andrew Decker saw three people walk out of the 91st Avenue House: an unidentified male, a female (who I believe may have been ERAZO, but whom agents could not see clearly enough to identify), and REANOS-MORENO.

63.     At about 12:20 pm, SA Decker watched as REANOS-MORENO and the female went to the Malibu.  REANOS-MORENO retrieved a brown paper bag from the rear passenger compartment of the Malibu.  REANOS-MORENO then spoke to the female.  The female walked away, and REANOS-MORENO began to walk with the brown paper bag while holding a phone to his ear.[15]

64.     At about 12:25 pm, SA Decker saw REANOS-MORENO go back inside the 91st Avenue House.

65.     At about 12:40 pm, Aguacate called REANOS-MORENO's phone, and a woman answered.  Based on a voice comparison done by monitors and confirmed by SFPD Officer Brenton Reeder to calls intercepted later in this investigation, I believe that this woman was REANOS-MORENO's girlfriend, Karol ERAZO Reanos.  Their conversation follows:

| ERAZO | Hello? |
|---|---|
| AGUACATE | Hello? |
| ERAZO | Yes. |
| AGUACATE | Um…can you bring come to the house, please? |
| ERAZO | Uh, I will let the guy know right now. |
| AGUACATE | Uh-huh, sounds good. |
| ERAZO | Alright. |
| AGUACATE | Okay. Tell him El Aguacate [PH]. |
| ERAZO | Yes I will let him know right now. |

---

[15] I believe that REANOS-MORENO has used multiple phones at once.  I know that PG&E records show that he has a phone number ending in 6256.

In Re App. for Crim. Complaint            21

| AGUACATE | Uh-huh.  Alright, alright. |
| ERAZO | Alright. |

66.     I believe based on intercepted calls and surveillance described below that when Aguacate said to drop by the house, he meant that he and others at a house on 14th Street in Oakland were ready to purchase drugs.  I also believe that, when ERAZO told Aguacate that she would let "the guy" know, she meant that she would tell REANOS-MORENO.

67.     At about 3:34 pm, SA Decker saw REANOS-MORENO leave the 91st Avenue House wearing a black backpack and get into the Malibu.  Agents followed REANOS-MORENO as he drove to Sunnyside Street near 103rd Avenue in Oakland, where he parked. REANOS-MORENO then got out of the driver's seat and into the right rear passenger seat of the Malibu.

68.     At about 3:45 pm, SA Decker saw REANOS-MORENO get out of the right rear seat of the Malibu wearing the backpack and walk to the Sunnyside Street side of a residence on 103rd Avenue in Oakland ("the 103rd Avenue House").

69.     At about 3:48 pm, SA Decker saw REANOS-MORENO leave the 103rd Avenue House while counting money.  Based on my training and experience and the intercepted calls, I believe that REANOS-MORENO was counting money he had been paid in exchange for drugs.

70.     REANOS-MORENO then got back into the Malibu, and the agents continued to follow REANOS-MORENO as he drove.

71.     At about 4:11 pm, REANOS-MORENO called an unidentified male using a phone number ending in 6424 (UM-6424).  Their conversation follows:

| UM-6424 | Hey. |
| REANOS-MORENO | Hey. |
| UM-6424 | So what then? [Background: voices] |
| REANOS-MORENO | Hey. |
| UM-6424 | Dude, Rolling is taking a shower. |
| REANOS-MORENO | Oh!  Tell him, tell him, tell him, tell him that I have the day |

|                    | kind now.  [Sniffles] |
|--------------------|-----------------------|
| UM-6424            | Yes, I will let him know right now when he comes. |
| REANOS-MORENO      | Alright then. |

72.     I believe that when REANOS-MORENO said he now had the "day kind," he meant that he had recently been re-supplied with cocaine.

73.     At about 4:18 pm, an unidentified male using a phone number ending in 4909 (UM-4909) called REANOS-MORENO.  An excerpt of their conversation follows:

| UM-4909            | What is up? |
|--------------------|-----------------------|
| REANOS-MORENO      | Tell those guys there that I have the day and the powder kind now. |
| UM-4909            | Okay, [U/I]. I will let them know right now because…it believe that these dudes wanted four (4) eights (1/8). |
| REANOS-MORENO      | Alright then.  Let them know. |
| UM-4909            | Alright. I will let them know right now. |

74.     I believe that when REANOS-MORENO said he now had the "day kind" and "powder," he meant cocaine base (crack) and powder cocaine, respectively.  As noted above, Individual 2 told the UC that the "day" referred to cocaine but that there was no particular code word to refer to specify cocaine base. *See* ¶ 30.  I believe that, here, REANOS-MORENO distinguished between powder and crack cocaine by calling powder cocaine "powder" and using "day" to refer to crack cocaine.

75.     At around the same time, SA Decker saw REANOS-MORENO arrive at an apartment building on 17th Street in Oakland where he parked the Malibu in the driveway. REANOS-MORENO got out of the Malibu wearing a black backpack and then went into the apartment building.

76.     At about 4:25 pm, SA Decker saw REANOS-MORENO leave the apartment building on 17th Street and drive away in the Malibu.

77.     At about 4:30 pm, REANOS-MORENO called Aguacate.  A portion of their

conversation follows:

| | |
|---|---|
| REANOS-MORENO | Um...what was I going to ask you? Is Peludo [PH][16] going to want any? |
| AGUACATE | I do not think so. I do not see that dude here. |
| REANOS-MORENO | Oh. Why don't you call him and ask him if he is going to need something? Because... |
| AGUACATE | Is just, is just that in the morning...I do not think so because that dude is not here. I have not seen him. |

78.    I believe that when REANOS-MORENO asked if "Peludo" wanted "some," and when Aguacate said that Peludo was "not here," he was referring to another individual living in the same location as Aguacate.

79.    At about 4:40 pm, SA Decker saw REANOS-MORENO park the Malibu on Castro Street, near 14th Street in Oakland. REANOS-MORENO, wearing the black backpack, then went inside an apartment building on 14th Street.

80.    At about 4:42 pm, REANOS-MORENO called Aguacate and directed him to open the door. Aguacate said he was coming.

81.    At about 4:47 pm, SA Decker saw REANOS-MORENO, still wearing the backpack, come out of the apartment building on 14th Street and walk back to the Malibu. I believe, based on the context of the calls, that REANOS-MORENO delivered drugs to Aguacate and possibly others in a residence on 14th Street.

82.    About ten minutes later, Aguacate called REANOS-MORENO and asked if REANOS-MORENO had already left, because Aguacate had forgotten to get another one "for the nose." I believe that this was a reference to one unit of powder cocaine, which often is inhaled. REANOS-MORENO said that he had already left but that he would meet with Aguacate when things slowed down. I believe that REANOS-MORENO meant that he was busy

---

[16] Portions of intercepted phone calls where the phonetic translation of a word is used will be referenced in this Affidavit with the designation "PH."

with his drug distributions and would return to see Aguacate after completing his day's deliveries.

83.     At about 5:40 pm, the DEA intercepted calls between REANOS-MORENO and an individual later identified as Alex Gomez BARRIENTOS. *See* ¶ 89.  A portion of the first intercepted conversation follows:

| | |
|---|---|
| REANOS-MORENO | I'm here by seventy-nine. |
| BARRIENTOS | Okay, you know where, behind there, same place… |
| REANOS-MORENO | All right. |
| BARRIENTOS | …on eighty-two and Holly. |

84.     At about 5:47 pm, a male using a phone number ending in 1725 called REANOS-MORENO.  I believe that the person using this phone was Jose Franklin Rodriguez GARCIA.[17] Their conversation follows:

| | |
|---|---|
| GARCIA | How are you doing there? |
| REANOS-MORENO | No, man I am doing well. I am here, I am here working. |
| | [Background: noise] |
| GARCIA | That is good, that is good. |
| REANOS-MORENO | Yeah. |
| | [Voices overlap] |
| GARCIA | And do, do you have… |

---

[17] I believe that GARCIA was using the -1725 phone at the time of this call for several reasons.  First, T-Mobile records show that this phone number was subscribed to a "Jose Garcia." Second, a search through a financial databased revealed a payment on December 17, 2018 to an individual in Houston, Texas.  The name of the sender is listed as "Jose Franklin Rodriguez Garcia" (GARCIA's full name) and the -1725 number is listed as the sender's contact phone number.  Third, as described below, in June 2019 agents executed a search warrant at the 91st Avenue House, where calls with the -1725 number, as well as location data for the phone, suggested that GARCIA was living.  Agents found and arrested GARCIA inside.  Fourth, during the search of the 91st Avenue House, in the same room where GARCIA's passport was found, agents found a box for a Samsung Galaxy J2 Metro phone with a phone number ending in -8341 written on it.  A search of the same financial transaction database revealed a financial transaction associated with the -8341 number under the name "Jose Franklin Rodriguez Garcia."  This payment was to the same individual in Houston, Texas as the December 2018 payment that listed the -1725 number.

| | |
|---|---|
| REANOS-MORENO | [U/I]. |
| GARCIA | …product? |
| REANOS-MORENO | Yes of everything. |
| GARCIA | Then as of today you are going to start giving it to me for one hundred and five (105), right? |
| REANOS-MORENO | Yes. |
| GARCIA | Huh? |
| REANOS-MORENO | Yes. |
| GARCIA | Come on over then. |
| REANOS-MORENO | Alright, I will come over there soon. |

85.     Also at about 5:57 pm, SA Rafe saw REANOS-MORENO park the Malibu on Holly Street between 82nd and 83rd Avenue in Oakland.  At approximately the same time, the DEA intercepted another call between REANOS-MORENO and BARRIENTOS.  A portion of that conversation follows:

| | |
|---|---|
| REANOS-MORENO | Hey, what was it that you wanted? |
| BARRIENTOS | Hey?  I wanted, uh… three of the nose one. |
| REANOS-MORENO | Three of the nose one. |
| BARRIENTOS | And five of the day one. |
| REANOS-MORENO | Five of day one, but you know the nose one is at the same price. |
| BARRIENTOS | What do you mean? |
| REANOS-MORENO | The nose one is at one-fifteen. |
| BARRIENTOS | How come? |
| REANOS-MORENO | Oh no, that one [U/I] I only lowered the day one. |
| BARRIENTOS | Nah, you're kidding me.  Okay, then.  Oh, well. |
| REANOS-MORENO | Okay, I'm here.  Come this way; I'm between eighty-two and eighty-three. |

**In Re App. for Crim. Complaint**                 26

BARRIENTOS            Okay, then.

86.     Based on my training and experience, knowledge of this investigation, and the narcotics later seized from BARRIENTOS, I believe that BARRIENTOS was ordering three units of powder cocaine and five units of crack cocaine. *See* ¶¶ 30-31, 74, 82. I also believe based on the drugs later seized from BARRIENTOS that REANOS-MORENO was quoting a price of $115 per one-eighth of an ounce of powder cocaine and cocaine base.

87.     About seven minutes later, agents saw a male, later identified by a Honduran identification card as Alex Gomez BARRIENTOS, get into the Malibu for approximately 10 minutes. BARRIENTOS then got out of the Malibu, and REANOS-MORENO drove away.

88.     After the Malibu drove away, agents approached BARRIENTOS and found in his jacket pocket three plastic baggies containing powder cocaine and five plastic baggies containing cocaine base, consistent with the order BARRIENTOS had placed in coded language with REANOS-MORENO. Later, laboratory testing determined that the plastic baggies contained a net total of 10.3 grams of powder cocaine (approximately equal to 3 one-eighth-ounce units) and 17.3 grams of cocaine base (crack) (approximately equal to 5 one-eighth-ounce units). Based on my training and experience, I know that these are distribution quantities of both drugs, which leads me to believe that BARRIENTOS is a street-level dealer supplied by REANOS-MORENO.

89.     During the interaction with BARRIENTOS, the agents took BARRIENTOS's phone temporarily and called the phone number with which REANOS-MORENO had been speaking on the calls transcribed above. BARRIENTOS's phone rang.

90.     Agents stopped surveilling REANOS-MORENO at this time, but they continued to intercept calls and to follow location data for his 6753 Phone.

At about 6:43 pm, GARCIA called REANOS-MORENO again. Their conversation follows:

REANOS-MORENO        Dude.

GARCIA               What is up dude?

| | |
|---|---|
| REANOS-MORENO | I am on my way, I am on my, I am on my way already. |
| GARCIA | [U/I]. |

[Voices overlap]

| | |
|---|---|
| REANOS-MORENO | Is just that, that I was picking that stuff, the, the, the eights (8) of this guy, the powder ones. |
| GARCIA | No, then you can talk to this dude. All the guys are here from the house. |
| REANOS-MORENO | Alright, alright then. I will be arriving soon. |
| GARCIA | Good. |
| REANOS-MORENO | On eighth (8th), up on eighth (8th) right? On eighth (8th) and eighteenth (18th)? |
| GARCIA | Yes on eighth (8th) and eighteenth (18th), from eighth (8th) and eighteenth (18th) you go a little further up, there are some apartments there. Call me and I will come to open up. |
| REANOS-MORENO | Alright then. You got it. |
| GARCIA | [Mumbles]. |
| REANOS-MORENO | I am here by twenty third (23rd) right now. |
| GARCIA | Alright. |
| REANOS-MORENO | Bye. |

91.    I believe that when REANOS-MORENO mentioned the "eight of powder," he meant an "eighth" of an ounce of powder cocaine. I know from my experience and training that an eighth of an ounce, a common distribution quantity for powder cocaine. When GARCIA said that "everyone" was there at the house, I believe he meant that several street-level dealers living in the residence were home.

92.    At about 6:46 pm, an unidentified male whose phone number ended in 1567 (UM-1567) called REANOS-MORENO, and said they wanted "food." REANOS-MORENO asked

where. UM-1567 said the place REANOS-MORENO just went. REANOS-MORENO said he
knocked, but no one opened, so he thought that they were not going to need anything. I believe
based on the totality of the circumstances, including the other suspected deliveries that
REANOS-MORENO made on this date, that when UM-1567 said he and others wanted "food,"
he was using coded language to avoid referring to drugs. When REANOS-MORENO said he
had knocked and that no one had answered, and that he had thought that UM-1567 and others
were not going to need anything, I believe he meant that he had gone to deliver drugs but that,
when no one answered, he assumed they did not need any additional drugs at that time.

93.     The DEA intercepted several more drug-related calls that evening. For example,
at about 7:36 pm, the DEA intercepted the following call between REANOS-MORENO and an
unidentified male whose phone number ended in 3592 (UM-3592). During the call, UM-3592
said he was going to "buy two of the black ones" and that another "dude" would buy "one-eight
of powder." I believe that when UM-3592 said he needed two "black ones" and that someone
else was going to buy an "eight of powder," he meant heroin and an eighth of an ounce of
powder cocaine, respectively. *See* ¶¶ 55, 74, 91.

94.     At about 8:12 pm, REANOS-MORENO called a phone number ending in 3941.
As described further in this Affidavit, because officers seized a phone with the same number
from Christian RODRIGUEZ-VALLE in April 2019 while RODRIGUEZ-VALLE was selling
drugs in the Tenderloin, I believe that RODRIGUEZ-VALLE was the other participant on this
call. Their conversation follows:

| | |
|---|---|
| REANOS-MORENO | What's up? |
| RODRIGUEZ-VALLE | Go ahead. |
| REANOS-MORENO | Well, are you home? |
| RODRIGUEZ-VALLE | Of course. |
| REANOS-MORENO | Right on, I'm be there. |
| RODRIGUEZ-VALLE | [U/I]. |
| REANOS-MORENO | Have there—have the door open. |

| | |
|---|---|
| RODRIGUEZ-VALLE | Yes, that's fine. |
| REANOS-MORENO | Okay, do I take you of everything? Or only of—. |
| RODRIGUEZ-VALLE | Only, only the night one, of both. |
| REANOS-MORENO | Do you need some, buddy? |
| RODRIGUEZ-VALLE | No, [U/I] I got a lot [U/I]. |
| REANOS-MORENO | Oh. |

[Voices overlap]

| | |
|---|---|
| RODRIGUEZ-VALLE: | I got [U/I] some because of what [U/I]. |
| REANOS-MORENO | [U/I]. |
| RODRIGUEZ-VALLE: | Yes of those, of the other twelve (12). |
| REANOS-MORENO | Okay, right on. |
| RODRIGUEZ-VALLE: | All right. |
| REANOS-MORENO | Okay. |
| RODRIGUEZ-VALLE: | [U/I]. |
| REANOS-MORENO | Hey, look. |
| RODRIGUEZ-VALLE: | Okay. |
| REANOS-MORENO | How much? |
| RODRIGUEZ-VALLE | Two (2) and two (2). |
| REANOS-MORENO | Two (2) and two (2), right on. |

95.     At about 8:51 pm, REANOS-MORENO called RODRIGUEZ-VALLE back, but an unknown woman answered. REANOS-MORENO told the woman to ask her husband what he wanted. The woman said "four of white, one of night, and one of glass," which I believe for the reasons given above meant four units of cocaine, one unit of heroin, and one unit of methamphetamine, respectively. *See* ¶¶ 30-31. I know based on my training and experience that methamphetamine is often referred to by the code word "glass" because of crystal methamphetamine's glass-like appearance.

96.     The woman then asked how much the "white" was going for, and REANOS-

MORENO said "105." The woman told REANOS-MORENO that "he" (the husband) would be waiting. REANOS-MORENO said he would be there soon.

**E.    Further investigation showed that REANOS-MORENO was subleasing redistributor houses to street-level dealers working for him.**

97.    During the period of court-authorized interception over REANOS-MORENO's 6759 Phone (as well as a second court-authorized interception period described further below), The DEA intercepted communications between REANOS-MORENO and individuals who I believe are street-level dealers who live in residences that REANOS-MORENO sublets to them. I believe these communications show that REANOS-MORENO sells distribution quantities of drugs to the street-level dealers, the street-level dealers sell those drugs, and then the street-level dealers use some portion of their drug proceeds to pay rent to REANOS-MORENO.

98.    For example, on January 20, 2019, REANOS-MORENO spoke with an unidentified male whose phone number ended in 1288 (UM-1288), in a call in which I believe there was discussion about housing and the price of drugs. An excerpt of their discussion follows:

| | |
|---|---|
| REANOS-MORENO | Look, what was I going to tell you?  Um...oh, if you need the day kind for any reason, it will be at one hundred and five (105). |
| UM-1288 | Alright, one hundred and five (105)? |
| REANOS-MORENO | One hundred and five (105). |
| UM-1288 | Dude, and do you think you can get me a studio there, dude? |
| REANOS-MORENO | Studio of... |
| UM-1288 | Yeah, for me and Katheryn, you understand?  You know that she works as well. |
| REANOS-MORENO | Uh-hum.  [U/I]... |
| [Voices overlap] | |

| | |
|---|---|
| UM-1288 | [U/I] for this month, do you understand?  If you can. |
| REANOS-MORENO | I will see, dude.  Yeah.  I will look for one [U/I]… |

99.     Later the same day, REANOS-MORENO spoke with an unidentified male whose phone number ends in 9281 (UM-9281).  An excerpt of their conversation follows:

| | |
|---|---|
| REANOS-MORENO | No, you tell me how things are going.  What do you need, what do you need? |
| UM-9281 | Mm…well I am going to call…I cannot assure you right now. |
| REANOS-MORENO | Uh-huh. |
| UM-9281 | I would have to talk to the other guys I live with to see how things are.  But do you have a house available for three (3), but not too expensive?<br>[Voices overlap] |
| REANOS-MORENO | Yes.  Well you tell me what you need, and I will see…<br>[Voices overlap] |
| UM-9281 | A studio only for three (3) people to live.  Can you get that? |
| REANOS-MORENO | A studio, a studio for, to…that is for three (3) people…but how much do you want to pay? |
| UM-9281 | No, it is not about how much we want to pay.  How much does a studio cost for…because a studio is only for two (2) people but the three (3) of us fit. |
| REANOS-MORENO | Yes, yes, yes, look there is a studio…there are studios that cost like, that are like one thousand six hundred (1,600), one thousand five hundred (1,500) around there. |
| UM-9281 | Uh-huh, but one that is not hot. |
| REANOS-MORENO | No, no, no.  A studio…[U/I]. |

100.     Based on my knowledge of this investigation, I believe that during this call

REANOS-MORNEO and UM-9281 were discussing whether REANOS-MORENO could find UM-9181 and two others a studio where they would live and work for the DTO. I know based on my training and experience that "hot" is a common code term used to refer to a location or person that has attracted law enforcement attention.

101.   On January 23, 2019, REANOS-MORENO spoke with the unidentified male user of a phone number ending in 3574 (UM-3574). UM-3574 asked whether REANOS-MORENO had any "material," and REANOS-MORENO said that he only had the "night kind," which I believe was a reference to heroin. *See* ¶¶ 30-31. The two then discussed an issue that had arisen at UM-3574's apartment, with UM-3574 saying that he wanted to be reimbursed from "the Chinese people" for damages to his furniture. REANOS-MORENO told UM-3574 that he had gotten a house that could go for $1,600 and had three bedrooms and that he was also looking for another apartment. REANOS-MORENO said the house was by 90th and that he would try to get something cheaper, like an apartment. REANOS-MORENO said the apartment (which, based on context, I believe was a reference to UM-3574's current apartment) was under his own name. UM-3574 said that REANOS-MORENO would have to pay for the damages, and REANOS-MORENO reiterated that he was looking for a place for UM-3574 and the other guys who wanted to move. Based on the context of this conversation, as well as texts between REANOS-MORENO and UM-3574 discussed below, I believe that UM-3574 was complaining about a problem at an apartment that REANOS-MORENO was subleasing to him and other street-level dealers.

102.   On January 28, 2019, the user of a phone number ending in 9938, who I believe was Allan Josue FUNEZ Osorto,[18] called REANOS-MORENO and asked what the deal was, explaining that a third party had told him that he had to "pay rent." REANOS-MORENO said

---

[18] I believe that this phone is used by FUNEZ because T-Mobile records showed that, as of January 28, 2019, it was subscribed to "Alan Funez" at "1423 103rd Ave, Oakland, CA 94603-3227". In addition, as described below, agents later arrested FUNEZ at the 103rd Avenue House in Oakland. During a search of that residence, agents found a Samsung Model SM-J727T1 phone box with an IMEI of 354254093266059. T-Mobile records showed that this IMEI matched the IMEI for the -9938 number.

something about "one week," and FUNEZ responded that he would not pay for the week. REANOS-MORENO said that FUNEZ would pay for the next month. FUNEZ said he had misunderstood. REANOS-MORENO told FUNEZ to "get on the ball and get to work," and FUNEZ said okay. I believe based on my training and experience and knowledge of this investigation—including surveillance and a search warrant described below—that, as of the time of this call, FUNEZ had just started living at the 103rd Avenue House, a residence rented out by REANOS-MORENO, and was inquiring about the rent payment schedule. I further believe that when REANOS-MORENO told FUNEZ to "get on the ball and get to work," he was directing FUNEZ to sell drugs. As noted, "work" is a common code term for drugs or selling drugs generally. This instruction by REANOS-MORENO and other statements summarized below show that selling drugs for the DTO was a requirement for being allowed to live in one of the redistributor houses.

103.    On January 26, 2019, the DEA intercepted several text messages and a call between REANOS-MORENO and UM-3574. Part of their text message conservation is reproduced below:

| | |
|---|---|
| REANOS-MORENO | dude I was calling you to see if you are going to work or if you are going to move out because I need to know so I can move in other people[.]  [L]et me know because they are waiting for me to let them know |
| UM-3574 | have you found me an apartment[?] [N]o, then I cannot move |
| UM-3574 | I have been telling you for a while to find me an apartment |
| REANOS-MORENO | I offered you a house you didn't say anything |
| REANOS-MORENO | let me look for another one but you know I have work and you haven't called me[.]  [T]hat's why I was calling you |
| REANOS-MORENO | You have to get on it to be able to get an apartment |

104.    Based on my training and experience and knowledge of this investigation, I

believe that, when REANOS-MORENO wrote that he had "work" and that UM-3574 had not called, REANOS-MORENO was complaining that UM-3574 had not been asking REANOS-MORENO for more drugs to sell even though he was living in a residence he was subleasing from REANOS-MORENO.  I believe that, when REANOS-MORENO said that UM-3574 had to "get on it" to get an apartment, he meant that UM-3574 had to sell drugs.

105.    After receiving REANOS-MORENO's last text, UM-3574 called REANOS-MORENO.  UM-3574 asked what was going on, insisting that he had asked REANOS-MORENO to get him an apartment a while ago.  REANOS-MORENO said he had told UM-3574 that he was not here (which, based on context and my knowledge of this investigation, I believe was a reference to the fact that REANOS-MORENO had been in Honduras a few weeks prior).  UM-3574 asked what had happened with the house REANOS-MORENO had, and REANOS-MORENO said he had given it to another guy because the last time he had spoken with UM-3574, UM-3574 was mad and never confirmed his interest in the house.  UM-3574 said REANOS-MORENO knew UM-3574 wanted to move out and did not have to keep reminding him.  REANOS-MORENO said there was another place, a two-bedroom apartment by 13th, for $2,000.  UM-3574 asked REANOS-MORENO to text him the address so he could go see it the next day.  A few moments later, REANOS-MORENO texted UM-3574 an address on 13th Avenue.  A moment later, REANOS-MORENO texted: "That's the address."

106.    The next day, UM-3574 called REANOS-MORENO.  UM-3574 asked REANOS-MORENO to come over, and REANOS-MORENO said he did not "work" that day and did not have anything.  UM-3574 said okay and asked if REANOS-MORENO would have some the next day.  REANOS-MORENO said yes.  REANOS-MORENO then asked if UM-3574 had gone to look at the apartment.  UM-3574 said yes but that he would look for another one somewhere else.  REANOS-MORENO said okay and that he would try and help UM-3574 find one.

107.    On January 28, 2019, REANOS-MORENO called an unidentified male whose phone number ended in 4909 (UM-4909).  REANOS-MORENO asked how UM-4909 was doing

with "work," and UM-4909 said he was working. REANOS-MORENO said "work" was available for that night or the next morning. UM-4909 said that the next morning would be best. UM-4909 then told REANOS-MORENO to come by, because UM-4909 was going to get an "8" and pay the rent. REANOS-MORENO told UM-4909 to let the other people there know, and UM-4909 said all right. UM-4909 said he would let "Maria" and the "skinny girl" know.

108.    On January 30, 2019, REANOS-MORENO spoke with an unidentified woman whose phone number ended in 1567 (UF-1567). UF-1567 said that she and others really wanted to work with REANOS-MORENO and wanted to stay in the house until REANOS-MORENO got another house for them. UF-1567 said she really wanted another woman out of the house, because UF-1567 could not live with the other woman. REANOS-MORENO said he would speak with the woman because he was waiting for places to put everyone else. UF-1567 said that the other woman did not want to work with REANOS-MORENO anymore. REANOS-MORENO said he would ask the woman if she wanted to stay to pay for the rent.

109.    The next day, REANOS-MORENO spoke with UF-1567 again. UF-1567 asked what was up with the house. REANOS-MORENO said he did not know and that some third parties had told him that UF-1567 wanted it. UF-1567 asked how much he was asking for it and said that she would let him know if that was too much or not. REANOS-MORENO asked how much UF-1567 wanted to pay for it. UF-1567 said that REANOS-MORENO was the owner of the house and that therefore he should say how much the rent was. UF-1567 then asked REANOS-MORENO to fix the window. REANOS-MORENO said that if UF-1567 said it would be for this month, then he would tell the other guys to move out. The two then discussed additional repairs that needed to be made at the apartment. REANOS-MORENO then said that he had the contract for the residence for one year. REANOS-MORENO said the apartment was under his name but that he could put it under her name. UF-1567 said that was fine with her but that REANOS-MORENO should talk to the "other guys," because she was not sure how they felt. REANOS-MORENO said he would pay the bills. UF-1567 said she would take the deposit to REANOS-MORENO, and REANOS-MORENO said she could move in after the fifth.

110.    On February 1, 2019, the DEA intercepted the following text messages from

REANOS-MORENO to UM-3574:

> man what's up[?]  look if you don't like the work then move out of
> there or if you already moved out so others can move in because I
> have already told you that if anything happens with the work to let
> me know
>
> i'm calling you to see what's going on so you can tell me

111.    The next morning, the DEA intercepted many more texts between UM-3574 and

REANOS-MORENO, including the following:

> trying to find another place for you guys but I am not going to look
> so that you guys can work with someone else[.]  I can't because
> you guys left the other place because of the same thing so the thing
> is not like that[.]  [Y]ou need to get an apartment.
>
> I will be honest with you[.]  [Y]our lawyer cannot do anything
> because you do not have a contract and if I get one because I am
> the one on the contract it will not go well for you guys here and
> everything[.]  [I] know the laws but I'm not like that[,] a bad
> person[.]  I pay money for each apartment for you and for you to
> work with someone else it's not right[.]  [Y]ou know what I meant
> right that you will always have problems

112.    Based on my training and experience and knowledge of this investigation, I

believe that in these texts, when REANOS-MORENO wrote that he did not want to find an

apartment so that UM-3574 could "work with someone else," and that it was "not right" for UM-

3574 to "work with someone else" when REANOS-MORENO "pay[s] money for each

apartment," he meant that he would not allow UM-3574 to sublease one of his residences if UM-

3574 was being supplied with drugs by someone else.

113.    The two men continued to text.  Below is a partial transcript:

UM-3574:                    I appreciate that you gave us someplace to live.

[. . . .]

UM-3574:                    Yes but don't worry[.]  [J]ust give us some days.

                            So we move this month.

                            I will let you know so you can pick up the keys

REANOS-MORENO:               listen i need to know before the 4th so I can move in other

**In Re App. for Crim. Complaint**            37

| | |
|---|---|
| | people |
| | Because they have until the 5th |
| UM-3574 | I do not think it will be before the 4th[.]  [L]isten I will let |
| | you know later on because I am going to see a house |
| | And I am telling you just don't text Kike because he's very |
| | impulsive |
| REANOS-MORENO: | listen if Kike is going to get work from me this month, you |
| | can stay there for the month[.]  [B]ut if you are not going to |
| | get anything, then it has to be right now |

114.   I believe that when REANOS-MORENO said he needed to know before the 4th

so that he could move other people in, he meant that he intended to move other street-level

dealers into the residence where UM-3574 was living if UM-3574 was moving out.  I further

believe that when REANOS-MORENO said that if "Kike" was going to get "work" that month,

UM-3574 could stay for the month, he meant that if Kike bought drugs from REANOS-

MORENO, UM-3574 and the others could continue to live in the apartment for that month.

115.   In later messages, UM-3574 mentioned that two children lived in the house with

him.

116.   Based on the foregoing calls and texts, as well as many others intercepted over

REANOS-MORENO's phone, I believe that REANOS-MORENO subleases multiple locations

in Oakland to street-level dealers who work for him.

## IV.    Identification of redistributor houses maintained by REANOS-MORENO.

### A.    One of the redistributor houses REANOS-MORENO has used to house street-level dealers is the 91st Avenue House in Oakland.

117.   On January 20, 2019, the DEA intercepted a call between REANOS-MORENO

and GARCIA.  During the call, REANOS-MORENO said there was a house on "91st" that he

had available.  I believe based on my knowledge of this investigation, including information

given below, that REANOS-MORENO was likely referring to the 91st Avenue House in

Oakland, his prior residence.[19]

118.    The call continued as follows:

| REANOS-MORENO | Yes, if anything call me.  And also, what was I going to tell you?  Oh that, I was also going to tell you that if you need white one or the night one, I will give it to you at one hundred and five (105) and one hundred ten (110). |

GARCIA                              Uh-huh.

REANOS-MORENO          Uh-huh.  Yeah, so that we can work hard.  And like I told you I was not here, man.  I apologize, you know, but I was not here.  You know that when one is here [U/I].

[Voices overlap]

[…]

REANOS-MORENO          You tell them, you know.  And if I tell you it is there or if I tell you I will get you one, I will get it for you.  [U/I].

[Voices overlap]

GARCIA                              But like I told you too, honestly that…look, honestly here they are helping us pay the electricity and, and, and, and the water too…this woman.

REANOS-MORENO          Uh-huh.

GARCIA                              She is helping us with all of that and I do not know what is up, if you would be willing to do the same?

REANOS-MORENO          Not with that, with that…it is because…

[Voices overlap]

---

[19] I believe based on the surveillance of REANOS-MORENO described above and physical location data for REANOS-MORENO's phone that he used to live at this location; the location data showed that the phone was frequently there overnight and in the early morning hours as of October and November 2018 and again as of January and February 2019.  Cellphone location data for REANOS-MORENO's cellphone showed that, as of the time of this call, he was living at a location on Earl Street in Oakland.

| | |
|---|---|
| GARCIA | At least… |
| REANOS-MORENO | Those bills are separate. |
| GARCIA | Yes, like I told you as long as you help us with something at least, no, like I told you I would talk to them as well. |
| REANOS-MORENO: | Look, the thing I can help you with there is the electricity, man, the electricity. |
| GARCIA: | With the electricity? |
| REANOS-MORENO: | Yes. |
| GARCIA: | Oh. |
| REANOS-MORENO: | Uh-huh. |
| GARCIA: | No, I will see what is up, see what these guys tell me then. I am going to [U/I]. |
| REANOS-MORENO: | Yes, but I practically do not do that with anyone man, but…you understand?  Since… |
| [Voices overlap] | |
| GARCIA: | Oh, but like I said there is like seven (7)…we are eigh…there are eight (8) of us. |
| REANOS-MORENO: | Yes, yeah.  No, like I told you, you understand [U/I]… |
| [Voices overlap] | |
| GARCIA: | And I…like I told you, we get a shit load of work, dude. |

119.    I believe based on my training and experience and knowledge of this investigation that when GARCIA said "there are eight of us," he meant that he was with a group of eight people looking for a residence and that, if they moved into REANOS-MORENO's residence, they would buy a large quantity of drugs from him.  I further believe that REANOS-MORENO was offering to help pay for electrical utilities.

120.    On a second call with GARCIA about 15 minutes later, REANOS-MORENO described the house further.  REANOS-MORENO said it was a single-family home, that it

would be available after the first of the month, and that no one would bother GARCIA and the others. GARCIA then said that he would going to tell the other guys, and that REANOS-MORENO could tell them over speakerphone that he was going to give them "product." GARCIA said he would confirm with REANOS-MORENO the next day, because he and the others did want to move from where they were living. Based on my knowledge of this investigation, I believe that on these two calls REANOS-MORENO was telling GARCIA that GARCIA and others could move into the residence at the 91st Avenue House and that he would supply them with drugs ("product") for redistribution.

121.    The next day, REANOS-MORENO and GARCIA spoke about the house again. On that call, GARCIA asked if REANOS-MORENO could find a house closer to "Foothill by 62 or around 40th," rather than on 91st. REANOS-MORENO said he would call the "lady" and see if she had a house around there. REANOS-MORENO said that he would try to find a closer place or if GARCIA and the others wanted to move to the place he had mentioned, that was up to them. GARCIA said he was going to talk to the guys. GARCIA also asked whether REANOS-MORENO could give the place to them at a lower rate, because they were currently paying $2,000. REANOS-MORENO said no because it is a house. GARCIA said he would talk to the guys and let them know that the house would be ready for the first of the month. REANOS-MORENO said that if GARCIA and the others wanted to wait for another option, that was fine, and that REANOS-MORENO was simply giving them the option.

122.    Location data for GARCIA's phone showed that in February and early March 2019, the phone was at the 91st Avenue House in Oakland in the mornings and evenings. I believe that this data corroborates that GARCIA lived at the 91st House because his phone was there during hours when most people are asleep.

123.    On February 1, 2019, the DEA intercepted a call between REANOS-MORENO and the user of a phone number ending in 6107, who I believe was CESAR Estrada Cruz.[20]

---

[20] I believe that CESAR uses the -6107 number because a search through a financial databased revealed that the -6107 number was used in connection with the name "Cesar Nohel Estrada Cruz" (CESAR's full name) throughout 2017 and 2018. In addition, as described below,

CESAR said he was still waiting for the key. REANOS-MORENO replied that "the lady" told him it would be that coming weekend. I believe based on the context of the following call that when CESAR said he was still waiting on the key, he meant he was waiting on a key to the 91st Avenue House.

124.    Two days later, REANOS-MORENO and CESAR spoke again. CESAR said he was at the address that REANOS-MORENO had given him. REANOS-MORENO then confirmed the address. CESAR asked if it was a beige house with a white gate. The address identified by REANOS-MORENO in this phone call corresponds to the address of the 91st Avenue House. I believe that when CESAR asked whether it was a beige house with a white gate, I believe he was looking at the 91st Avenue House, which fits that description.

125.    Based on the above conversations between REANOS-MORENO and GARCIA and between REANOS-MORENO and CESAR, the location data for GARCIA's phone, and evidence that REANOS-MORENO sublets residences to street-level dealers, I believe that in late January or early February 2019, GARCIA, CESAR, and other street-level distributors moved into REANOS-MORENO's former residence at the 91st Avenue House.

126.    On February 11, 2019, at approximately 3:56 pm, the DEA intercepted another call between REANOS-MORENO and GARCIA. GARCIA asked REANOS-MORENO to "come by" because "people want some." REANOS-MORENO responded that he only had the "black" ones, had run out of the "white" ones, and had "windows." GARCIA said he would call REANOS-MORENO back. I believe that in this conversation GARCIA was asking REANOS-MORENO to "come by" the 91st House to deliver drugs, and that REANOS-MORENO told GARCIA that he had heroin and methamphetamine, but did not have any cocaine available. *See* ¶¶ 42, 55.

127.    About an hour later, at 4:55 pm, the DEA intercepted another call between REANOS-MORENO and GARCIA. GARCIA asked REANOS-MORENO for some "black,"

---

agents later arrested CESAR at the 91st Avenue House, where they also found drugs packaged for distribution.

and REANOS-MORENO said okay.  GARCIA then asked if REANOS-MORENO was coming by soon, and REANOS-MORENO said yes.

128.    The DEA (assisted by the U.S. Attorney's Office) obtained a federal court order authorizing the installation and monitoring of a car tracker on the Malibu.  Based on information from that tracker, at about 6:20 pm that day, the Malibu was parked less than 500 feet from the 91st Avenue House for approximately 5 minutes.  Based on my training and experience and knowledge of this investigation, including the intercepted calls discussed above, I believe that REANOS-MORENO delivered the drugs that GARCIA had requested to the 91st Avenue House.

**B.    REANOS-MORENO also maintained redistributor houses on Foothill Boulevard and on 103rd Avenue in Oakland.**

129.    REANOS-MORENO also repeatedly made suspected deliveries of drugs to residences on Foothill Boulevard in Oakland (the "Foothill Boulevard House") and the aforementioned 103rd Avenue House in Oakland.

130.    For example, on February 4, 2018, at 12:02 pm, the DEA intercepted a call between REANOS-MORENO and an individual using a phone number ending in 2088, later identified as Eric MONTOYA-MARQUEZ.  MONTOYA-MARQUEZ told REANOS-MORENO to come by, and REANOS-MORENO said okay. *See* ¶ 185.  About 15 minutes later, at 12:19 pm, REANOS-MORENO called MONTOYA-MARQUEZ and said he was there.  MONTOYA-MARQUEZ told REANOS-MORENO to come.

131.    At about the same time, SFPD Officer Michael Cunnie saw the Malibu drive up to the 1800 block of Vicksburg Avenue in Oakland and park.  Officer Cunnie then saw REANOS-MORENO walk to the rear of the Foothill Boulevard House wearing a backpack.  At about 12:30 pm, REANOS-MORENO returned to the Malibu and drove away.  I believe based on my training and experience, the calls and surveillance described in the following paragraphs, and the fact that agents have previously seen REANOS-MORENO making suspected deliveries of drugs while wearing a backpack, that REANOS-MORENO went to the Foothill Boulevard House to

deliver drugs.

132.    About 15 minutes later, SFPD Officers Cunnie, O'Connor, and Cunningham saw REANOS-MORENO enter the 103rd Avenue House through the front door.

133.    At about 1:05 pm, while REANOS-MORENO was still inside the 103rd Avenue House, he received a call from a phone number ending in 2911, which, based on calls and surveillance during a controlled purchase discussed below, I believe was being used by Arnold CRUZ Rodriguez. *See* In the call, REANOS-MORENO said that he would be dropping by shortly because he was "delivering one" right now. About 4 minutes later, the officers saw REANOS-MORENO leave the 103rd Avenue House. Based on my training and experience and knowledge of this investigation, I believe that, when REANOS-MORENO said he was "delivering one" right now, he meant he was delivering drugs to the 103rd Avenue House.

## V.    Identification of Manuel ARTEAGA, REANOS-MORENO's runner

### A.    On March 27, 2019, officers saw REANOS-MORENO and ARTEAGA engage in a suspected drug transaction.

134.    On March 27, 2019, SFPD officers followed REANOS-MORENO as he drove a white Ford Mustang (the "Mustang") near the intersection of Masterson and Lily Streets in Oakland. Once there, the officers noticed that REANOS-MORENO's Malibu was parked near the same intersection.

135.    The officers recognized the person sitting in the driver's seat of the Malibu as ARTEAGA, whom SFPD officers have previously arrested in San Francisco for distribution of controlled substances. The officers watched as REANOS-MORENO drove up to the Malibu and threw a weighted, white, plastic bag out of the driver's-side window of the Mustang and onto the hood of the Malibu. ARTEAGA then leaned forward, grabbed the plastic bag, and sat back into the driver's seat of the Malibu.

136.    Based on my training and experience, I believe that the actions of REANOS-MORENO and ARTEAGA are consistent with drug trafficking. SFPD narcotics officers have told me that they know ARTEAGA as a street-level distributor of controlled substances in San

Francisco.  I also know that it is common for drug suppliers to limit the scope and duration of

their interactions with drug purchasers and drug couriers so as to minimize the chance of being

caught by law enforcement.  Based on my training and experience, the quick nature of the

transaction, and the fact that both REANOS-MORENO and ARTEAGA are suspected drug

traffickers, I believe the white plastic bag contained narcotics that REANOS-MORENO was

providing to ARTEAGA.

137.    Additionally, I know that mid-level narcotics dealers often use "runners" to assist

with deliveries of narcotics to customers.  Because ARTEAGA was driving REANOS-

MORENO's Malibu, and in light of the suspected drug transaction just described, I believe that

ARTEAGA is a runner working for REANOS-MORENO.

### B. Agents repeatedly saw ARTEAGA make suspected deliveries of drugs to the 91st Avenue House in Oakland.

138.    During this investigation, agents and officers have repeatedly seen ARTEAGA go

to the 91st Avenue House in Oakland making what I believe are deliveries of drugs.

139.    For example, on May 1, 2019, SFPD Officers Scafani, Cunnie, and Reeder were

conducting surveillance near the 91st Avenue House.  Over the course of the day, the officers

saw multiple individuals entering and exiting the 91st Avenue House.

140.    At about 5:10 pm, the officers saw ARTEAGA get out of a white Cobalt (the

"Cobalt"), walk into the driveway of the 91st Avenue House, and then walk out of view.

Approximately ten minutes later, the officers saw ARTEAGA walk out of the driveway, get back

into the Cobalt, and then drive away.

141.    The next day, May 2, 2019, SFPD officers again conducted surveillance in the

area of the 91st Avenue House.  At approximately 4:45 pm, Officer Scafani saw ARTEAGA

park the Cobalt nearby.  ARTEAGA got out of the Cobalt and walked into the 91st Avenue

House.  After approximately 15 minutes, Officer Scafani saw ARTEAGA leave the residence,

get back into the Cobalt, and drive away.

142.    Based on my training and experience and knowledge of this investigation—

including the fact that ARTEAGA made repeated, short trips to the 91st Avenue House; the fact that REANOS-MORENO was then housing at least one street-level drug dealer at that residence; and the evidence that ARTEAGA is a runner working for REANOS-MORENO—I believe that ARTEAGA drove the Cobalt to the 91st Avenue House to deliver drugs for REANOS-MORENO.

**C.    In May and June 2019, interceptions over REANOS-MORENO's phone provided further evidence that ARTEAGA was working as his runner.**

143.    In May 2019, the DEA (assisted by the U.S. Attorney's Office) obtained a federal court order authorizing the DEA to intercept wire and electronic communications over two of REANOS-MORENO's phones (and phones used by other individuals). During the interception period, the DEA intercepted calls between REANOS-MORENO and an individual using a phone number ending in 3557, whom agents later identified as ARTEAGA.[21]

144.    For example, on May 23, 2019, at about 6:58 pm, ARTEAGA called REANOS-MORENO and asked if REANOS-MORENO had "brought it." REANOS-MORENO said he was on his way there. Later on the call, REANOS-MORENO said he was on his way, going down 14th. REANOS-MORENO told ARTEAGA to wait in the car and that he would pass by. ARTEAGA said okay.

145.    On May 24, 2019, the DEA intercepted another call between REANOS-MORENO and ARTEAGA that I believe was related to drug trafficking. A portion of that call follows:

---

[21] The context of the calls between the user of phone number 3557 (UM-3557) and REANOS-MORENO are consistent with UM-3557 working as a "runner" or delivery person for REANOS-MORENO. During surveillance throughout this investigation, the DEA saw ARTEAGA make suspected drug deliveries to the redistribution houses managed by REANOS-MORENO. As described above, on May 24, 2019, UM-3557 and REANOS-MORENO discussed meeting at the "buffet." Later that day, SFPD Officers saw REANOS-MORENO, ARTEAGA, and an unknown man walk out of a restaurant called NYC Buffet in Oakland. Finally, on May 30, 2019, at approximately 3:27 pm, the DEA intercepted a call from UM-3557 REANOS-MORENO. No audio was captured for that call. Three minutes later, at approximately 3:30 pm, Officer Scafani saw REANOS-MORENO and ARTEAGA meet at a gas station in Oakland. Taken together, I believe that UM-3557 is used by ARTEAGA.

| | |
|---|---|
| ARTEAGA: | This guy is in a bad mood. |
| REANOS-MORENO: | Who? |
| ARTEAGA: | Chaca. |
| REANOS-MORENO: | Why? |
| ARTEAGA: | That he is coming, he is coming.  He is [U/I] early [U/I], and he came and told me that they told him [U/I] to give it to me.  [U/I]. |
| REANOS-MORENO: | Who? |
| ARTEAGA: | It seems as though [U/I], that this and that.  [U/I] so I sent him to hell.  In case he calls you [U/I]. |
| REANOS-MORENO: | And what did… and so what happened, then? |
| ARTEAGA: | I am telling you that he told me to give him four (4) of the day ones, and leave him one (1) of the powder and a half, that he would pay me for it.  You know what I mean?  But that I should go back [U/I] quickly [PH].  I have to see some other guys.  [U/I] Milton [Ph] [U/I] |
| REANOS-MORENO: | Uh-huh. |
| ARTEAGA: | And that he wants to [U/I] this work, and he wants me to go back because it is my work.  I told him, "Fucker, I have been waiting for you, and I have to go see another guy."  So then, he was like, "No [U/I] with you guys, when it's [U/I] like you do not give a shit," and this and that.  That is what he told me, that is what he said. "No, but if not [U/I]," this and that.  He said [U/I] give me the half, and if not he was going to go with someone else.  [U/I] he hung up on me, you know what I mean?  [U/I]. |
| REANOS-MORENO: | Hmm. |

| | |
|---|---|
| ARTEAGA: | So if he calls you, you know. You know what I mean? |
| REANOS-MORENO: | And, and, and, but [U/I], hey but, were you not going to drop them off, why did you not give them to him? And, and, and, but [U/I], hey but, were you not going to drop them off, why did you not give them to him? |
| ARTEAGA: | [U/I] I am telling you that I am going to leave them here with him.  I am right here! |
| REANOS-MORENO: | Oh. |
| ARTEAGA: | And he told me, "[U/I] how is he? [U/I] when it's on credit, you guys think that one is going to steal from you."  [U/I] that I was going to give them to him and for him to give it to me tomorrow. And he was [U/I] and he even hung up on me. |
| REANOS-MORENO: | Mm. |
| ARTEAGA: | And he told me, "[U/I] work," and this and that.  I told him, "Well, I'm not here," I said.  You know what I mean?  And he told me, "No, come back."  He wants me to leave and come back.  So I told him, "Give it to me tomorrow, dude." "No," he said, "I see that when it is on credit you guys... I don't know what's up," he said.  "I'm going to give you the money," he said.  I told him, "Well, I am going to leave them there for you."  He said no, and this and that.  "You guys think one is going to steal from you," the stuff he comes up with.  I told him, "[U/I] is mine," I said.  [U/I]. |
| REANOS-MORENO: | He is crazy.  No, well, then just leave him there.  That is fine. |
| ARTEAGA: | No, I do not know. So then? |

| REANOS-MORENO: | No. Well, if he does not want it, then do not give them to him, then. |
| ARTEAGA: | Well, he is [U/I]. I told him I was going to leave it there for him, and he hung up on me. |
| REANOS-MORENO: | That is why I am telling you, no. If he does not want it, then do not give it to him. |
| ARTEAGA: | All right then [U/I]. |

146.     Based on my training and experience and knowledge of this case I believe that in this conversation ARTEAGA and REANOS-MORENO were discussing an unsatisfied drug redistributor. I believe that the customer ordered four units of crack cocaine ("four of the day ones") and one unit of powder cocaine ("leave him one of the powder"). *See* ¶¶ 30-31. Here, I believe that because ARTEAGA and REANOS-MORENO also used the word "powder" in the same conversation, their reference to "powder" meant powder cocaine and "day" meant crack cocaine.

147.     Additionally, based on my training and experience and knowledge of this investigation, I believe that the redistributor expected the drugs to be given to him on credit ("and he told me, "[U/I] how is he? [U/I] when it's on credit, you guys think that one is going to steal from you") and that ARTEAGA did not want to wait very long for payment ("Give it to me tomorrow dude. 'No' he said..."). I know that narcotics traffickers as well as drug redistributors receive drugs on credit with the expectation that they will pay for the drugs once they have sold them; this is sometimes referred to as being "fronted" the drugs. These arrangements are usually between individuals with an ongoing relationship, because there is a risk that the person being "fronted" the drugs might renege on paying for them or have the drugs seized by law enforcement.

148.     On May 28, 2019, the DEA intercepted two more calls between REANOS-MORENO and ARTEAGA. A portion of their conversation follows:

| REANOS-MORENO | Where are you? |

| | |
|---|---|
| ARTEAGA | Well, I'm heading over there now. |
| REANOS-MORENO | But where are you right now? |
| ARTEAGA | Over here on sixty-three. I was going to go for you now and wait for you, but just the same [U/I] does not come [U/I] be there. |
| REANOS-MORENO | Uh-hum. |
| ARTEAGA | This dude Octavio did not send you any money. |
| REANOS-MORENO | No. |
| ARTEAGA | It is because he did not sell anything. That shit looks so bad. |
| REANOS-MORENO | Yeah. |
| ARTEAGA | Not even my cousin has called me. He has not called me for a few days. |
| REANOS-MORENO | Mm. |
| ARTEAGA | Neither did my friend who lives on ninety-eight. He used to get a lot before, he would get the black and the white [U/I], but he asked me if I had a different one. I told him… |
| [Voices overlap] | |
| REANOS-MORENO | Mhm. |
| ARTEAGA | …the other day I told him that I did have a different one but [U/I]… |
| REANOS-MORENO | There is another one that I have here, man that is different, maybe this one, maybe this one they do not say anything. Did that Aldair's [PH] dude call you? |
| ARTEAGA | Um, I called him yesterday. I told him to head over to seventy-three, but I am, I am going to call him and tell him to head over to the buffet to, to give him that stuff there.  It |

|  | is closer. |
| --- | --- |
| REANOS-MORENO | Uh-huh. |
| ARTEAGA | So… Okay, then I will meet you at the buffet. |
| REANOS-MORENO | Wait, so, I will take this one to you, and if they ask you, this one is better. |
| ARTEAGA | It this a different one? |
| REANOS-MORENO | Yes. |
| ARTEAGA | Okay. |
| REANOS-MORENO | And tomorrow they are bringing me another type. |
| ARTEAGA | Okay, then. |
| REANOS-MORENO | Uh-huh. Okay, then. |
| ARTEAGA | Another of powder because he wants one of powder also [U/I]. |
| REANOS-MORENO | No, tell him that you are not giving any of powder. |
| ARTEAGA | Oh, no? |
| REANOS-MORENO | Or, um, um… no, tell him no because… how many are there of that one? |
| ARTEAGA | Of powder, I don't know, maybe four. |
| REANOS-MORENO | About how much? |
| ARTEAGA | About five, I think. That one time that, that we had cut it but yes a little bit about… |
| REANOS-MORENO | You have about five, then? |
| ARTEAGA | I think. |
| REANOS-MORENO | Oh, no, then do not give it to him because I do not have of that one until they can bring it to me. |
| ARTEAGA | Okay, then, [U/I] a little bit. |
| REANOS-MORENO | Mm. |

| ARTEAGA | Yes, um, of that one, I won't give it to you until tomorrow. |
| REANOS-MORENO | Okay, then, I'll see you at the buffet. |
| ARTEAGA | Okay, then. |

149.    As noted above, I know that "powder" is a common code term for powder cocaine. *See* ¶ 74. I believe that this call provides further evidence that ARTEAGA is a runner working at REANOS-MORENO's direction. ARTEAGA stated that "Octavio" had not sent REANOS-MORENO any money because Octavio had not sold anything, which I believe meant that Octavio had not sold any drugs and therefore was unable to pay REANOS-MORENO for drugs he had been fronted. In addition, REANOS-MORENO repeatedly gave directions to ARTEAGA, suggesting that he holds a position of authority over ARTEAGA (e.g., "No, tell him that you are not giving any of powder"; "[D]o not give it to him because I do not have of that one until they can bring it to me.").

150.    Shortly after this call, at about 7:27 pm, SFPD Officer Cunnie saw REANOS-MORENO walk out of a home on Earl Street in Oakland and approach the Mustang wearing a black backpack. REANOS-MORENO put the backpack into the Mustang and then got into the car and drove away. At about 7:54 pm, Officer Cunnie found the Mustang parked in the parking lot of NYC Buffet at 4108 International Boulevard in Oakland. The car was unoccupied. Also parked in the lot was the Cobalt that agents had previously seen ARTEAGA driving.

151.    At about 8:15 pm, Officer Cunnie saw REANOS-MORENO, ARTEAGA, and an unknown Hispanic male walk into the parking lot. Officer Cunnie then saw ARTEAGA get into the Cobalt and drive away.

## VI.    Identification of street-level dealers working with REANOS-MORENO

### A.    The street-level dealers who work for REANOS-MORENO travel from Oakland to the Tenderloin to sell drugs.

152.    Calls intercepted over REANOS-MORENO's phone show that the street-level dealers working for him travel from Oakland to the Tenderloin to sell drugs.

153.    For example, on January 20, 2019, the DEA intercepted a call between REANOS-

MORENO and an unidentified male who goes by the name "Junior." REANOS-MORENO asked Junior where he was going right now, and Junior responded, "Civic Cen," which I believe was a reference to the Civic Center in San Francisco. REANOS-MORENO directed Junior to go to "Golden" at night, which I believe was a reference to Golden Gate Avenue. Junior said that the following day he would go to where "Afro" was working, down under "Golden," but that he was currently "working at CVS." I believe that when Junior said he was working at CVS, he meant the CVS at the corner of Market and 7th Streets in San Francisco, approximately one block from the San Francisco Federal Building, an area where drug dealers often congregate and that is near the entrance to the Civic Center BART station. REANOS-MORENO then said the "white" was at "105" and the "black" was at "110," which I believe meant that he was selling cocaine for $105 and heroin for $110.

154.   On February 4, 2019, the DEA intercepted a call between REANOS-MORENO and GARCIA. GARCIA asked if REANOS-MORENO had any two-bedroom apartments. He said "the guys" wanted to help REANOS-MORENO, but they needed a place. GARCIA further said that they worked on Civic Center and Golden.

155.   I believe that during this call, GARCIA was following up on the possibility of he and his associates selling drugs for REANOS-MORENO. I also believe that when GARCIA said that Manuel and the others worked "on Civic Center and Golden," he meant that they sold drugs in the area of Civic Center and Golden Gate Avenue in San Francisco.

**B.   In January 2019, REANOS-MORENO repeatedly delivered drugs to ARTEAGA-MORALES.**

156.   On several days in January 2019, the DEA intercepted REANOS-MORENOS discussing suspected drug deliveries with an individual using a phone number ending in 7111, later identified as Kevin ARTEAGA-MORALES.[22] For example, on January 17, 2019, at 4:15

---

[22] I believe that the number ending in 7111 belongs to Kevin ARTEAGA-MORALES based on investigation during a July 20, 2019 traffic stop. On that date, ARTEAGA-MORALES was stopped by SFPD for a traffic violation. He was given a citation for not having a driver's license, in violation of California Vehicle Code § 12500(a), for not having a front license plate, in violation of California Vehicle Code § 5200, and for driving a car without proper insurance, in violation of California Vehicle Code § 16028. SFPD officers arrested another individual in the

pm, REANOS-MORENO told ARTEAGA-MORALES that he was "working." ARTEAGA-MORALES asked if REANOS-MORENO had "everything." REANOS-MORENO responded that he "did not have any windows." ARTEAGA-MORALES then told REANOS-MORENO to "come over now." Approximately 40 minutes later, REANOS-MORENO called ARTEAGA-MORALES and said he was outside.

157. Based on my training and experience, and my knowledge of this investigation, I believe that that when REANOS-MORENO said he was "working," he meant that he was out delivering drugs. When ARTEAGA-MORALES asked if REANOS-MORENO had "everything," he was asking whether REANOS-MORENO had all the types of drugs that he sold. Further, when REANOS-MORENO said he did not have "windows," I believe he meant that he did not have methamphetamine for sale at that time, but had other types of drugs. As referenced earlier, "windows" is a code word for methamphetamine used by drug traffickers. Finally, based on my knowledge of this investigation, I believe that REANOS-MORENO met with ARTEAGA-MORALES to deliver drugs because ARETAGA-MORALES told REANOS-MORENO to "come over now," and within one hour, REANOS-MORENO called to say that he was outside.

158. Later in the month, on January 28, 2019, REANOS-MORENO called ARTEAGA-MORALES and asked if ARTEAGA-MORALES needed any of the "nose" because "that one was ready." ARTEAGA-MORALES asked for "2," which REANOS-MORENO acknowledged. Based on my training and experience, and my knowledge of this investigation, I believe REANOS-MORENO was telling ARTEAGA-MORALES that he had powder cocaine for sale, and that ARTEAGA-MORALES placed an order for two units of powder cocaine. *See* ¶¶ 39, 82.

159. Based on my knowledge of this investigation, these intercepted calls, and

---

car who possessed a backpack containing suspected heroin, cocaine, methamphetamine, and fentanyl. Prior to this stop, investigators suspected that ARTEAGA-MORALES was the user of the phone number ending in 7111. SFPD Officer Reeder called the 7111 number and a phone in seized from ARTEAGA-MORALES during the stop rang.

discussions with SFPD officers, I believe that ARTEAGA-MORALES is a street-level dealer working for REANOS-MORENO. I understand that SFPD officers have seen him in the Tenderloin engaging in suspected narcotics transactions.

**C.    In February 2019, CRUZ sold four ounces of methamphetamine to a confidential source.**

160.    On February 18, 2019, CS-1 placed a recorded call to the same phone number ending in 2911 mentioned in the preceding section and spoke with a male who, based on the surveillance described below, I believe was CRUZ. CS-1 asked CRUZ how much it would cost to purchase "four ounces," and CRUZ responded, "Of what? The crystal?" The CS replied, "Yes." CRUZ then said: "Give me one thousand, four hundred."

161.    Based on my training and experience and discussions with other experienced law enforcement officers, I believe that CRUZ was using the word "crystal" to refer to methamphetamine. "Crystal" is a common code word for methamphetamine because of its clear and crystal-like appearance. I also believe that, when CRUZ asked for "one thousand, four hundred," he was asking for $1,400. I know that drug dealers often refer to a drug's price using only a number, rather than specifically using the words "dollars" or "thousand," so that anyone who might overhear the conversation will not understand what the number is referring to.

162.    On February 28, 2019, CS-1 again called CRUZ at the 2911 number, telling CRUZ that he/she wanted "four of them." CRUZ responded, "crystal, right?" CS-1 then asked CRUZ how much CRUZ was going to charge him/her. CRUZ responded, "Give me 13 today." I believe for the reasons given in the preceding paragraph, and based on the context of this call, that CRUZ was telling CS-1 that he would sell CS-1 four ounces of methamphetamine for $1,300. CS-1 told CRUZ that they could meet in the same spot as they had on a prior occasion, which CS-1 understood to refer to a Denny's parking lot in San Mateo. CRUZ responded, "Okay."

163.    That afternoon, at a predetermined location, DEA SAs Gabino Gutierrez and Jeffrey Beckett searched CS-1's car and person and determined that he/she was not carrying any

contraband. CS-1 was equipped with a recording/transmitting device that allowed agents to listen to CS-1's conversations in real time. SA Beckett then gave CS-1 $1,400 in agency funds.

164. At approximately 6:05 pm, a white Ford Escape (the "Escape") arrived in the Denny's parking lot and parked next to CS-1's car. The driver of the Escape then got out of the Escape, walked to the front, lifted the Escape's hood, and retrieved an object from inside the engine compartment. Based on his prior review of CRUZ's mugshot, SA Beckett identified CRUZ as the driver of the Escape. After retrieving the object, CRUZ closed the hood of the Escape and got into the front passenger seat of CS-1's car.

165. Based on my training and experience and discussions with other experienced law enforcement investigators, I know that drug dealers often store narcotics under the hood of a car, near the engine compartment, because law enforcement officials cannot see underneath the hood of a vehicle while the vehicle is in motion or during a traffic stop. I therefore believe, based on my training and experience and knowledge of this investigation, that when CRUZ retrieved an object from the Escape's engine compartment, he was retrieving the suspected methamphetamine that CS-1 later purchased, as discussed below.

166. Once CRUZ was in CS-1's car, he removed four plastic bags of methamphetamine from the front pocket of his sweatshirt and handed them to CS-1. CS-1 then gave CRUZ $1,300. CRUZ took the money without counting it and put it into his pocket.

167. After the transaction, CS-1 met with agents, providing them with $100 that was not spent and the four plastic bags of methamphetamine that he/she had purchased from CRUZ. Laboratory testing determined that the baggies contained 108.7 grams of pure methamphetamine.

**D.    In April 2019, officers seized heroin, methamphetamine, cocaine, and fentanyl from RODRIGUEZ-VALLE and FUNEZ near Hyde Street and Golden Gate Avenue.**

168. SFPD seized drugs in the Tenderloin from other REANOS-MORENO DTO redistributors in April 2019. On April 12, 2019, at about 10:50 pm, SFPD Officer Vinesh Govindbhai and others officers were conducting surveillance near the 300 block of Golden Gate Avenue when Officer Govindbhai saw a male, later identified as Christian RODRIGUEZ-

VALLE, walking back and forth in front of 350 Golden Gate Avenue. Officer Govindbhai watched as a white male approached RODRIGUEZ-VALLE and the two engaged in a quick conversation. RODRIGUEZ-VALLE appeared to pull a plastic bag from his waistband and then hand a small object to RODRIGUEZ-VALLE at waist level. RODRIGUEZ-VALLE then put the plastic bag back into his waistband. When RODRIGUEZ-VALLE turned around, Officer Govindbhai could see that he had U.S. currency in his hand and that he appeared to be adding it to a bundle of cash that was already in his hands.

169.    RODRIGUEZ-VALLE continued to loiter in the area. At about 11:10 pm, Officer Govindbhai saw a similar encounter: another male approached RODRIGUEZ-VALLE, the two had a quick conversation, the male passed RODRIGUEZ-VALLE U.S. currency, RODRIGUEZ-VALLE removed a plastic bag from his waistband and then passed something to the other male, and then RODRIGUEZ-VALLE appeared to add the U.S. currency to an existing bundle of cash in his hands.

170.    Based on his training and experience, Officer Govindbhai believed that he had just seen two hand-to-hand drug transactions. He provided a description of RODRIGUEZ-VALLE to SFPD Officers Cunnie and Edward Tien, who approached and arrested RODRIGUEZ-VALLE without incident. Upon searching RODRIGUEZ-VALLE, the officers found a plastic bag in his waistband containing individually packaged bindles of suspected heroin, suspected methamphetamine, and suspected crack and powder cocaine. The officers also found suspected fentanyl in a black canister inside RODRIGUEZ-VALLE's waistband. The officers also seized $204 that was found in RODRIGUEZ-VALLE's back pant pocket, a wallet containing an additional $290, and a phone.

171.    Officer Cunnie obtained a search warrant for RODRIGUEZ-VALLE's phone and determined that it had the same phone number (ending in 3941) that had been intercepted communicating about drugs with REANOS-MORENO. *See* ¶ 94.

172.    Later in April 2019, officers seized cocaine, heroin, methamphetamine, and fentanyl from FUNEZ near Hyde Street and Golden Gate Avenue.

173.    On April 17, 2019, at around 8:00 pm, a DEA agent working in an undercover (UC) capacity went to the 300 block of Golden Gate Avenue and attempted to contact Brayan MARTINEZ, who was loitering on the block.  In the approximate area of 370 Golden Gate Avenue, a male (later identified by SFPD Officers Reeder and Scafani as Allan FUNEZ) approached the UC.  The UC asked, "Rock?  Rock?"[23]  FUNEZ responded, "Yeah, I got rock. How much you need?"  The UC said, "Ten, I have ten."

174.    FUNEZ took out a handful of small, individually wrapped plastic baggies of what was later determined to be crack cocaine.  FUNEZ placed two individually wrapped baggies in the UC's hand.  The UC then handed FUNEZ $10.

175.    Once the transaction was completed, the UC continued to walk toward MARTINEZ.  MARTINEZ was standing with a group of Hispanic men near the intersection of Golden Gate Avenue and Hyde Street.  The UC approached MARTINEZ, and the following exchange occurred:

| | |
|---|---|
| UC | What's up, man?  Rock? |
| MARTINEZ | Yes, how much? |
| UC | Ten. |
| MARTINEZ | You look narco.  You the police?  I got weed, I got weed. |
| UC | So what's up? |
| MARTINEZ | Weed?  No, no, no, you police. |
| UC | C'mon, man. |
| MARTINEZ: | Show me your under there. |
| [MARTINEZ then gestured for the UC to lift his shirt, possibly to see if he was carrying a firearm or wearing a wire.] | |
| UC | Do what?  C'mon, man. |
| MARTINEZ | You police. |

---

[23] The conversations between the UC and the Target Subjects were in English.

| | |
|---|---|
| UC | Nothing? |
| MARTINEZ: | You look like police for sure.  You look hella clean, bro. |
| UC | Okay, I'll take my money elsewhere. |

176.    The UC then walked away from MARTINEZ without purchasing any drugs.

177.    Based on my training and experience, knowledge of this area of the Tenderloin as a high narcotics-trafficking area, and the results of a search and arrest of MARTINEZ described below, I believe that MARTINEZ offered to sell the UC crack cocaine ("Yes, how much?") but that he changed his mind upon deciding that the UC was likely law enforcement.

178.    Later the same night, SFPD Officers Reeder, Scafani, Cunnie, and Klaib returned to the 300 block of Golden Gate Avenue and approached MARTINEZ, FUNEZ, and others with whom they were loitering.  As the officers approached, Officer Reeder saw FUNEZ quickly look toward Officer Reeder with a shocked look on his face and then reach toward the undercarriage of a nearby parked vehicle.  After doing so, FUNEZ quickly stood up and began to raise his hands.  The officers detained the group, which included FUNEZ, Karol ERAZO Reanos, and MARTINEZ, among others.

179.    Officer Reeder looked underneath the vehicle he had seen FUNEZ reach toward. On the ground, he saw a recyclable coffee cup.  Inside the cup were individual baggies of suspected crack cocaine, methamphetamine, heroin, and fentanyl.  Laboratory testing confirmed the presence of .4 grams of fentanyl.  Additional test results are pending.

**E.    Later in April, SFPD officers saw MARTINEZ engage in a drug transaction at Hyde and Golden Gate and then seized cocaine, heroin, and methamphetamine from him.**

180.    On April 19, 2019, at about 4:50 pm, SFPD Officer Alexander Austria and SFPD Field Training Officer (FTO) Richard Schiff were driving southbound on Hyde Street, approaching the intersection with Golden Gate Avenue, when Officer Austria saw a Hispanic male, later identified as MARTINEZ, give a plastic baggie containing numerous bindles of suspected narcotics to an unknown male standing next to him.  Based on his training and experience and knowledge of this area of the Tenderloin as being a high narcotics-trafficking

area, Officer Austria believed he had just witnessed a hand-to-hand drug transaction.

181.    Officer Austria got out of his patrol car in an attempt to detain both men.  As soon as he made eye contract with MARTINEZ, MARTINEZ began running westbound on Golden Gate Avenue.  Officer Austria pursued MARTINEZ down Golden Gate Avenue toward Larkin Street.  MARTINEZ was then cut off by FTO Schiff in the patrol car, forcing MARTINEZ to flee southbound across Golden Gate Avenue, toward the Philz Coffee shop.  Officer Lee of the University of California Police Department was walking out of Philz at that time and apprehended MARTINEZ.

182.    A passerby pointed out to SFPD Officer Victor Custodio that there was a plastic baggie along the curb in front of the Wells Fargo ATM at 375 Golden Gate Avenue.  Officer Austria retrieved the baggie, which was later determined to contain 66 bindles of suspected cocaine, 39 bindles of suspected heroin, and 14 bindles of suspected methamphetamine.

183.    The officers later obtained surveillance video from the building at 378 Golden Gate Avenue.  The surveillance footage showed MARTINEZ running westbound on Golden Gate Avenue.  The footage showed that, as MARTINEZ passed the Wells Fargo ATM, he threw a baggie into the gutter underneath a white van, which is where the officers later found the baggie containing the drugs described above.

**F.    In May 2019, MONTOYA-MARQUEZ sold heroin to an undercover SFPD officer near the corner of Hyde and Eddy in the Tenderloin.**

184.    On May 8, 2019, at about 5:22 pm, an SFPD officer working in an undercover capacity (UC) approached MONTOYA-MARQUEZ who was standing on Hyde Street in the Tenderloin.  MONTOYA-MARQUEZ asked what the UC needed.  The UC responded, "black." I understand this to mean that the UC was asking to purchase heroin.  *See* ¶ 55.  MONTOYA-MARQUEZ told the UC to wait and then walked to the corner of Hyde and Eddy.  When MONTOYA-MARQUEZ returned, he had a black pouch in his hand.  MONTOYA-MARQUEZ poured several clear bindles containing a black substance into the palm of his hand. MONTOYA-MARQUEZ asked the UC, "How much?"  The UC said, "40."  MONTOYA-

MARQUEZ then said, "Half," to which the UC responded, "Ya 40." MONTOYA-MARQUEZ pulled out one of the bindles in his hand and said, "half gram." At that time, the UC handed over two $20 bills, and MONTOYA-MARQUEZ handed over the bindle containing suspected heroin.

185.    After the sale was complete, MONTOYA-MARQUEZ told the UC that he was "there" every day from 3 pm to 9 pm. Based on my knowledge of this investigation, I believe MONTOYA-MARQUEZ meant that he sold drugs in that area of the Tenderloin every day and therefore the UC could come back at another time to buy drugs from him. MONTOYA-MARQUEZ also gave the UC his phone number, which ended in -2088. As described above, based on intercepted phone calls and physical surveillance, I believe that MONTOYA-MARQUEZ lives in the Foothill Boulevard House and sells drugs supplied by REANOS-MORENO. *See* ¶¶ 130-131.

### G.    In June 2019, SFPD officers saw FUNEZ travel from the 103rd Avenue House to the Tenderloin and make suspected drug sales.

186.    On June 11, 2019, at about 6:05 pm, SFPD Officer James Puccinelli was conducting surveillance at the 103rd Avenue House in Oakland when he saw FUNEZ and another Hispanic male (UM1) walk out of the residence. FUNEZ got into the passenger seat of a burgundy Hyundai (the "burgundy Hyundai") parked in the driveway, and UM1 got into the driver's seat.

187.    Members of the SFPD narcotics unit followed the burgundy Hyundai into San Francisco, where it eventually parked on the southeast corner of Golden Gate Avenue and Hyde Street in the Tenderloin.

188.    From approximately 7:00 pm to 9:00 pm, members of the SFPD narcotics unit continued surveillance of FUNEZ and UM1. Officer Puccinelli saw FUNEZ loitering on the 300 block of Golden Gate Avenue. FUNEZ approached an unknown white male, and the two engaged in a quick conversation. FUNEZ and the unknown white male walked behind a silver truck and turned towards each other, face to face. Both FUNEZ and the unknown male were looking down toward FUNEZ's hands, and FUNEZ appeared to Officer Puccinelli to have

something in his palm. FUNEZ appeared to hand the unknown items in his hand to the unknown
white male. Shortly afterwards, the white male walked eastbound on Golden Gate Avenue
towards Hyde Street, and FUNEZ continued to loiter on the 300 block of Golden Gate Ave.

189.    Based my training and experience, the two men's quick conversation and hand-to-
hand transfer, my knowledge that this section of Golden Gate Avenue is a high
narcotics-trafficking area, the fact that FUNEZ lives in a redistributor house provided by
REANOS-MORENO, and the results of a search of the 103rd Avenue House (discussed below),
I believe that FUNEZ and the unknown male engaged in a hand-to-hand narcotics transaction.

190.    SFPD Officer Michael Montero saw a different white male approach FUNEZ on
the 300 block of Golden Gate Avenue. The unknown white male appeared to give FUNEZ an
unknown amount of U.S. currency. FUNEZ then placed an unknown object in the white male's
palm. After the exchange, the unknown white male walked westbound on Golden Gate Avenue
towards Larkin Street. For the reasons given above, I believe that FUNEZ distributed drugs to
the unknown white male.

191.    Shortly thereafter, Officer Montero saw FUNEZ approaching the driver's side of
a black sedan parked near 374 Golden Gate Avenue. An unknown person was sitting in the
driver's seat. FUNEZ leaned down towards the driver's side of the black sedan and appeared to
engage in a quick conversation with the unknown driver. FUNEZ then briefly stepped away
from the black sedan. With his left hand, FUNEZ reached into his front left jacket pocket and
pulled out what appeared to Officer Montero to be a handful of white bindles. With his right
hand, FUNEZ took some of the suspected drug bindles from his left hand, and handed them to
the driver of the black sedan. As FUNEZ was walking back towards the black sedan, he placed
the rest of the unknown amount of suspected bindles in his left palm back into his front left
jacket pocket. The driver of the black sedan handed FUNEZ an unknown amount of U.S.
currency. FUNEZ reached into his back right pants pocket and pulled out what appeared to be a
large amount of U.S. currency. FUNEZ then selected an unknown amount of U.S. currency and
gave it to the driver of the black sedan. FUNEZ then quickly walked eastbound on Golden Gate

Ave towards Hyde Street.

192.    Based on my training and experience, I know that drug dealers often carry large amounts of U.S. currency in multiple denominations in order to complete narcotics transactions more quickly and easily.  I believe that in this case, the driver of the black sedan handed FUNEZ an unknown bill of U.S. currency, likely a large denomination, and FUNEZ retrieved multiple unknown bills of U.S. currency from his pocket in order to give the buyer change.

193.    A short while later, Officer Montero saw FUNEZ engage in a quick conversation with another male.  FUNEZ retrieved what appeared to Officer Montero to be numerous white bindles from his front left jacket pocket using his left hand.  Using his right hand, FUNEZ appeared to take some of the suspected bindles from his left hand, and gave them to the unknown male.  The male gave FUNEZ an unknown amount of U.S. currency and quickly walked westbound on Golden Gate Avenue towards Larkin Street.  FUNEZ placed the rest of the suspected white bindles that were in his left hand back into his front left jacket pocket.

### H.    In June 2019, SFPD officers saw CESAR travel from the 91st Avenue House to the Tenderloin and make suspected drug sales.

194.    On June 12, 2019, Officer Michael Cunnie conducted surveillance at REANOS-MORENO's suspected redistributor house at the 91st Avenue House.

195.    At around 7:00 am, Officer Cunnie saw a silver Mitsubishi (the "Mitsubishi") pull out of the driveway and double-park in front of the house.  A male ("UM2") was driving.

196.    At around 7:50 am, Officer Cunnie saw a Hispanic male emerge from the residence carrying a backpack.  This male walked away from the residence and got into the driver's seat of a gold Toyota (the "Toyota") parked on the same block.  Officer Cunnie later learned that the Toyota was registered to CESAR Estrada-Cruz at the 91st Avenue House.  Officer Cunnie then conducted a search of SF Mugshots for the name "Cesar Estrada-Cruz" and recognized CESAR as the person he had seen driving the Toyota.

197.    Officer Cunnie traveled to San Francisco and began canvasing the high narcotics-trafficking areas located in the Tenderloin and South of Market area.  At approximately 10:25

am, he was driving north on 7th Street from Mission Street when he saw both UM2 and CESAR loitering on the east sidewalk of 7th Street outside the San Francisco Federal Building at 90 7th Street. Both suspects were sitting on the concrete wall along the exterior of the federal building.

198.    Officer Cunnie moved to an elevated area of cover and began conducting surveillance of UM2 and CESAR using binoculars and a Nikon P900 camera.

199.    Officer Cunnie conducted surveillance of both men from about 10:40 am through approximately 11:05 am. During that time, he saw UM2 holding multiple small white objects and small black objects in the palm of his hand, which Officer Cunnie believed to be individually wrapped pieces of cocaine base and individually wrapped pieces of heroin. UM2 continuously transferred the suspected cocaine base and heroin from the palm of his hand to his mouth.

200.    Based on my training and experience, I know that people who sell drugs on the streets of San Francisco often store the drugs for distribution in their mouths. They do this so that if they are detained by law enforcement they can swallow the drugs and avoid arrest.

201.    Officer Cunnie also saw UM2 make what he believed to be a hand-to-hand narcotics deal. During the suspected transaction, UM2 was standing near an unidentified male who was sitting on the small concrete wall along the exterior of the building. As the unknown male began counting what appeared to be U.S. currency, UM2 used his right hand to select from the palm of his left hand a piece of a black substance that appeared to be wrapped in plastic. Given the color of the drug, Officer Cunnie believed that this was heroin. The unknown male then handed UM2 what appeared to be several bills of U.S. currency. UM2 handed the unknown male an object that appeared to be what he had picked from his palm. UM2 then handed the unknown male what appeared to be U.S. currency. Based on his training and experience, Officer Cunnie believed he had witnessed UM2 sell heroin to the unknown male and then supply him with change.

202.    Officer Cunnie then saw the unknown male bring the suspected heroin to his mouth. He appeared to rip open the packaging using his teeth. Officer Cunnie saw the unknown male place the suspected heroin into a small plastic bottle and begin shaking the bottle.

203.    Based on his training and experience, Officer Cunnie knows that people who ingest heroin by sniffing it will often place the heroin inside a bottle with a cutting agent, such as powdered lactose, and then shake the bottle, blending the heroin with the cutting agent to create a fine powder that can then be sniffed through the nostril. The fact that the unknown male did this with the object he appeared to purchase from UM2 led Officer Cunnie to believe that the object was heroin.

204.    Officer Cunnie also continued to monitor CESAR. CESAR appeared to be constantly manipulating objects in his mouth. Based on Officer Cunnie's training and experience, he believed that CESAR was concealing drugs in his mouth. Officer Cunnie also saw CESAR make what he believed to be several hand-to-hand drug transactions. Each time, CESAR would appear to spit small white objects from his mouth into his hand and then exchange the object for U.S. currency from an unknown person.

205.    At approximately 11:05 am, Officer Cunnie saw both UM2 and CESAR loitering together with two unknown males on the east side of 7th Street, north of Mission Street. The four males appeared to be having a conversation. CESAR looked north towards Market Street. A moment later, all four males simultaneously turned away and began quickly walking southbound on 7th Street. While they were walking away, the males continued to look north on 7th Street towards Market Street. The four males walked out of Officer Cunnie's field of vision. Several moments later, three uniformed SFPD officers on bicycles rode south on 7th Street from Market Street. Based on the actions of UM2, CESAR, and the two unknown males, Officer Cunnie believed they were walking away from the area to distance themselves from the approaching police officers. Officer Cunnie believed that this was further evidence that both UM2 and CESAR were selling illegal narcotics on the streets of San Francisco.

206.    A few hours later, Officer Montero saw the Toyota park down the street from the 91st Avenue House. Officer Montero took a picture of the male he saw get out of the Toyota. Officer Cunnie later reviewed the photograph and recognized the male as CESAR.

**VII.    Execution of a search warrant at the suspected redistributor house on 91st Avenue in Oakland**

A.    **Officers found CESAR, GARCIA, and others at the redistributor house on 91st Avenue in Oakland along with crack and powder cocaine, heroin, and methamphetamine packaged for distribution.**

207.    On June 19, 2019, SFPD officers and DEA agents conducted surveillance outside the 91st Avenue House.  At about 4:46 pm, SFPD Officer Scafani saw the Cobalt arrive at the residence.  Officer Scafani saw ARTEAGA get out of the car and walk into the house.  Officer Scafani could see that ARTEAGA's pant pocket appeared to be heavy, as if items were inside.

208.    About twenty minutes later, Officer Scafani saw ARTEAGA leave.

209.    At about 5:30 pm, SFPD officers, accompanied by DEA special agents, executed a state search warrant.

210.    The officers found three minor children in the living room.

211.    In the front bedroom, the officers found and detained GARCIA and a second man.  In this room, agents found a gray sock.  Inside the sock were twelve knot-tied packages containing smaller knot-tied packages of crack cocaine, four knot-tied packages containing smaller knot-tied packages of black-tar heroin, and three knot-tied packages containing smaller knot-tied packages of suspected methamphetamine.  Later, laboratory testing determined that some of the packages contained approximately 6.548 grams of cocaine base (crack), 2.234 grams of heroin.  Additional test results are pending.

212.    Officers found an identification card bearing the name "Jose Franklin Rodriguez Garcia" (GARCIA's full name) inside a suitcase in the closet, along with four phones.  The officers also found two receipts for wire transfers in the same room.  The receipt listed a "Sender" of "Jose Franklin Rodriguez Garcia."  It also listed the -1725 number as the associated phone number.

213.    In back bedroom, officers found and detained CESAR.  A woman and a minor child were also in that room.  Officer Reeder seized a Samsung cellphone from CESAR.

214.    In the same bedroom officers found a leopard-print robe on the closet door of the bedroom.  Inside the pocket of the robe was another gray sock containing knot-tied plastic packages of black-tar heroin, knot-tied and Ziploc packages of crack cocaine, and knot-tied

packages of suspected methamphetamine.[24]  Laboratory testing determined that some of the

baggies contained approximately 1.683 grams of heroin, 6.6 grams of cocaine base (crack), and

1.55 grams of fentanyl.  Additional test results are pending.

215.    In the garage of the house, officers found a red, zippered case.  The case

contained two Ziploc bags of brown, powdered heroin; multiple knot-tied plastic packages of

black-tar heroin; two plastic packages containing methamphetamine; and Ziploc packages of

crack cocaine.  Laboratory testing determined the baggies contained approximately 7.3 grams of

pure methamphetamine, 2.86 grams of black-tar heroin, 3.83 grams of powdered heroin, 2.1

grams of cocaine base (crack), and 2.1 grams of fentanyl.  Concealed inside a barbecue pit

adjacent to the garage was a plastic bag containing suspected black-tar heroin,

methamphetamine, and cocaine base.  Laboratory testing determined the bag contained

approximately 6.3 grams of fentanyl, 3.58 grams of heroin, and 10.6 grams of pure

methamphetamine.

216.    In total, SFPD arrested four individual at the 91st Avenue House.

**B.      Later the same night, REANOS-MORENO and ERAZO reacted to the
         search warrant at the 91st Avenue House.**

217.    Shortly after officers executed the search warrant at the 91st Avenue House, the

DEA intercepted several calls between REANOS-MORENO and ERAZO who was using phone

number ending in -7745).[25]  At about 8:20 pm, the two had the following conversation:

---

[24] In the same pocket as the narcotics was an ID card bearing the name "Brenda
Margarita Aguilar Maldanado."

[25] I believe ERAZO was the user of this telephone based on location data associated with
the phone and physical surveillance conducted by SFPD Officer Scafani on July 16, 2019.  On
that day, at approximately 1:30 pm, location data indicated that the phone was inside or near a
residence located on Earl Street in Oakland.  Officer Scafani set up surveillance of that residence
at that time.  At 1:57 pm, he saw ERAZO and REANOS-MORENO come out of the residence.
REANOS-MORENO got into a car, and ERAZO then went back inside.  At approximately 5:44
pm, ERAZO came out of the residence again and got into the backseat of a Toyota Corolla.  An
unidentified man was in the driver's seat.  The Corolla drove away from the house, and Officer
Scafani followed it.  At approximately 5:49 pm, location data for the phone ending in 7745
indicated that it was moving on Highway I-580 near the Coolidge Street exit.  The Corolla was
driving near this area at that time.  Officer Scafani continued to follow the Corolla as it drove
towards San Francisco.  Location data for the phone ending in -7745 then showed that the phone
was moving westbound on I-80, which corresponded with the Corolla's location.  The Corolla

| REANOS-MORENO | Huh? |
|---|---|
| ERAZO | Hey, Pelon… they said that the narcos raided the house over there on 91st. |
| REANOS-MORENO | Oh, really? |
| ERAZO | Yes, so, be careful.  Kiko just called me; they already told him that they raided them. |
| REANOS-MORENO | Alright, then. |
| ERAZO | Okay |

218.    I believe based on this call and others intercepted over REANOS-MORENO's phone that REANOS-MORENO goes by the nickname "Pelon."  I further believe that this call (among others described in this affidavit) shows that ERAZO was aware of and involved in REANOS-MORENO's drug dealing, including his supplying of drugs to street-level dealers at the 91st Avenue House.  I know that "narcos" is a common code word for law enforcement officers who investigate narcotics crimes.  I therefore believe that when ERAZO mentioned "narcos" at 91st, and when she told REANOS-MORENO to be careful, she meant that REANOS-MORENO should be careful not to get caught in connection with the drugs at that house.  I also believe, based on the fact that "Kiko" called ERAZO rather than REANOS-MORENO directly, as well as additional calls discussed below, that ERAZO is involved with managing the redistributor houses with REANOS-MORENO.

219.    About twenty minutes later, ERAZO called REANOS-MORENO back.  Their conversation follows:

| REANOS-MORENO | Huh? |
|---|---|
| ERAZO | Did you find anything out? |

---

ultimately came to the Tenderloin and parked on the 400-block of Turk Street.  Officer Scafani continued to surveil ERAZO throughout the evening.  At approximately 9:49 pm, location data for the phone number ending in -7745 indicated that the phone was near the intersection of Hyde and Golden Gate.  Officer Scafani walked towards that area and saw ERAZO approximately one block south of that intersection.

| | |
|---|---|
| REANOS-MORENO | No, nothing.  Not yet. |
| ERAZO | Oh, well over here there is.  Tell Come to be careful, because there is a lot of noise around here.  And he was lucky; he went to take care of them before.  Mm, because it is noisy over here because they busted Cesar.  That is what everyone believes, that he, he lived at thirty fifth (35th). |
| REANOS-MORENO | Mhm. |
| ERAZO | Yes. |
| REANOS-MORENO | Well, let's see.  Come just called them.  But, he, he does not know Come says that he went to see them, but they were going crazy, they were grabbing the feo also, that is for sure.  Hell, no! No, no, no. |

[Voices overlap]

| | |
|---|---|
| ERAZO | If, if only, if only, if you do something, do not see Come.  Do not see him at any location.  Do not go see him. |
| REANOS-MORENO | Then he.  Let me see what is up.  Come called them right now but he says that, that the, the phones are ringing. But no one is picking up, but I told him to turn the phone off. |
| ERAZO | Yes, man, it is what my people told me.  Listen, Fito called me, and right now that I came here with Chete and you.  Chete was saying, but Chete believes that they lived at thirty fifth (35th) still where you got them from. |
| REANOS-MORENO | Mhm. |
| ERAZO | Mhm, because the rumor here is… |

[Voices overlap]

| | |
|---|---|
| REANOS-MORENO | No I did not get them, I did not get, I got them from down there, over there around twelfth (12th). |

| | |
|---|---|
| ERAZO | Mhm. Ander (PH) it is because, well yes, but since they lived over there around thirty fifth (35th).  You remember, right? |
| REANOS-MORENO | Yes. |
| ERAZO | Well, then, everyone thinks that is where they got busted.  But everyone says that Cesar got busted, and those dudes because they are Chete's cousins, you understand? |
| REANOS-MORENO | But who is Cesar? |
| ERAZO | Cesar is the, the tall one, the one who has a wife and daughter. |
| REANOS-MORENO | Oh, uh-huh, uh-huh, uh-huh. |
| ERAZO | Uh-huh, um and there is lots of movement over here right now because the law enforcement are here, but it is very strange.  That law enforcement are around right now during the night. |
| REANOS-MORENO | Listen probably because, because they were watching all these crazies grabbing the feo also.  And they probably were being watched.  If Come was there they would have taken Come because when Come went.  And, he already… |
| [Voices overlap] | |
| ERAZO | He already was over there.  Maybe they do not know what he has.  By luck that dude, had left or left beforehand.  And what I am worr… what worries me honestly is that.  I know that Come goes late understand? And I said: Fuck!  All we needed was for Come to be there and for him to get screwed. |
| REANOS-MORENO | Yes but, I just called Come right now and was the first |

|  | thing he said, because he also said that he goes, he goes to take care of them late. |
| --- | --- |
| ERAZO | And they have not brought you the other car for you to switch it with him right? |
| REANOS-MORENO | No, no they have not brought it. |
| ERAZO | Oh because it is ugly. Imagine getting into this for shit you do not even sell it, man, understand? Mm, they are going to start to, they could be following this dude.  Because who knows if more than once they have seen him arrive over there. |
| REANOS-MORENO | Yes right.  Yes I can imagine.  It is more [U/I] ugly but it is going to get uglier man.  Hopefully he was leaving [U/I] |

[Recording interruption]

220.    I believe that when ERAZO told REANOS-MORENO to tell "Come" to be careful," and that Come was "lucky" because he had "[gone] to take care of them before," she meant that REANOS-MORENO should tell ARTEAGA (whose nickname I believe is "Come") to be careful with other drug deliveries, and that ARTEAGA was lucky he had not been caught, given that he had made a delivery of drugs to the house shortly before the search.  I also believe that when ERAZO said "they" had "busted Cesar," she meant that law enforcement had arrested CESAR.

221.    I further believe that when ERAZO said, "Come says that he went to see them, but they were going crazy, they were grabbing the *feo* also," she meant that ARTEAGA had reported to her that the street-level dealers at the 91st Avenue House had been purchasing fentanyl in addition to the other drugs.  I believe that "*feo*," Spanish for "ugly," is a reference to fentanyl, both because of the phonetic similarity ("feo" vs. "fentanyl") and because on a call from June 7, 2019, REANOS-MORENO asked an unidentified male whose phone number ended in 1538 (UM-1538) if he had any of the "feo."  UM-1538 asked which kind.  REANOS-

MORENO said it was the "new kind" that he had been looking for and that no one had been able to get a hold of. UM-1538 responded, "Oh, the new one. No, not yet." I believe the two men were discussing fentanyl, because, compared to heroin, cocaine, and methamphetamine, fentanyl is a relatively new drug for which there are not widely used code words.

222.    I believe that when ERAZO said that it was "very strange" that "law enforcement are around right now during the night," she meant that it was strange that the search warrant had been executed at night. When REANOS-MORENO said it was "probably because, because they were watching all these crazies grabbing the feo also," he meant that the unusual circumstances were probably related to the street-level dealers having fentanyl. When REANOS-MORENO said that, "if Come was there they would have taken Come," I believe he meant that if ARTEAGA had still been at the house, law enforcement would have arrested him, too.

223.    When ERAZO said, "Maybe they do not know what he has," and "By luck that dude, had left or left beforehand," I believe she meant that it was possible law enforcement did not know that ARTEAGA was delivering drugs, and luckily he had left before the search. When ERAZO said, "Fuck! All we needed was for Come to be there and for him to get screwed," she meant that Come, as REANOS-MORENO's runner, was a particularly important asset, and if he had been arrested it could have led to law enforcement action against her and REANOS-MORENO.

224.    When ERAZO said, "Imagine getting into this for shit you do not even sell it," I believe she meant that it was unfortunate that REANOS-MORENO's drug-dealing business was being affected by law enforcement raids when REANOS-MORENO did not distribute fentanyl. When ERAZO said, "they are going to start to, they could be following this dude, because who knows if more than once they have seen him arrive over there," I believe she meant that law enforcement might be following ARTEAGA.

225.    A few minutes later, ERAZO called REANOS-MORENO back. Their conversation follows:

REANOS-MORENO        Mhm.

| | |
|---|---|
| ERAZO | What did you say? What were you saying? |
| REANOS-MORENO | No that, no, man, it was that, it was that those dudes were selling that thing probably and… |
| ERAZO | Mm. |
| REANOS-MORENO | Those dudes were selling, you see.  Chapin mother fucker!  Was the one that was selling and, and Cesar also were the ones selling those things. |
| ERAZO | Oh, hey, Fito said that: That who told him, the one who told him, understand?  He says that he was, he got lucky that he was not at that house, but there were three over there, I do not know how many lived there.  But it seems that there were only three in that house when they got busted. |
| REANOS-MORENO | Well, over there they were. |
| [Voices overlap] | |
| REANOS-MORENO | I do not know who, I do not know who those three were that were there understand?  Because I only know that Cesar, Chapin and, and two other dudes lived there.  Understand?  Because I do not know which, which one was not there, because they say there were three understand? |
| ERAZO | Mmm |
| REANOS-MORENO | And well, if, if they had already gotten some, obviously they found them with it well, because Come had already been there, understand? |
| ERAZO | Yes, Come had already been there. |
| REANOS-MORENO | Yes, for him to be just. |
| [Voices overlap] | |

| REANOS-MORENO | Hey. |
| --- | --- |
| ERAZO | Hey, tell Come to just be careful today, do you understand me? |
| REANOS-MORENO | Five, five people lived there, five. |
| ERAZO | Well, they say there were three of them. |
| REANOS-MORENO | Oh. |
| ERAZO | And those people are going to want you to move them for sure, understand? |
| REANOS-MORENO | Yes. |
| ERAZO | Unless that, they don't see you and you swing by around there.  Because dumb assess. |
| REANOS-MORENO | All right, then. |
| ERAZO | All right. |

226.    Based on the context of calls intercepted on June 19, 2019, I believe that when REANOS-MORENO said, "it was that those dudes were selling that thing probably," he meant that he believed law enforcement searched the 91st Avenue House because some of the street-level dealers (he later specified "Chapin" and "Cesar") were selling fentanyl, attracting attention from law enforcement.

227.    I further believe that when ERAZO said that "it seems that there were only three in that house when they got busted," she was referring to the three street-level dealers whom SFPD arrested: CESAR, GARCIA, and another individual.  When REANOS-MORENO said, "I only know that Cesar, Chapin and, and two other dudes lived there," I believe he meant that he knew that four street-level dealers, including CESAR, lived at the 91st House.

228.    I also believe that when REANOS-MORENO said, "And well, if, if they had already gotten some, obviously they found them with it well, because Come had already been there," he meant that "obviously" the police had found drugs at the house, because "Come" "had already been there" to resupply the street-level dealers.  When ERAZO responded, "Yes, Come

had already been there," I believe she meant that ARTEAGA had gone to the house right before the search and had delivered drugs. When ERAZO directed REANOS-MORENO to tell Come to "be careful," I believe she meant that REANOS-MORENO should warn ARTEAGA about what had happened and tell him to be cautious with future deliveries of drugs.

229.    When REANOS-MORENO then said, "Five, five people lived there, five," I believe he meant that he knew of five street-level dealers at the 91st Avenue House: the four men SFPD arrested (CESAR, GARCIA, and two others) and "Fito," who, based on the call above, was not at the house when the search occurred.

230.    I also believe that when ERAZO said, "And those people are going to want you to move them for sure," she meant that, the street-level dealers in the house would want REANOS-MORENO to find them a new redistributor house so they could continue working for him.

## VIII.    Execution of a search warrant at the suspected redistributor house on 103rd Avenue in Oakland

### A.    On June 21, 2019, REANOS-MORENO and ERAZO discussed ERAZO "cooking" drugs to be given to ARTEAGA.

231.    On June 21, 2019, at about 1:02 pm, REANOS-MORENO called ERAZO, and the following exchange occurred:

| | |
|---|---|
| ERAZO | Hello. |
| REANOS-MORENO | Hey. |
| ERAZO | Ah? |
| REANOS-MORENO | Have you made any of that? |
| ERAZO | I am already making it Pelon (PH), see I called you a while back because I could not, not even order Uber or anything. But it was ready and she was just weighting it. [Voices overlap] |
| REANOS-MORENO | Have you not got anything out, anything out yet? |
| ERAZO | No, I just started weighing it. |
| REANOS-MORENO | Huh? |

| ERAZO | I just started weighing it. |
| REANOS-MORENO | And how many did you make? |
| ERAZO | Well, I am about to start weighting it right now. |
| REANOS-MORENO | Alright then weight about four of them and take them, because if you are going to weight all that. |
| ERAZO | Yes Pelon (PH) remember I had to make that sugar.  It was not only to come and cook it. I had to wait for it to dry and everything. |
| REANOS-MORENO | Only if you put about three and take it to them.  Because they had been waiting for Come for a while, since yesterday they had been waiting for that. |
| ERAZO | Well, I already told him to wait an hour for me to bring it to him. |

232.    I believe that when REANOS-MORENO asked if ERAZO had "made any of that," and ERAZO said she had, and that she was about to start "weighing it," the two were referring to drugs that ERAZO was preparing for sale. I know that drugs are commonly sold by weight. When REANOS-MORENO told ERAZO to "weigh about four" and bring them over to him, I believe he was telling her to weigh out four units of drugs and deliver them to him. When ERAZO said that she not only had to "cook" it, but also had to wait for it to dry, I believe she was referring to the process of preparing drugs: crack cocaine from powder cocaine. I know that "cooking" is a common code term for preparing drugs. In addition, I believe that ERAZO's reference to "drying" suggests that she was "cooking" crack cocaine, which is a process that involves boiling cocaine and baking soda in water and then allowing it to dry into rock-like substances. When REANOS-MORENO told ERAZO to take three of them to "Come," I believe he was telling her to take three units of drugs to ARTEAGA so that ARTEAGA could deliver the drugs to the redistributor houses. When ERAZO said she would bring the material to "him" in an hour, I believe she meant that she would bring the drugs to ARTEAGA.

**In Re App. for Crim. Complaint**          76

**B.     About two hours later, officers saw ARTEAGA make a suspected delivery of drugs to the 103rd Avenue House.**

233.    At around the same time as the above-described call between REANOS-MORENO and ERAZO, officers and agents set up surveillance outside the 103rd Avenue House.

234.    At about 3:05 pm, SFPD Officer Blake Cunningham saw FUNEZ walk onto the property and through the front door.

235.    At about 3:34 pm, Officer Cunningham saw ARTEAGA's Cobalt drive west on 103rd Avenue, past the house.  The car parked on Sunnyside, and then ARTEAGA got out. ARTEAGA walked into the 103rd Avenue House through the front door.

236.    At about 3:41 pm, Officer Cunningham saw ARTEAGA exit the front door, walk to the Cobalt, and drive away.

**C.     Officers found FUNEZ, MARTINEZ, and PERDOMO at the 103rd Avenue House along with cocaine, heroin, and methamphetamine packaged for redistribution.**

237.    At about 4:11, the SFPD officers, joined by SA Decker, executed a warrant to search the 103rd Avenue House.  After SA Decker and Officer Kirk Edison breached the west gate of the property and walked into the backyard, SA Decker saw a Hispanic male adult, later identified as MARTINEZ, running out of the back of the house.  SA Decker saw that MARTINEZ was clutching a wooden cutting board and plastic materials.

238.    SA Decker verbally identified himself and ordered MARTINEZ to stop and show his hands.  MARTINEZ ignored the command and continued to turn away from SA Decker.  SA Decker used his feet to swipe at MARTINEZ's legs and then forced MARTINEZ to the ground. Once on the ground, MARTINEZ was compliant, and SA Decker put him into handcuffs.

239.    SA Decker inspected the items that MARTINEZ had dropped upon being detained.  Along with the wooden cutting board, MARTINEZ dropped a knot-tied plastic package containing methamphetamine and a cellophane wrap containing five knot-tied packages of black-tar heroin.  Laboratory testing confirmed the presence of 28.2 grams of pure methamphetamine and 1.3 grams of heroin.

240.    At the same time that SA Decker was detaining MARTINEZ, SFPD officers entered the residence.  The officers found PERDOMO Moreno in one room.[26]

241.    SFPD officers found and detained FUNEZ in another room.  On top of a black dresser was a plastic Ziploc package containing crack cocaine.  Laboratory testing confirmed he presence of 1.6 grams of cocaine base (crack).  Inside a black dresser was $1,065 in cash.  In the same location was the cash was paperwork addressed to "Allan Funez" at "2101 103rd Ave, Oakland, CA 94603."  The officers also found thirteen cell phones in the room.  Eight of the cellphones were in the top drawer of the bedroom dresser.  In the same drawer, the officers found an identification bracelet for FUNEZ and a Honduran passport listing the name "Allan Josue Funez Osorto."  The officers also found $3,400 in U.S. currency inside a black sock.

242.    In the kitchen, under the sink, SA Decker found one knot-tied plastic package containing multiple knot-tied packages of suspected crack cocaine and two knot-tied plastic packages containing multiple knot-tied packages of a mixture of suspected black-tar heroin and crack cocaine.  SA Decker also found three boxes of .9 mm ammunition on a shelf.

**D.    Later that night, REANOS-MORENO and ERAZO reacted to the search warrant at the 103rd Avenue House.**

243.    Later that night, at about 5:06 pm, the DEA intercepted the following call between REANOS-MORENO and an unidentified male whose phone number ended in 3305 (UM-3305):

| | |
|---|---|
| UM-3305 | I am going to have to see you, you know. |
| REANOS-MORENO | Yes? |
| UM-3305 | Because the buddy was busted, you already know, right? |

---

[26] In addition to the call described above at in paragraph 49, the DEA intercepted several calls on which PERDOMO used coded language to discuss drugs with REANOS-MORENO. For example, on February 10, 2019, REANOS-MORENO asked PERDOMO to "go outside" to meet a third party (who I believe was REANOS-MORENO's runner).  PERDOMO said he was at Walgreens.  REANOS-MORENO asked who was at the house, and PERDOMO said "the guy" was there.  REANOS-MORENO told PERDOMO to call that guy and tell him to go outside.  PERDOMO then asked for two of the "day kind" and one "night," which I believe meant cocaine and heroin, respectively.

| | |
|---|---|
| REANOS-MORENO | Whom? |
| UM-3305 | The buddy Joel. |
| REANOS-MORENO | At the one-hundred and three (103)? |
| UM-3305 | Yes, at the one-hundred and three (103).  They just busted him right now. |
| REANOS-MORENO | Right now? |
| UM-3305 | Yes. |
| REANOS-MORENO | I do not believe you. |
| UM-3305 | For sure man. Right now they just called me, you get me?  That was why I was calling you but… |
| REANOS-MORENO | Oh! |
| UM-3305 | Where are you?  So I can go there. |
| REANOS-MORENO | Look, right now I am, I am far away, buddy, but, I will call you when I am around there. |
| UM-3305 | For sure, because I am going on a trip tomorrow, early morning, you get me?  And I wanted to see you today. |
| REANOS-MORENO | No yeah, I will see you today. |
| UM-3305 | Right on, give me a call then. |

244.    I believe that when UM-3305 said the guy had been "busted" and REANOS-MORENO asked if it was "over at 103rd," he meant the 103rd Avenue House.

245.    About two hours later, the DEA intercepted a call from ERAZO to REANOS-MORENO.  A portion of their conversation follows:

| | |
|---|---|
| ERAZO | Oh, have you figured out anything? |
| REANOS-MORENO | No, yeah, not yet, no.   I just passed by there but no, no, I do not see anyone. |
| ERAZO | Oh, nothing? Nothing? |
| REANOS-MORENO | Uh-huh, nothing, nothing. |

| ERAZO | Oh. |
|---|---|

ERAZO　　　　　　　　Oh.

REANOS-MORENO　　Uh-huh.  But they gave... they gave a lot, we will have to see if a lot was dropped off.

ERAZO　　　　　　　　Yea, he said yeah.  He gave some to several people and that they all said the same thing.

REANOS-MORENO　　No, but that, oh, with the little bit he gave, that little bit let's see...

[Voices overlap]

ERAZO　　　　　　　　Oh yes, well yeah you know they sell by twenties (20's) and the twenties (20's) are small, you get me? Maybe he gave like a twenty (20), uh,  that is barely anything.

[...]

REANOS-MORENO　　Well, no well, we have to see, to see that they try it out, they have to give him something because imagine they only, they only gave him a sample to see it, well...son of a bitch for them to get all crazy [U/I].

[Voices overlap]

ERAZO　　　　　　　　That is why, [U/I].

REANOS-MORENO　　No but... [Background: sounds] I was going to drop off some but right now how things are, it is better not not to.

ERAZO　　　　　　　　Of what?

REANOS-MORENO　　I am telling you, I was going to drop off some but how things are right now, not anymore.

ERAZO　　　　　　　　Who were you going to give some to?

REANOS-MORENO　　Huh?  To Chaca, to Chaca and the others but how things are right now, I do not think so.

ERAZO　　　　　　　　Oh.

| REANOS-MORENO | Uh-huh.  Right on. |
|---|---|
| ERAZO | Alright. |

246.    I believe that when ERAZO asked whether REANOS-MORENO had any
information, she was asking about the search of the 103rd Avenue House.  Based on my
knowledge of the investigation, I believe when REANOS-MORENO said they would need to
"see if a lot was dropped off," he meant that they would need to wait and see if ARTEAGA had
dropped off a large amount of drugs that day prior to the execution of the search warrant.  I know
based on my training and experience that a reference to "twenties" means a baggie of drugs that
costs $20.  Therefore, when ERAZO responded that, they sell by twenties, I believe she meant
that the street-level dealers in the 103rd Avenue House dealt in small quantities where they sold
individual baggies of drugs for $20 each.  Finally, later in the call when REANOS-MORENO
said that he was going to "drop off some but right now how things are, it is better not [] to," I
believe he meant that he was going to deliver drugs somewhere, but because of the law
enforcement scrutiny, it would be safer for him to not do so at that time.

247.    At about 9:15 pm, the DEA intercepted another call from ERAZO to REANOS-
MORENO.  That conversation follows:

| ERAZO | No, no, have they finally said anything? |
|---|---|
| REANOS-MORENO | What? |
| ERAZO | Have you heard anything, yet? |
| REANOS-MORENO | About, about who? |
| ERAZO | About Josue. |
| REANOS-MORENO | No, nothing, I'm going to call right now but they are already in Santa Rita, over there. |
| ERAZO | Already?  Then it was true. |
| REANOS-MORENO | Yeah, and, no, well, that was fast. |
| ERAZO | Oh.  [Background: laughter] |
| REANOS-MORENO | Uh-huh. |

| ERAZO | Well, I was thinking about Josue's things, poor guy, and those guys left those boxes full of coke. [Background: noises] |
| REANOS-MORENO | No, well, Darco stayed there, they did not take him. |
| ERAZO | No? How come? |
| REANOS-MORENO | No, because they said he did not have anything on him and… |
| | [Voices overlap] |
| ERAZO | Oh. |
| REANOS-MORENO | And they said they were going, basically for Barba. |
| ERAZO | No way. |
| REANOS-MORENO | Yeah, because the other day they took pictures of everyone… |
| ERAZO | Uh-huh. |
| REANOS-MORENO | … he said they found feno [PH] on that guy.  And [U/I], but they were following him.  He says they were following that car for the past two (2) months. |
| ERAZO | No way. |
| | [Voices overlap] |
| REANOS-MORENO | They came for, for the ugly more than anything else.  They came for the ugly. |

248.     I believe that when ERAZO asked whether REANOS-MORENO had heard anything about "Josue," she meant Josue PERDOMO, whom SFPD had arrested at the 103rd Avenue House.  When REANOS-MORENO said that "they" were already in "Santa Rita," I believe he was referring to Santa Rita jail.  When REANOS-MORENO said that "Darco" was still there and had not been taken, I believe he was referring to a third male who was at the 103rd Avenue House but whom SFPD did not arrest.  When REANOS-MORENO said that "they"

were following the car for the past two months and that "they" had gone there because of the "*feno*," I believe he meant that law enforcement had been following ARTEAGA's car and that they had gone to the 103rd Avenue House because of fentanyl.

249.    Shortly thereafter, REANOS-MORENO called a bail bonds shop and said that he was calling to find out about his cousin "Jose Perdomo or Moreno." The person who answered asked when "he" had been arrested, and REANOS-MORENO said that it had been at about 4 or 5 pm and that there were three who had been arrested. The bail-bonds representative asked if REANOS-MORENO knew the names of the other men, and REANOS-MORENO said no. Later, REANOS-MORENO said to wait, because someone was going to tell him the name. REANOS-MORENO then returned to the phone and told the representative that "Allan Funez" was the name of another person who had been arrested.

250.    Later that night, REANOS-MORENO spoke with the bail-bonds company again. He repeated that the name of his cousin who had been arrested was "Jose Natanael PERDOMO Moreno."

IX.    **Transfer of "independent contractor" drug distributors to another DTO.**

    A.    **After the search and arrests at the 91st Avenue House, the residents of that house searched for a new redistributor house to move into.**

251.    On June 26, 2019, about a week after the search of the 91st Avenue House, at which point all of the residents of that house who had been arrested were on bail from charges filed in state court, the DEA intercepted calls showing that the street-level drug dealers were looking for a new redistributor house and that they were willing to work for a different DTO (i.e., one not headed by REANOS-MORENO) if that DTO would provide a good house and a good price on drugs.

252.    Specifically, at about 4:55 pm that day, the DEA intercepted a call between two individuals who I believe are mid-level drug dealers working for another DTO active in the Tenderloin. I will call these individuals "Individual 4" and "Individual 5." Their conversation follows:

| | |
|---|---|
| Individual 4: | Uh, he said, [Individual 6] said that, that he needs the house for those guys, and that he was going to call you right now.  Get on it and let [Individual 7] know [U/I]. |
| Individual 5: | Oh, yeah.  I'll call [Individual 7] right now. |

[Voices overlap]

| | |
|---|---|
| Individual 4: | Tell [Individual 7].  Yeah, he is going to call you right now.  He said he needs a house for six (6). |
| Individual 5: | All right, then. |

253.    I believe based on the context of the calls described below that when Individual 4 said that "[Individual 5]" "need[ed] the house for those guys," Individual 4 meant that Individual 5 was looking for a house for the street-level dealers who used to live at the 91st Avenue House.

254.    A few minutes later, Individual 6 called Individual 5.  Part of their conversation follows:

| | |
|---|---|
| Individual 6: | Dude, hey, those dudes want a house, man. |
| Individual 5: | I was told they are five, right? |
| Individual 6: | Yes, they are five, dude. I, I told that dude… "but you need to confirm if you are going to want a house," I told him, "because you are not going to make these guys get a house and then you will not get it later." |
| Individual 5: | Uh-huh. |
| Individual 6: | And he told me, "Yes, dude."  And he asked me to give your number, dude. |
| Individual 5: | Give him the number, dude, and I'll come to an agreement right now with [Individual 7] and have her look for a house. |

255.    I believe based on the context of this and other calls described below that when Individual 4 asked whether there were "five" and Individual 6 said yes, Individual 6 meant the four drug dealers who used to live at the 91st Avenue House—CESAR, GARCIA, and two

others—and one of the women who was also present during the search warrant execution. When Individual 6 said that "they" had just been busted a little while ago, I believe he was referring to the search warrant at the 91st Avenue House.

256. A few minutes later, Individual 5 called Individual 6 back and asked whether "they" were "good." Individual 6 said that they were "good workers" and that he had seen them working every day but Wednesday. When Individual 6 said that the guys were "good workers," I believe based on the results of the search warrant at 91st Avenue and the context of later calls (on which the two discuss prices for drugs) that he meant that they were good at selling drugs. When Individual 6 said he had seen these five people work every day but Wednesdays, I believe he meant that they sold drugs six days a week.

257. On a call at about 5:40 pm, Individual 6 told Individual 5 that he would have "them" (the guys) call Individual 5.

**B.    Before accepting an offer for a new redistributor house, the residents of the 91st Avenue house negotiated drug prices with a representative of the DTO.**

258. A few minutes later, Individual 5 got a call from a male whose phone number ended in 8106 (UM-8106). Their conversation follows:

| | |
|---|---|
| UM-8106: | Hey, so what is up?  No, dude, he told me…I told that dude to see if someone had a house there but one that is not burnt or anything. |
| [...] | |
| Individual 5: | …Who, what are those guys' names? |
| UM-8106: | I do not know if you know a dude named Brian. |
| Individual 5: | Brian, huh? |
| UM-8106 | Jeiber [PH]. |
| Individual 5: | Oh, yeah? |
| UM-8106: | They, they are the brother of…I do not know if you know Cesar. |

| | |
|---|---|
| Individual 5: | Cesar? No, I do not know him. Hold on. |

259.    I believe that when UM-8106 said he had asked a third party if he knew anyone who had houses that were not "burned," he meant that he had asked Individual 5 if he knew of someone with a redistributor house that had not attracted law enforcement attention. When UM-8106 said one of the other guys was named "Cesar," I believe he was referring to CESAR Estrada Cruz, who had been arrested at the 91st Avenue House the week before.

260.    Shortly thereafter, UM-8106 and Individual 4 spoke again. Part of their conversation follows:

| | |
|---|---|
| Individual 5: | Oh. So, then, how many are all of you? |
| UM-8106: | Honestly, dude, there are four (4) of us and a girl. |
| Individual 5: | Yeah? And, and, you all work good? |
| UM-8106: | Yeah, we all work there. But, like I am telling you, that when you when there is bad stuff out there... |
| Individual 5: | Yeah, that is... |
| UM-8106: | One has to understand all of that, too. |
| Individual 5: | Yeah. [U/I]. |
| UM-8106: | When, when it is good, one gets plenty of it. |
| Individual 5: | Yeah. Yeah, that sounds good, so, then, [U/I]... |

261.    I believe that when Individual 4 asked if they all "work good," he was asking whether the people looking for a house were good at selling drugs. When UM-8106 said they "all work" and mentioned "bad stuff" versus "when it is good," I believe he meant that the people looking for a house were good at selling drugs, but that their ability to do so depended on the quality of the drugs. I believe that when UM-8106 said that "when it is good, one gets plenty of it," he meant that when the quality of the drugs was "good," he and his associates would buy "plenty" of drugs from Individual 5's DTO.

| | |
|---|---|
| Individual 5: | Yeah, because, honestly, we would like to take all of you so we can get a house as well, to see if there is a house somewhere to get |

you in fast.

| | |
|---|---|
| UM-8106: | Buddy, but how much is she giving the work for…the product? |

[…]

| | |
|---|---|
| Individual 5: | Look, well, things are like this…well the white, the white kind, if you guys get a lot of it; I will give it for one, ten (110). |
| UM-8106: | Well actually, to be honest, I am going to tell you the truth, buddy. |
| Individual 5: | Uh-huh! |
| UM-8106: | We right now, we are getting it for one-hundred and five (105). |
| Individual 5: | Yeah? |
| UM-8106: | Yeah at one-hundred and five (105), and actually, to be honest right now we are moving around because we got busted right here. |

[Voices overlap]

| | |
|---|---|
| Individual 5: | Uh-huh! |
| UM-8106 | That is why or else we would not be moving out. |

262.   When Individual 5 said that he wanted to see if there was a house somewhere to get "you in fast," I believe he meant that his DTO was interested in having the street-level dealers formerly employed by REANOS-MORENO's DTO start working for their DTO instead. When UM-8106 asked how much Individual 5 and others were "giving the work at," I believe he was asking at what price Individual 5's DTO sold drugs. As noted, "work" is a common code term for drugs. When Individual 5 said that, if they would get "plenty of the white," he could give it to them "at 110," I believe he meant that if the street-level dealers bought large quantities of cocaine for resale, Individual 5 could provide it at a price of $110 per one-eighth of an ounce. When UM-8106 said that he and the others were getting "it" at "105 right now," I believe he meant that REANOS-MORENO had supplied that drug to them at a price of $105 per one-eighth of an ounce. When UM-8106 said that they were "moving around" because they got "busted" or else they would not be moving, I believe he was trying to negotiate a better price of $105 rather than $110 before committing to move into a redistributor house run by Individual 5's DTO.

263.    Moments later, the DEA intercepted a three-way call between UM-8106, Individual 5, and another individual who I believe manages rental properties for Individual 5's DTO ("Individual 8").  Their conversation follow:;

UM-8106:            ...I told you we first want to know about the prices as well, because...

[Voices overlap]

Individual 8:       Yeah, no, no...uh-huh.

UM-8106:            Uh, I do not know how much you are giving out the white, and black work. [U/I] crystal [PH], because honestly...I am going to be sincere and honest, here we are buying it at one hundred and five (105), the white one.

[Voices overlap]

264.    When UM-8106 said that he and the others wanted to know about "the prices" at which Individuals 5 and 8 were giving "white," "black," and "crystal," I believe he meant that he and the other street-level dealers wanted to know more about the prices at which Individual 5 and Individual 8's DTO provided heroin, cocaine, and methamphetamine.  When UM-8106 reiterated that he and the others were buying "white" at "105," I believe he was again trying to ensure that, if he and the other street-level dealers switched to the other DTO, they would be able to get drugs at the same prices.

265.    Later that night, Individual 4 (who had been working to set up the conversation between Individual 5 and UM-8106) called Individual 5 again.  Individual 4 said that "those guys" wanted to move as soon as possible.  He said that they got "busted there recently" and didn't want to stay there any longer.  I believe that when Individual 5 said that "those guys" wanted to move as soon as possible because they had been "busted there recently," he meant that UM-8106 and the other street-level dealers wanted to move to a new redistributor house as soon as they could in light of the search warrant that had been executed at the 91st Avenue House.

**CONCLUSION**

266.    I believe based on the foregoing facts that there is probable cause to believe that the Target Subjects have violated 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C).


I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.


_____
Eric Diamond
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me on July 31 , 2019.


_____
HONORABLE THOMAS S. HIXSON
United States Magistrate Judge

**In Re App. for Crim. Complaint**                89

## ATTACHMENT A

| DEFENDANT | PARAGRAPHS OF COMPLAINT |
|---|---|
| Andy REANOS-MORENO a/k/a "Pelon" | *passim* |
| Karol ERAZO Reanos | 39, 65-66, 178, 217-232. 244-248 |
| Manuel ARTEAGA a/k/a "Come" a/k/a "Comer" | 21. 135-151, 207-208, 220-223, 232, 235-236, 246 |
| Allan Josue FUNEZ Osorto | 22, 102. 172-179, 186-193 |
| Brayan MARTINEZ | 22, 173-178, 180-183, 237-240 |
| Josue Natanael PERDOMO Moreno a/k/a "Cachete" | 22, 49-50, 237-240, 248-250 |
| Jose Franklin Rodriguez GARCIA | 22, 84, 90-91, 117-122, 125-128, 154-155, 211-212 |
| CESAR Estrada Cruz | 22, 123-125, 194-206, 213-214, 219-220, 226-229, 258-259 |
| Arnold CRUZ Rodriguez a/k/a "Jose" | 22, 133, 160-167 |
| Christian RODRIGUEZ-VALLE | 22, 94-96, 168-171 |
| Alex Gomez BARRIENTOS a/k/a "Axel Gamez"; | 22, 83, 85-89 |
| Eric MONTOYA-MARQUEZ | 130-131, 184-185 |
| Kevin ARTEAGA-MORALES. | 156-159 |