Pages 1-21

1                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
2                      SAN FRANCISCO DIVISION

3

4   UNITED STATES OF AMERICA,     )  Case No.  19-cr-00381-WHA
                                  )
5             Plaintiff,          )  San Francisco, California
                                  )  Wednesday, August 21, 2019
6        vs.                      )
                                  )
7   ANDY MANUEL REANOS-MORENO,    )
    et al.,                       )
8                                 )
               Defendants.        )
9   _____)

10                  TRANSCRIPT OF DETENTION HEARING
              BEFORE THE HONORABLE ELIZABETH D. LAPORTE
11                  UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For Plaintiff:            SAILAJA PAIDIPATY, ESQ.
                              U.S. Attorney's Office for the
14                            Northern District of California
                              450 Golden Gate Avenue, 11th Floor
15                            San Francisco, California 94102
                              (415) 436-6821
16
    For Defendant Andy        GAIL R. SHIFMAN, ESQ.
17  Manuel Reanos-Moreno:     Law Offices of Gail Shifman
                              24531 Fillmore Street
18                            San Francisco, California 94115-1814
                              (415) 551-1500
19
    Interpreter:             CAROL RHINE MEDINA
20
    For Pretrial Services:   ANA MENDOZA
21
    Transcription Service:   Peggy Schuerger
22                            Ad Hoc Reporting
                              2220 Otay Lakes Road
23                            Suite 502-85
                              Chula Vista, California 91915
24                            (619) 236-9325

25

    Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.

2

1    <u>SAN FRANCISCO, CALIFORNIA  WED., AUGUST 21, 2019  10:57 A.M.</u>

2                          --oOo--

3            THE CLERK:  Calling 19-cr-381, USA v. Andy Manuel

4    Reanos-Morena.

5        (Pause.)

6            MS. PAIDIPATY:  Apologies, Your Honor.  Sailaja

7    Paidipaty for the United States.

8            THE COURT:  Thank you.

9            MS. SHIFMAN:  Good morning, Your Honor.  Gail Shifman on

10   behalf of Mr. Reanos-Moreno who's present in custody being

11   assisted by the Spanish language interpreter.

12       And before we go any further, in case we forget, there needs

13   to be a correction on the case name here.  It's actually the wrong

14   name for Mr. Moreno, just on the case name itself, I don't believe

15   on the complaint -- the complaint or the indictment.  It should be

16   Moreno, M-o-r-e-n-o, rather than Morena.

17           MS. PAIDIPATY:  And I think that's just the docket on

18   ECF versus the actual charging documents.  If we could --

19           THE COURT:  Oh, so the docket -- so the Court Clerk will

20   have to correct the docket.

21           MS. PAIDIPATY:  Right, if we can ask to have that

22   corrected.

23           MS. SHIFMAN:  We meant to do that earlier, but it

24   slipped our minds.

25           THE COURT:  That's fine.  Okay.  So this is on for

1   detention hearing and setting further proceedings.  Does everyone

2   have a chance to look at the addendum and the original report?

3            MS. PAIDIPATY:  Yes, Your Honor.

4            THE COURT:  And what's the Government's view?

5            MS.  PAIDIPATY:   The  Government  is  still  seeking

6   detention, and we believe that there are a confluence of factors

7   here that are particular to this Defendant that still indicate a

8   serious risk of flight and that's primarily his ties in the United

9   States versus his ties internationally, the consequences of the

10  case here, and his access to cash.

11       So to briefly walk through some of that, his primary ties in

12  this  district,  based  on  the  underlying  investigation,  are  his

13  family members, who we believe are involved in drug trafficking,

14  and his co-conspirators.

15       The first sureties that the Defendant put forward were his

16  sisters -- Carol, Sonya, and I believe Fani (ph).  SFPD officers

17  report that they see his sisters Carol and Sonya on a near daily

18  basis  in  the  tenderloin  involved  in  suspected  narcotics

19  transactions.  She is not -- now, to be clear, neither of them are

20  charged in this case.  I believe Carol has in the past been

21  arrested for suspected drug dealing.  And Carol, I believe, is in

22  a  relationship  or  told  police  officers  that  she's  in  a

23  relationship with the Defendant's -- one of the co-Defendants,

24  Kevin Arteaga-Morales.

25       Now, the reason I'm walking through some of those ties --

1    since they're not any more the proposed sureties -- are that those
2    are the people that are the closest to him and they are also
3    involved in we believe his drug-dealing business.  They are not
4    here legally and were originally the people put forward.  So I
5    think the people who are closest to Mr. Reanos-Moreno also face a
6    decent amount of legal exposure and all of them have ties back to
7    Honduras, which is where their family is and where Mr. Reanos-
8    Moreno spent about a month and a half, from December to January.

9        Take that with the fact that, here, Mr. Reanos-Moreno is
10   charged with a five-year mandatory minimum.  If convicted, he
11   would not be safety-valve-eligible as the Government has alleged
12   that he's actually the head of this entire enterprise that's been
13   charged.  So that is a serious consequence.

14       He is here legally.  He has a green card.  But if convicted,
15   he would actually face some of the similar serious immigration
16   consequences based on the allegations.

17           THE COURT:  He could -- he could lose his green card
18   status is what you're saying.

19           MS. PAIDIPATY:  Exactly.

20           THE COURT:  Uh-huh.

21           MS. PAIDIPATY:  And then the last point is the access to
22   cash.  When Mr. Reanos-Moreno was arrested on August 6th, agents
23   found about $28,000 in cash in the apartment that he shared with
24   his co-Defendant -- co-Defendants Manuel Arteaga and his
25   significant other, Karol Erazo, who is also charged.  That is a

1    lot of cash.

2        He also, as part of the conspiracy, has been alleged to be

3    housing  street-level  dealers  in  multiple  houses  throughout

4    Oakland.  His name is on multiple PG&E bills.  And, therefore, in

5    order to keep up his enterprise, he has a lot of cash flow coming

6    in and out.

7        One of his co-Defendants, Nicolas Soria, lives in the Central

8    District.  An underlying investigation here showed that on one day

9    at approximately 4:00 p.m., Mr. Soria drove up from Los Angeles

10   with what we suspect to be drugs, went to Mr. Reanos-Moreno's

11   home, where he was ultimately arrested on Earl Street.   The two

12   met.  They switched vehicles.  And shortly after that, Mr. Soria

13   was stopped by CHP and he had about 500 grams of cocaine in the

14   car  and  $17,000 of  cash.    We  suspect  that  that  involved  a

15   narcotics transaction at Mr. Reanos-Moreno's home.

16       So he has some out-of-district contact also with respect to

17   drug-dealing, who also have access to cash.

18       Now, why is that not mitigated by a halfway house?  Well, I

19   think  as  this  Court  sees  fairly  routinely,  unfortunately,  a

20   halfway house is not always very secure.  I think we've had plenty

21   of defendants who have walked away.  And the difference between --

22

23       THE COURT:  Yesterday, somebody jumped away allegedly.

24       MS. PAIDIPATY:   That is -- and while there was an

25   individual  determination,  I  think  that  is  indicative  of  the

1    security  measures  or  lack  thereof,  and  because  of  the

2    international ties, the cash, if Mr. Reanos-Moreno were to walk

3    away from the halfway house, given that his closest contacts are,

4    again, involved in criminality and not here legally, being able to

5    get him back would be very difficult.

6        So now let me address the proposed surety.  We were actually

7    meeting outside briefly with Ms. Solem, and I really appreciate

8    that she has come forward.  She actually drove here all the way

9    from Ukiah.  Ukiah is about three hours away.  And one concern the

10   Government has is whether she actually would be able to exercise

11   much  moral  suasion  given  her  distance  and,  two,  given  her

12   relationship -- we were in the hallway.  The Government -- I was

13   trying to get a little bit more information on how they knew each

14   other.

15       She  says  she  runs  an  apprentice  program  which  essentially

16   helps people learn a trade, the auto body trade.  And she said

17   she's been having conversations with Mr. Reanos-Moreno.  I didn't

18   discern  whether  he's  already  gone  through  that  program  or  is

19   perhaps about to go through it.

20       But  based  on  the  Government's  investigation  --  and  that

21   includes wiretaps, vehicle trackers -- from at least October 2018

22   to the time of his arrest, his occupation daily has been dealing

23   drugs and running a pretty vast enterprise.

24       And so what the Government wants to know is if Ms. Solem is

25   aware of what is alleged in the criminal complaint in pretty big

1  detail, that not only was he involved in drug trafficking, but we

2  actually say he's the leader of this and this is what he had been

3  doing for nearly the last year -- over a year and a half.

4      If Ms. Solem lives in Ukiah, which is far away, I'm not

5  convinced that she would be able to -- to ensure his appearance

6  and really be able to actually keep an eye on him.  I think it's

7  also somewhat telling that she's not -- it's not a secured bond.

8  And given that it's not family, I understand that.  But I think

9  that still also, given the other factors, really suggests a

10  serious risk of flight.

11          THE COURT:  All right.  And I take it Ms. Solem is here

12  somewhere.

13          MS. SHIFMAN:  Yes, Your Honor.

14          THE COURT:  I don't know who it is -- yeah.  All right.

15          MS. SHIFMAN:  She is present.  She's in the back row

16  raising her hand.

17          THE COURT:  All right.

18          MS. SHIFMAN:  Before she comes forward, what I'd like to

19  do is address just a couple of the things that the Government has

20  said.  Actually, maybe Ms. Solem could come forward.

21          THE COURT:  All right.  Please come forward.

22          MS. SHIFMAN:  Ms. Solem -- perhaps that would aid the

23  Court in moving forward.

24      Just a couple of things, Your Honor.  What the Government has

25  basically argued goes to the weight of the evidence rather than an

8

1  actual risk of flight.  Mr. Reanos --

2          THE COURT:  Well, some of it went to flight, but -- all

3  right.  Go ahead.

4          MS. SHIFMAN:  Yes, Your Honor.  Mr. Reanos-Moreno has

5  been here in the United States legally.  He has a green card.

6  Pretrial   Services   has   interviewed   him,   has   verified   the

7  information,   has   provided   a   report   to   the   Court,   and   has

8  recommended that he be released to a halfway house and only be

9  allowed to leave for purposes of court, to meet with counsel, to

10 go to Pretrial Services.  And at this point, not even be released

11 for purposes of employment, though I assume at some point that

12 might be something that can be discussed and perhaps worked out.

13     It's not Ms. Solem's job to keep an eye out as a surety.

14 It's her job, in essence, to be a guarantor.  The keeping the eye

15 out on Mr. Reanos-Moreno --

16         THE COURT:  No.  I understand the difference between a

17 custodian and a surety.  On the other hand, generally the sureties

18 are somebody who is -- knows the Defendant well and continues to

19 have contact with him.  So there is --

20         MS. SHIFMAN:  Yes.

21         THE COURT:  -- that would be difficult between a halfway

22 house and Ukiah.

23         MS. SHIFMAN:  Well, Your Honor, until his arrest, they

24 were in contact by phone.  And they can stay in contact by phone,

25 on Ms. Solem's cell phone -- not at her employment.  She prefers

1    to not be called.  She is a U.S. citizen.  She's a legitimate
2    business owner.  She owns three body shops that she's owned for 30
3    or 35 years.  She knows Mr. Reanos-Moreno because -- she knows the
4    family as well as specifically Mr. Reanos-Moreno.  She's known him
5    for more than three years and perhaps as long as five.  She
6    doesn't remember the exact date.  She knows his brother.  She
7    knows his sisters.  They've been engaged -- he has not gone
8    through the apprenticeship program, but they were making
9    arrangements for him to go through the apprenticeship program at
10   one of her body shops.

11        And she is here in this district and she lives in Ukiah, but
12   she lives in this district.

13             THE COURT:  I understand.  It's a big district, but yes.
14   But --

15             MS. SHIFMAN:  And I've explained to her exactly what
16   he's charged with and she's been present to listen to what the
17   Government has to say as well.  I know that whoever spoke to him
18   from Pretrial Services also explained the risk associated with
19   signing onto the bond.

20        Ms. Solem has told me more than once, "I totally get it.  I
21   believe he will appear in court as needed to do so.  I'm willing
22   to assume this risk."  She is not -- she has no criminal history.
23   She's not associated with any of the allegations or any other
24   allegations.  She has employed people through her body shops who
25   have in the past committed crimes.  She understands what that

1   means.   She's a foreign immigrant.   She understands what that

2   means.   And I would just say, you know, I want the Court to know

3   that though Mr. Reanos-Moreno went home over Christmas to visit

4   his mother, he does not want to live or go back to Honduras.   He

5   wants to stay here in the United States.   There's zero interest in

6   returning to that country -- for obvious reasons -- on a permanent

7   basis.

8            THE COURT:   What's the status of the passport, which is

9   referred to as "unknown"?

10           MS. SHIFMAN:   Yeah.   So he did have a passport.   It was

11  at the apartment.   We -- he does not have it -- obviously got

12  arrested at the apartment where he rented.   We assume that law

13  enforcement had seized it.   The Pretrial Services report indicates

14  that they did not.   I sent an investigator over to the apartment.

15  The apartment was rented with furniture.   Everything -- clothing,

16  toiletries -- everything in that apartment -- his camera -- has

17  been removed.   We believe that was done by the landlady.   We don't

18  know that for sure, but --

19           THE COURT:   Right.

20           MS. SHIFMAN:   -- she would be the person --

21           THE COURT:   Seems likely.

22           MS.  SHIFMAN:    -- to have access to it.   We have

23  contacted the landlady.   And if I need to send the investigator to

24  contact her in a personal way, I'm happy to do that.   But we think

25  she's got not just personal items but also his passport.   We don't

1  have it.  We don't know exactly --

2        THE COURT:  That would seem a little bit odd, but -- I

3  mean, it's possible, but it's certainly possible that she

4  confiscated everything.  It would seem a little odd for somebody

5  to hold onto someone else's passport without notifying anybody,

6  but it's not impossible by any means.

7        MS. SHIFMAN:  I mean, I don't know anything about the

8  landlord.

9        THE COURT:  Yeah, right.  Obviously, yeah.  Well -- all

10  right.  And I think -- would you please just for the record state

11  your name and your relationship to the Defendant.

12        MS. SOLEM:  Yeah.  My name is Kari Solem and I'm an auto

13  body shop owner and my relationship with Andy is that I was

14  preparing to put him through my apprenticeship program --

15        THE COURT:  Uh-huh.

16        MS. SOLEM:  -- at my shops.

17        THE COURT:  Uh-huh.  How is it that you know him?  I

18  mean, what's --

19        MS. SOLEM:  I met him through -- the word on -- okay.

20  So 30 years ago when I started my body shops, I was the first

21  woman in California to do that.

22        THE COURT:  Good for you.

23        MS. SOLEM:  So all the magazines came and did articles

24  on me and have continued to do so.  So somehow his brother got a

25  hold of this article I'm in and I got a phone call and I was at

1    work and I was very busy and I was really short with him.  But

2    later on, I got back to him and he said that his brother might be

3    interested in beginning the program.  I asked --

4              THE COURT:  This was several years ago?

5              MS. SOLEM:  This was like almost five years ago.

6              THE COURT:  Uh-huh.

7              MS. SOLEM:  I asked him a few questions, sounded good.

8    I told him that I could meet with him.  And so that's how it

9    began.

10       I don't think there's any accidents.  I know -- I'm shocked

11   to hear a lot of these charges, but I do know that given my

12   experience with people that are involved in drugs and have gotten

13   into trouble, if you give them an opportunity to work in the

14   community, you know, to do the right thing, they'll take it.

15       A lot of these people that I've talked to have told me that

16   it was, you know, their only option or they got pressured into it

17   or whatever.  And I have people that have a 20-year success rate

18   that came in off of a gang or on drugs or whatever and they've

19   been through rehabilitation programs while they worked for me.

20       And as far as me not being able to keep an eye out, I have a

21   real good connection with the guy up above, and I prayed about

22   this, and I also work in Santa Rosa.  So I am all over the place.

23   Yes, it was a three-hour drive to come here, but I was happy to do

24   it because I believe in the Defendant.  I really do.

25              THE COURT:  Do you understand that if he's convicted, he

1   faces a minimum -- automatically as I understand it -- five years

2   in prison?

3            MS. SOLEM:  I'm sad to hear that.

4            THE COURT:  So he -- if that were to happen, he would

5   not get a chance to rehabilitate himself until after all of that

6   was done -- that his passport is missing and that, you know --

7   presumably, maybe it's through no fault of his own, but it is

8   missing.

9            MS. SOLEM:  As far as the apprenticeship program goes,

10  you know, there's really no reason to start this until we figure

11  out what's gonna happen here.

12           THE COURT:  Right.

13           MS. SOLEM:  I don't have any reason to believe -- I know

14  that he's done bad things here in San Francisco and I know that

15  he's under arrest for that.  But I don't have any reason to

16  believe that he's going to continue on.  I'm going -- I'm offering

17  him an opportunity after.

18           THE COURT:  Well, the question would be whether -- the

19  real question here is whether, given a choice -- even though he'd

20  certainly rather not go to Honduras under other circumstances --

21  if he at some point comes to believe that he's facing a minimum of

22  five years and possibly more in prison here, that it might seem

23  better to go somewhere else, at least temporarily.

24           MS. SOLEM:  Well, my response to that is his mother is

25  in Honduras, I believe, and --

14

1          THE COURT:  So he has relatives there.

2          MS. SOLEM:  -- his family is here.

3          THE COURT:  Some of them are here and some of them are

4   there, I guess.

5          MS. SOLEM:  You know, and there's a reason why he came

6   here in the beginning, but I'm sure that it didn't have anything

7   to do with what he's doing now.  I just -- I believe that this

8   particular person is not a piece of paper with charges.  I believe

9   that he, given the opportunity -- even after he serves -- given

10  the opportunity, if he has to go to jail --

11         THE COURT:  How often have you been seeing him?  How

12  much time have you spent with him?

13         MS. SOLEM:  Talking to him on the phone --

14         THE COURT:  On the phone.

15         MS. SOLEM:  -- through his sister or him directly, once

16  a week, at least.

17         THE COURT:  You understand the sister's also alleged by

18  the Government just now to be involved in the tenderloin?

19         MS. SOLEM:  I didn't know that, Your Honor.  I did not

20  know that.

21         THE COURT:  Yeah.  I mean, does that make any difference

22  to you?

23         MS. SOLEM:  You know, I'm just -- I know that it's a

24  risk.  I know that.  But I've taken lots of risks on other people

25  and I just -- if I feel like it's not going the right direction or

1    I feel like things aren't going in the direction that I had hoped

2    that they would go, then I'm going to be contacting his attorney

3    and the Court.

4              THE COURT:  Why would you not be willing to have -- the

5    bond have some security to it?

6              MS. SOLEM:  Well, Your Honor --

7              THE COURT:  It sounds like you're doing pretty well

8    financially, which is a good thing.

9              MS. SOLEM:  Yeah.  Because I'm not directly related and

10   I need to be -- I need to be shown that he's serious and he's

11   going to follow through with this and he's going to go and do

12   everything that's asked of him.  And, you know, a bond through the

13   Federal Government, signing a bond is -- just because the

14   property's not secured doesn't mean -- like you just said, that I

15   do have property.  I have three auto body shops.  I have no

16   partners.

17             THE COURT:  Uh-huh.

18             MS. SOLEM:  So -- and a home.

19             THE COURT:  Uh-huh.

20             MS. SOLEM:  You know, and I'm getting married in three

21   weeks.

22             THE COURT:  Congratulations.

23             MS. SOLEM:  So I'm really -- I'm really tired.  I'm

24   sorry.  But that's just my stance and I think I'm gonna stand on

25   it because -- and I appreciate so much explaining to you

1  everything.  I'm going to think about that later and, you know --

2  but I think I'm going to stand on this today and sign the bond if

3  you're willing to have me.

4          THE COURT:  Yeah.  You are very eloquent and very

5  impressive and everything you say is well-taken in terms of, you

6  know, rehabilitation is always preferable.  On the other hand, I

7  am concerned that you are not as aware of some of the things here

8  as -- that have come as somewhat news, including that it sounds as

9  if this is a family business here.  So the family ties are not

10 necessarily positive.

11     Not that they're all negative, but -- and you've certainly

12 seen, you know, some very positive side to it, but I am -- I'm

13 concerned by what the Government said about the access to cash.

14 I'm concerned -- although it has a potentially completely innocent

15 explanation, but still the passport hasn't been found.  But we

16 also know that passports aren't -- there are ways to get in and

17 out of this country without one but -- as well, but it certainly

18 makes it easier.

19     And, as I say, I'm concerned that -- you know, I have no

20 doubt that the first choice, and even the second, third, fourth,

21 fifth would be to stay here rather than to go to Honduras under

22 most circumstances, but this is a new circumstance.

23     So I'm very concerned.

24          MS. SHIFMAN:  Your Honor, I want to address a couple

25 things.  First of all, with regard to access to cash, that also is

1   part of the evidence of the case, that the cash came from

2   trafficking.

3       You know, if Mr. Reanos is --

4           THE COURT:  I'm not -- I don't have to ignore the

5   evidence in the case.  The nature of the charges --

6           MS. SHIFMAN:  No.

7           THE COURT:  Yes, but I -- but I'm not going to ignore

8   things that are relevant that I'm supposed to look at in the

9   circumstances.  And this is one of them.

10          MS. SHIFMAN:  Yes.  I understand.

11          THE COURT:  And it's hard to get those amounts of cash

12  from doing construction work.  It just -- on a part-time basis or

13  whatever, you're saying he was doing, so --

14          MS. SHIFMAN:  I understand that, Your Honor.  But one

15  thing it does point out is -- and what you heard the Government

16  say was access to cash but that the investigation of the case was

17  ongoing.  I haven't heard any --

18          THE COURT:  He presumably has less now, but he might

19  have stashed some elsewhere.  Presumably there's none coming in at

20  this point.

21          MS. SHIFMAN:  Well, Your Honor, we could assume

22  everything --

23          THE COURT:  All right.  Okay.  I'm not -- I'm sorry,

24  but, please, don't accuse me of making assumptions.

25          MS. SHIFMAN:  I wanted to also address the --

1          THE COURT:  It's not very helpful.

2          MS. SHIFMAN:  No, no, I'm not doing that, Your Honor.

3   I'm just trying to point to what the information was that we heard

4   today from the Government.  And the second thing with regard to

5   his sisters, Your Honor, I don't -- I got one police report in

6   advance of today regarding his sister -- I believe it was Karol --

7   and she was present in a car that got stopped where someone else

8   was arrested and they were arrested with drugs.  She was not

9   charged.  She was not sentenced.  She was released.

10      So I don't find -- I mean, you know, I have a client who has

11  sisters.  Their relationship with my client, just based on the

12  charges, I mean, there's gonna be some access to people who have

13  allegedly or at least by probable cause committed crimes.

14      That does not make them drug conspirators or co-conspirators

15  in these charges.

16          THE COURT:  She didn't -- she didn't say that.  She just

17  said that they are also doing -- engaged in illegal activity in

18  the tenderloin and the police see them daily there.

19      Yes?

20          MS. PAIDIPATY:  The sister that we were speaking about,

21  I never met her, never talked to her.  This is a different sister.

22          THE COURT:  I think -- weren't there two sisters?

23          MS. PAIDIPATY:  There were two sisters.  So Sonya and

24  Karol.

25          MS. SOLEM:  Okay.  So Sonya is the sister that has given

1   them messages when -- I would like to see him and told him about

2   the program.

3          THE COURT:  And I think she spoke about both of them.

4          MS. PAIDIPATY:  Yes.  And, actually, that's a little

5   concerning because Sonya told Pretrial that she has not been in

6   contact with her brother for the last year approximately.  She

7   also has provided two different addresses to Pretrial.  One

8   address which was put forward as a surety, 44th Street in Oakland.

9   When Sonya spoke with Pretrial with respect to her brother, a

10  different address with respect to Kevin Arteaga-Morales, one of

11  the co-Defendants here, who I believe was in a relationship

12  previously on and off with Karol, the other sister, so I think

13  there's a concern again about the people who have the most ready

14  access to Mr. Reanos-Moreno.

15         And I appreciate Ms. Solem coming here.  I think it's

16  clear that she's here to help, but I don't think she has enough

17  contact, since a lot of it was telephonically and kind of through

18  a third party -- that I still don't think that's sufficient to

19  ensure a lack of flight, given all of the other factors.

20         THE COURT:  Well, I am sorry to say I am persuaded by

21  the reasons the Government has given and the risks that Pretrial

22  identified, albeit they came to a different conclusion.  So I am

23  going to detain him.  I appreciate very much your willingness to

24  do that and it sounds like you're doing amazing work for the

25  community and are to be congratulated.

1          MS. SOLEM:  Thank you, Your Honor.

2          THE COURT:  It's very kind of you to do that.  And good

3   luck with your impending marriage.

4          MS. SOLEM:  I've got to go back to work.

5          THE COURT:  Marriage in two weeks, so --

6          MS. SOLEM:  Yes.

7          THE COURT:  So if you would prepare an order.

8          MS. PAIDIPATY:  Yes, Your Honor.

9          THE COURT:  All right.  Do we need to set any dates or

10  are we set on that?

11         MS. PAIDIPATY:  We -- the case is in front of Judge

12  Alsup on September 17 for relation, and I discussed that with

13  Counsel.  The Government anticipates --

14         THE COURT:  It's not been related yet?

15         MS. PAIDIPATY:  Not yet.  The relation paperwork is

16  being finalized.

17         THE COURT:  Okay.

18         MS. PAIDIPATY:  And we discussed an exclusion of time

19  pending discovery from the Government.

20         THE COURT:  All right.

21         MS. SHIFMAN:  No objection to an exclusion of time, Your

22  Honor.

23         THE COURT:  All right.  Thank you.

24         MS. PAIDIPATY:  Thank you very much.

25         MS. SHIFMAN:  Thank you, Your Honor.

1       (Proceedings adjourned at 11:24 a.m.)

2

3           I, Peggy Schuerger, certify that the foregoing is a

4   correct transcript from the official electronic sound recording

5   provided to me of the proceedings in the above-entitled matter.

6

7   _____          August 26, 2019
    Signature of Approved Transcriber            Date

8

9   Peggy Schuerger
    Typed or Printed Name
10  *Ad Hoc Reporting*
    Approved Transcription Provider
11  for the U.S. District Court,
    Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25