1    DAVID L. ANDERSON (CABN 149604)
United States Attorney

2

HALLIE HOFFMAN (CABN 210020)
3    Chief, Criminal Division

4    SAILAJA M. PAIDIPATY (NYBN 5160007)
RYAN REZAEI (CABN 285133)
5    Assistant United States Attorneys

6       450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102-3495
7       Telephone: (415) 436-7200
      FAX: (415) 436-7234
8       sailaja.paidipaty@usdoj.gov
      ryan.rezaei@usdoj.gov
9

Attorneys for United States of America

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

SAN FRANCISCO DIVISION

13

14    UNITED STATES OF AMERICA,       )    No Cr 19-0381-1 CRB
                                                )
15          Plaintiff,                          )
                                                )    UNITES STATES' OPPOSITION TO MOTION TO
16    v.                                              )    REVOKE DETENTION ORDER
                                                )
17    ANDY REANOS-MORENO,              )    Hearing Date: October 16, 2019
                                                )    Time: 1:00 p.m.
18          Defendant.                      )    Court: Hon. Charles R. Breyer
                                                )

19

20         Defendant Andy Reanos-Moreno ran an extensive drug trafficking enterprise that, on a daily

21 basis, sold methamphetamine, heroin, cocaine, and crack in the Tenderloin neighborhood of San

22 Francisco. As the head of this conspiracy, Reanos-Moreno faces severe consequences: a five-year

23 mandatory minimum prison sentence (though drugs seized during the investigation satisfy the federal

24 threshold for a ten-year minimum) and loss of his status as a legal permanent resident.

25         His primary ties to the United States consist of other drug traffickers, almost all of whom are in

26 the country illegally. The criminal investigation revealed that the organization was a family affair.

27 Reanos-Moreno's wife (Karol Erazo Reanos), cousin (Josue Nataneal Perdomo Moreno), and his

28 brother-in-law (Kevin Arteaga-Morales) are co-defendants in this case. All three of Reanos-Moreno's

sisters, who live in the Bay Area and were originally proposed to Pretrial Services as potential sureties, have previously been arrested for drug trafficking. One sister was arrested on state drug trafficking charges the day before Reanos-Moreno's detention hearing. The remainder of the defendant's family, including his parents and brother live in Honduras – a country that Reanos-Moreno visited as recently as January 2019.

Given the consequences of his crimes, Reanos-Moreno, and indeed his extended family, have every incentive to flee the jurisdiction. And importantly, not only does Reanos-Moreno have the motive to flee, but he has the means. Reanos-Moreno ran a profitable criminal enterprise flush with cash, some of which was laundered overseas. His fingerprints were found on packaging material used to wrap over $189,000 in cash that another individual tried to smuggle into Mexico. Agents also found receipts for international money transfers on Erazo's phone.

At the time of Reanos-Moreno's arrest, agents seized over $28,000 in cash in addition to fentanyl, methamphetamine, and cocaine. On another occasion, Reanos-Moreno paid his co-defendant, Nicolas Soria, approximately $17,000 for drugs. Soria, one of Reanos-Moreno's drug suppliers drove up from Los Angeles, where he lives, to Reanos-Moreno's house in Oakland for the sale. If released, Reanos-Moreno will have access to significant quantities of drugs with a resale price in the tens of thousands of dollars. Additionally, many street-leveler dealers suspected of working for Reanos-Moreno are not indicted in the current federal case. Reanos-Moreno, therefore, has the ability to continue a drug trafficking operation and finance flight from the jurisdiction.

Because Reanos-Moreno can resume his trafficking operation, whether domestically or internationally, a $100,000 unsecured bond cannot mitigate Reanos-Moreno's risk of flight. He can simply reimburse a surety for any money lost resulting from a bond violation. On the day of his arrest alone, Reanos-Moreno possessed almost one-third of the amount of the proposed bond figure in cash. Further, as established during the detention hearing, Kari Solem, the proposed surety, is only loosely connected to Reanos-Moreno, mainly speaking with him occasionally over the phone or through family. It is unclear if she has ever met Reanos-Moreno in person. While Solem's efforts to assist Reanos-Moreno and others in the criminal justice system are undoubtedly laudable, she cannot exercise sufficient moral suasion over the defendant ensuring his compliance with bond conditions.

Contrary to defendant's contention, the Bail Reform Act presumes that no conditions of release sufficiently mitigate his risk of flight. Reanos-Moreno fails to rebut that presumption and the evidence put forward by the government establishes by a preponderance that he is a serious risk of flight. This Court should affirm Magistrate Judge Laporte's order detaining Reanos-Moreno pretrial.

## I. STATEMENT OF FACTS

### A. Reanos-Moreno ran a sophisticated drug trafficking organization that employed over two-dozen street-level dealers.

Since at least October 2018, Reanos-Moreno and Erazo ran an extensive drug trafficking organization (DTO) in the East Bay and San Francisco. (*See* Dkt. 1, Compl. ¶¶ 17-19; 21.) The DTO hired street-level dealers who purchased drugs from Reanos-Moreno and then traveled from Oakland to the Tenderloin district in San Francisco where the drugs were resold. (*Id.*) Reanos-Moreno and Erazo rented houses and apartments throughout Oakland, which they subleased to the street-level dealers. (*Id.*) Each day, a lieutenant for the organization drove to each of the DTO's houses to resupply the street-level dealers. (*Id.*) With this daily supply stream, the dealers minimized their potential legal exposure by only possessing small quantities of drugs at any one time. Many of these street-level dealers have been arrested numerous times by state authorities with these small quantities of drugs. But the federal investigation, particularly intercepted conversations between Reanos-Moreno and members of the DTO, revealed that the dealers sold those seemingly minimal amount of drugs in the Tenderloin every day. One dealer gave an undercover officer his phone number and said he worked at the corner of Hyde Street and Eddy Street daily from 3 p.m. to 9 p.m. (*Id*. ¶¶ 184-185.)

The investigation further revealed the tight control that Reanos-Moreno held over the DTO. If a street-level dealer was not buying drugs from Reanos-Moreno, he had to leave the DTO's house, and Reanos-Moreno made it clear that the dealer could be replaced. For example, the DEA intercepted several text messages that Reanos-Moreno sent to a suspected street-level dealer living in one of the DTO's houses. Reanons-Moreno stated: "trying to find another place for you guys but I am not going to look so that you guys can work with someone else[.]" (*Id.* ¶ 111.) In subsequent texts, Reanos-Moreno stated that he needed to know whether the individual would move out before a certain date "so [he] can move in other people." (*Id.* ¶ 113.) He went on to say, "[L]isten if Kike is going to get work from me

this month, you can stay there for the month[,] [B]ut if you are not going to get anything, then it has to be right now." (*Id.*) Based on their training and experience, and knowledge of this investigation, agents believe the street-level dealer was not purchasing drugs from Reanos-Moreno and therefore was given an ultimatum to either leave the house or start buying and selling drugs for the DTO. (*See id.* ¶¶ 110-116.)

### B. The Reanos-Moreno DTO was financially lucrative for Reanos-Moreno and his family.

The DTO brought in enough money for Reanos-Moreno to rent numerous houses and apartments in Oakland, and to pay utilities for those locations. During the search warrant execution at Reanos-Moreno's home, agents found leases in Reanos-Moreno and Erazo's names for three homes in Oakland. They also found a utility bill for one of the homes in Reanos-Moreno's name.

Reanos-Moreno also had sufficient cash on hand to buy tens of thousands of dollars' worth of drugs at one time. During the investigation, agents identified one of Reanos-Moreno's drug suppliers, co-defendant Nicolas Soria, who lives in Southern California. Agents intercepted calls between the two men regrading narcotics trafficking. On one call in June 2019, Soria referred to something as "grainy," that it looked like "dirt," and was not worth the trip. Soria then said it was "good now" and they were "badass." Agents believe Soria was referring to a prior shipment of drugs as being inferior, but assuring Reanos-Moreno that his current supply was better. Soria then asked how much Reanos-Moreno wanted, and stated that it had to cash up front. Agents believe Soria was taking an order for drugs from Reanos-Moreno and noting that he would not sell the drugs on consignment, but rather expected payment upon delivery.

Agents received a warrant for location data for Soria's phone. At approximately 3:30 a.m. on the morning of July 11, 2019, agents noticed that Soria's phone was traveling north on Interstate 5. Believing that Soria was delivering drugs to Reanos-Moreno, agents set up surveillance outside Reanos-Moreno's home in Oakland. At approximately 10:20 a.m., Soria arrived at Reanos-Moreno's house. Reanos-Moreno met Soria in the driveway and after a brief discussion, the two men went inside. A short time later, they came out of the house. Reanos-Moreno got into Soria's car and drove away. Soria placed two bags into a second car and drove away. A few minutes later, California Highway Patrol

stopped the car Soria was driving. During a consensual search of the car, officers found packages of cocaine and $17,000 in cash in the car. Based on the intercepted phone calls and information learned through the overall investigation, agents believe Reanos-Moreno paid Soria the $17,000 for drugs delivered to his house.

Reanos-Moreno and Erazo appear to have funneled at least some of the DTO's proceeds abroad. In May 2018, agents in San Ysidro, California searched a car containing approximately $189,000 in cash packaged into 25 individual bundles that the driver tried to smuggle into Mexico. Three of Reanos-Moreno's fingerprints were found on the plastic packaging material. Additionally, agents located images of over one dozen receipts for international money transfers on one of Erazo's phones that was seized at the time of her arrest. A review of these images shows that on one day alone, January 3, 2019, at least 10 transfers of approximately $1,000 were sent by different individuals from the same location in Oakland to 10 different people in Honduras and Spain. Two of the receipts were sent to members of Erazo's family (the money transfer receipts lists the recipients last names as Erazo Arteaga). A receipt for a transfer on another day was to Allan Reanos Moreno, the defendant's brother. These receipts reflect the hallmarks of money laundering and indicate that Reanos-Moreno and his family have money overseas.

Federal authorities continue to investigate the scope of the DTO's financial transactions, but the capital required to maintain the DTO's housing network, the volume of drugs seized during the investigation, and the amounts of money discussed on intercepted phone calls indicate that Reanos-Moreno can access many tens of thousands of dollars of cash, if not hundreds of thousands of dollars.

**C.    In August 2019, agents arrested Reanos-Moreno, and seized over $28,000 and fentanyl, methamphetamine, and cocaine from his house.**

On July 31, 2019, the Honorable Thomas S. Hixson, U.S. Magistrate Judge for the Northern District of California, issued a Criminal Complaint charging Reanos-Moreno, Erazo, their top lieutenant, Arteaga, and ten of the DTOs street-level dealers with a drug trafficking conspiracy. Dkt. 1, Compl. The following week, agents and officers arrested twelve of the charged DTO members, including Reanos-Moreno. At the same time, agents executed a search warrant on Reanos-Moreno and Erazo's home, where they seized over $28,000 in cash, and various drugs including fentanyl, methamphetamine,

and cocaine. As mentioned above, agents also found leases in Reanos-Moreno's name for multiple homes in Oakland, and receipts for money transfers to Honduras.

Reanos-Moreno made an initial appearance on August 7, 2019. At that time, the Court scheduled a detention hearing for August 15, 2019. Prior to the anticipated hearing, U.S. Pretrial Services interviewed Reanos-Moreno who proposed his three sisters as possible sureties. Pretrial found the sisters to be unsuitable sureties as they have no legal status and minimal income. As explained in greater detail below, it appears that one sister, Sonia Reanos, lied to Pretrial about her arrest history, her home address, and the frequency of her contact with Reanos-Moreno.

Defendant sought to continue the detention hearing in order to speak with additional sureties. The hearing was rescheduled for August 21, 2019. Prior to the hearing, Reanos-Moreno proposed Kari Solem, a family friend, to serve as a surety on a $100,000 unsecured bond. Pretrial recommended release to a halfway house with Ms. Solem as a surety and other conditions.

### D. Magistrate Judge Laporte detained Reanos-Moreno, finding that he posed a serious risk of flight that could not be mitigated by the proposed surety.

On August 21, 2019, Magistrate Judge Laporte held the detention hearing, during which both parties made proffers. The government argued that an unsecured bond signed by Ms. Solem was insufficient to mitigate Reanos-Moreno's risk of flight. Because Reanos-Moreno, and many members of his family, face serious consequences as a result of this prosecution, they are all incentivized to flee to Honduras where the rest of their family live. (*See* Dkt. 106, Ex. A, Transcript at 3:11 – 4:8.) The government further noted the significant sum of cash found in Reanos-Moreno's home at the time of arrest, and argued that he could potentially access additional cash to aid in flight. (*Id.* at 4:21 – 5:17.) The unsecured nature of a halfway house fails to mitigate flight when a defendant has substantial international ties. (*Id.* at 5:18 – 6:5.) Finally, the government addressed Ms. Solem's viability as a surety. While there is no question that Ms. Solem has the means to pay the bond should Reanos-Moreno violate his conditions, her connection to Reanos-Moreno is fairly limited. During the hearing, Ms. Solem stated that she spoke to Reanos-Moreno weekly either directly or through his sister, Sonia. (*Id.* at 14:11-16; 18:25-19:2.) Sonia, however, told Pretrial that she had not been in contact with Reanos-Moreno for the past year. (*Id.* at 19:4-19.) The government further noted that Sonia gave different

addresses to Pretrial when interviewed as a potential surety for Reanos-Moreno as opposed to when interviewed on behalf of their cousin (and Reanos-Moreno's co-defendant) Perdomo-Moreno. (*Id.*) The government argued that Ms. Solem's contact with Reanos-Moreno was too limited to be an effective surety, particularly if much of the contact was through an unreliable intermediary. (*Id.*)

In response, defendant noted that he resides in the country legally and that his movements, if released to a halfway house, would be restricted therefore mitigating flight. (*Id.* at 8:4-12.) He also argued that Ms. Solem was a viable surety who has the financial ability to sign the bond and understands the associated risks. (*Id.* at 8:23-10:7.)

The Court asked defendant about his passport, which Pretrial noted was missing. Defense counsel explained that following Reanos-Moreno's arrest, his landlord emptied his home and moved his personal belongings. Defense believed the passport was likely moved at that time and may be with the landlord. (*Id.* at 10:8 – 11:8.)

Magistrate Judge Laporte weighed the parties proffers and ordered Reanos-Moreno detained because the proposed conditions of release were insufficient to mitigate the serious risk of flight. The Court was particularly concerned by the defendant's access to cash, missing passport, and international ties when considered against the prison time that he currently faces. (*Id.* at 16:6-23.)

## II. LEGAL STANDARD

To detain a defendant pending trial, the Court must find by a preponderance of the evidence that there are no conditions that will reasonably assure the defendant's appearance as required, or find by clear and convincing evidence that there are no conditions which reasonably will assure the safety of any person or the community. 18 U.S.C. § 3142(f). In cases such as this, where there is probable cause to believe that the Defendant violated the Controlled Substances Act and faces a maximum of 10 years or more in prison, there is a rebuttable presumption that no condition or combination of conditions reasonably will assure the defendant's appearance as required and the safety of the community. *Id.* § 3142(e)(3)(A). The burden of production then shifts to the defendant. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (citing *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)). Although the presumption is rebuttable, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382-83 (1st Cir. 1985) (Breyer, J.). In other words, the presumption is not so weak that whenever

the defendant introduces evidence, "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." *Id.* Since a defendant can "always provide the magistrate with *some* reason … a 'bursting bubble' approach might render the presumption virtually meaningless, contrary to Congress's clear intent." *Id.* (emphasis added).

If the Court finds that the defendant has rebutted the statutory presumption of detention, the Court considers four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, and criminal history, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

A district court conducts a de novo review of the magistrate's order. *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990).

Here, the defendant cannot overcome the presumption in favor of detention. Further, the nature and circumstances of the offense charged, namely the extensive drug trafficking organization run by the defendant with substantial money, the weight of the evidence, as illustrated through intercepted communications, and the Reanos-Moreno's international family ties establish that no conditions of release can mitigate his risk of flight.

### III. ARGUMENT

#### A. Reanos-Moreno's International Ties, Minimal Domestic Connections, and Access to Large Quantities of Cash, Coupled with the Severe Consequences He Faces As a Result of Prosecution Render Him a Serious Flight Risk

Given the potential consequences he faces, Reanos-Moreno has no reason to stay in the United States if released. As Magistrate Judge Laporte aptly noted during the detention hearing: "[T]he real question here is whether, given a choice -- even though he'd certainly rather not go to Honduras under other circumstances -- if he at some point comes to believe that he's facing a minimum of five years and possibly more in prison here, that it might seem better to go somewhere else, at least temporarily." (Dkt. 106, Ex. A., Transcript at 13:18-23.)

Reanos-Moreno's closest friends and family in the United States are all involved in the drug

trade and do not have legal status. His partner (Karol Erazo), cousin (Perdomo-Moreno), and his brother-in-law (Arteaga-Morales) are all indicted as part of the conspiracy; all three are in this country illegally. Reanos-Moreno's three sisters (Karol, Sonia, and Fani) who live in the Bay Area are all also here illegally. While the sisters are not charged in the federal indictment, all three have previously been arrested on state drug trafficking charges. Both Karol and Sonia previously used aliases in their interactions with police (which may be why Pretrial was unable to find any arrests in Sonia Reanos's name). As recently as August 2019, SFPD officers saw Karol and Sonia on street corners in the Tenderloin with Kevin Arteaga-Morales, one of Reanos-Moreno's co-defendants. The youngest sister, Fani, was arrested by SFPD for drug-related charges on August 20, 2019 – the day before Reanos-Moreno's detention hearing. The increased scrutiny on the Reanos-Moreno family in light of the federal prosecution gives Reanos-Moreno and his sisters every reason to return to Honduras where Reanos-Moreno's parents and brother live.

Further, if released, Reanos-Moreno has the ability to abscond. As noted above, he ran a financially profitable DTO. He kept tens of thousands of dollars of cash on hand – more than enough money for him and his family to flee the jurisdiction. Defense argues that Reanos-Moreno's cash was seized upon arrest, and therefore he no longer possess access to capital. However, the investigation showed that Reanos-Moreno sent significant amounts of money abroad – including, it seems, through bulk cash smuggling. He could therefore regain access to that money. And importantly, Reanos-Moreno retains the ability to generate money by resuming his drug trafficking activity. Agents believe Reanos-Moreno acquires drugs from several suppliers. While they identified one of Reanos-Moreno's suppliers (Soria), other remain unknown. In addition, numerous street-level dealers intercepted on Court-authorized wiretaps remain unidentified. Reanos-Moreno could therefore swiftly resume operating his drug enterprise, which would provide him with the ability to abscond.

In sum, Reanos-Moreno has the motive and means to flee the jurisdiction.

**B.      A Halfway House and Unsecured Bond Are Insufficient to Mitigate Risk of Flight.**

Neither a halfway house nor an unsecured bond signed by Ms. Solem sufficiently mitigate Reanos-Moreno's risk of flight. First, as this Court well knows through countless escape cases, halfway houses are far from secure facilities. While a defendant may be placed on "lockdown," there is nothing

9

preventing a defendant from simply walking out. The risk of flight would potentially be mitigated if Reanos-Moreno had reliable local connections. However, Reanos-Moreno's extensive international ties and his illicit domestic connections increase the possibility that he will leave the country or be able to stay out of sight from law enforcement.

Second, the government appreciates Ms. Solem's support of Reanos-Moreno, but her relationship to the defendant is too attenuated to mitigate his flight risk. Ms. Solem appears to only have had telephone contact with Reanos-Moreno, and even that was not always direct communication, but rather messages relayed through Reanos-Moreno's sister, Sonia. Yet, Sonia told Pretrial that she hasn't talked to her brother in the past year. Given this apparent lie, Sonia can hardly be trusted as an intermediary. Even Ms. Solem acknowledged that she still has some doubts regarding Reanos-Moreno, which is why she will not secure the bond with money or property. As she explained to Magistrate Judge Laporte, Ms. Solem said she needs Reanos-Moreno to prove to her that he will be responsible. (Dkt. 106, Ex. A, Transcript at 15:9-12.) Her reticence to post a secured bond is understandable as she neither family nor a close friend. But that underscores why her signature on the bond does not ensure Reanos-Moreno's appearance. Further, the money Reanos-Moreno made through his criminal enterprise and stands to make again if released indicates that he could repay Ms. Solem is the bond was collected against her. In short, the risk taken on by Reanos-Moreno and Ms. Solem is insufficient to keep the defendant in this district.

## IV. CONCLUSION

Facing a lengthy prison sentence, and minimal legitimate ties to the United States, Reanos-Moreno has no incentive to remain in this country if released. For the reasons stated above, this Court should affirm Magistrate Judge Laporte's ruling and order Reanos-Moreno detained pretrial.

DATED: October 15, 2019                     Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

  /s
SAILAJA M. PAIDIPATY
RYAN REZAEI
Assistant United States Attorneys

10