STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

SAILAJA M. PAIDIPATY (NYBN 5160007)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    sailaja.paidipaty@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **NO. 19-CR-0381-01 CRB** |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | Judge: Hon. Charles R. Breyer |
| ANDY REANOS-MORENO, a/k/a "Pelon", | Sentencing Date: June 10, 2022 Time: 11:00 a.m. |
| Defendant. | |

## I.     INTRODUCTION

By his mid-twenties, Andy Reanos-Moreno ran a vast network of street-level drug dealers in the Bay Area.  Over a dozen dealers worked for his drug trafficking organization (DTO), receiving near daily drug supplies that they sold on the streets of the Tenderloin neighborhood in San Francisco.  Far from being a rudimentary organization, Reanos-Moreno ran a sophisticated operation that provided housing for these street-level dealers.  In exchange, the dealers were expected to purchase drugs for

resale from Reanos-Moreno and Reanos-Moreno only.  If they weren't selling for the organization, then they had to get out of the DTO's apartment.  On a near daily basis these dealers called Reanos-Moreno to place orders for re-supplies of drugs.  At Reanos-Moreno's direction, co-defendant Manuel Arteaga (a/k/a Angel David Centeno), delivered these supplies to the various houses and apartments in the DTOs network.  As intercepted calls revealed, Reanos-Moreno knew that a key to avoiding legal consequences was to ensure that no dealer possessed a large quantity of drugs at any one time.  The frequent resupplies allowed any individual co-defendant to claim that they were merely a small-time dealer if caught by law enforcement.  But these drugs, dealt by multiple people, every day, for over a year, added up to kilos of drugs distributed in San Francisco.

Reanos-Moreno's role as the head of the organization involved sourcing the drugs, which at times were delivered from Southern California by co-defendant Nicolas Soria, renting the houses and apartments for street-level dealers, and managing customer relations.  For example, in December 2018, Reanos-Moreno returned to Honduras for the Christmas holidays.  Upon return, intercepted calls revealed that customers complained about the individual that he left in charge of the DTO while away. Reanos-Moreno assured at least one customer that he was back in charge, indicating that the organization was back on track with Reanos-Moreno at the helm.

Of note, and in contrast to nearly all of his co-defendants, Reanos-Moreno had other options for his life in this country.  Having come to the United States as a teenager, he earned a high school diploma and is a legal permanent resident.  Instead of using those opportunities, Reanos-Moreno recruited his co-defendants, many of whom hail from the same area as Reanos-Moreno's family in Honduras, and ran a drug ring.  The money and power were simply more enticing than legitimate employment.  On the day of his arrest, agents seized over $25,000 in cash from the home that Reanos-Moreno shared with co-defendant Karol Erazo.  And as intercepted calls reveal, Reanos-Moreno used his legal immigration status and familiarity with American laws to threaten undocumented street-level dealers who were not selling enough narcotics for the organization.

Given his role as the head of the DTO, Reanos-Moreno's crimes warrant a significant custodial sentence.  The government also, however, recognizes two important factors that counsel towards the

UNITED STATES' SENTENCING MEMO.
NO. 19-0381-01 CRB

imposition of a downward variance.  First, prior to his federal arrest, Reanos-Moreno never spent more than five days in custody.  Given his lack of criminal convictions, a high sentence, but one below the Guidelines range, adequately promotes specific deterrence and respect for the law.  Second, unlike other DTOs operating in the Tenderloin, including DTOs charged in the related case of *United States v. Viera-Chirinos*, et al, No Cr 19-367 CRB, it does not appear that Reanos-Moreno used or promoted the use of firearms within the DTO.  No firearms were seized from his home at the time of his arrest and agents did not intercept discussions of firearms over the course of the year-long investigation.  Placing Reanos-Moreno, then, in context with other DTOs and DTO leaders charged at the same time, there is no indication that the defendant contemplated using violence that is otherwise typical of the drug trade. This mitigating factor weighs in favor of a below Guidelines sentence.  Balancing Reanos-Moreno's role, the complexity of the organization that he led, and the volume of drugs distributed with these mitigating factors, the government recommends the imposition of a 115-month sentence, a 15 percent downward variance, followed by four years of supervised release, forfeiture, and a mandatory $100 special assessment.

## II.     SENTENCING GUIDELINES CALCULATIONS

The government agrees with the U.S. Sentencing Guidelines as determined by the U.S. Probation Office ("Probation") in the Presentence Report ("PSR"), which are as follows:

| | | |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. §§ 2D1.1(a)(5), (c)(4):<br>(At least 3,000 KG but less than 10,000 KG of Converted Drug Weight) | 32 |
| b. | Role Enhancement, U.S.S.G. § 3B1.1(a) | +4 |
| c. | Acceptance of Responsibility: | - 3 |
| d. | Adjusted Offense Level: | 33 |

PSR ¶¶ 42-51.  The base offense level reflects the combined quantity of drugs seized from members of the organization that were supplied by Reanos-Moreno, as well as drugs seized from Reanos-Moreno's residence on the date of his arrest.  During the investigation, agents executed search warrants at two locations in Oakland that were rented in in Reanos-Moreno's and Erazo's names, respectively, where many of the lower-level co-defendants in this case lived.  These warrants were executed directly after

UNITED STATES' SENTENCING MEMO.
NO. 19-0381-01 CRB

1  Arteaga (Reanos-Moreno's courier) dropped off a drug resupply to each location. As described further

2  below, following the law enforcement raids, Reanos-Moreno and Erazo discussed the events over the

3  phone and whether they were in jeopardy of also being under law enforcement suspicion.

4      Probation's calculation also includes a four-level enhancement under U.S.S.G. § 3B1.1(a) for

5  Reanos-Moreno's role as an "organizer or leader of a criminal activity that involved five or more

6  participants or was otherwise extensive." The evidence overwhelmingly establishes Reanos-Moreno as

7  the leader of an extensive DTO. Reanos-Moreno was in charge of (i) sourcing drugs for the

8  organization, (ii) the housing system that served as the backbone of the distribution system, and (iii)

9  directing which dealers received drugs supplies. First, numerous intercepted calls show that street-level

10  dealers looked to Reanos-Moreno for their drug supply. *See e.g.* Dkt. 1, Compl. (originally filed under

11  3:19-71162 TSH) ¶¶ 36-46, 49-51. Reanos-Moreno either immediately delivered those drugs or

12  indicated that he was waiting for his own source of supply to bring him a new batch of drugs. *See id.*

13  ¶¶ 36-46, 49-51, 54-56. With respect to the housing system, Reanos-Moreno's name was on one of the

14  leases for a house in Oakland where some of the street-level dealers lived. PSR ¶ 37. Intercepted

15  conversations indicate that Reanos-Moreno supplied various housing options to street-level dealers

16  contemplating working for the DTO and negotiated where the dealers lived. *See e.g. id.* ¶¶ 98-116.

17  Finally, Reanos-Moreno provided instructions to Arteaga regarding who to provide drugs to and how

18  much to provide. For example, during one conversation, on May 24, 2019, Arteaga noted his

19  frustrations with one of the street-level dealers who he was scheduled to deliver drugs to that day. *Id.*

20  ¶ 145-47. The dealer asked Arteaga to come back later on and Arteaga did not want to wait around. *Id.*

21  During the conversation, Reanos-Moreno instructed Arteaga, "If he does not want it, then do not give it

22  to him," to which Arteaga responded, "All right then." *Id.* In sum, Reanos-Moreno directed all aspects

23  of the organization and the four-level enhancement applied by Probation is appropriate.

24      Probation calculates the final adjusted offense level, inclusive of a reduction for acceptance of

25  responsibility, at a level 33. At a Criminal History Category I, the advisory Guidelines range is 135-

26  168. Based on the volume of drugs to which Reanos-Moreno has admitted distributing and his status as

27  a leader/organizer, which prevents Reanos-Moreno from seeking relief under the federal safety valve

28

4

1   statute, this Court must impose a sentence of at least 60 months in prison.[1]  Probation recommends a

2   custodial sentence of 83 months.  For the reasons set forth below, the government recommends the

3   imposition of a 115-month sentence.

4   **III.    GOVERNMENT'S SENTENCING RECOMMENDATION**

5           The Court should impose a sentence sufficient, but not greater than necessary, to reflect the

6   purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*, 520

7   F.3d 984, 991 (9th Cir. 2008).  The Court should begin by calculating the correct sentencing range under

8   the Sentencing Guidelines.  *Id.*  The Guidelines are "the 'starting point and the initial benchmark,'"

9   *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011) (quoting *United States v. Kimbrough*, 552 U.S.

10  85, 108 (2007)), and the Court should "remain cognizant of them throughout the sentencing process."

11  *United States v. Gall*, 552 U.S. 38, 50 n.6 (2007).  After determining the appropriate Guidelines

12  calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the

13  factors set out in Section 3553(a).  *Carty*, 520 F.3d at 991-93.  Here, the most important considerations

14  are the nature and circumstances of the offense, the need to afford adequate deterrence, and the

15  protection of the public.  18 U.S.C. § 3553(a)(1), (a)(2)(B)-(C).

16          To date, the Court has sentenced ten co-defendants from Reanos-Moreno's organization.  In

17  addition, since August 2019, the Court has presided over the cases of more than a dozen other

18  defendants in four related cases.  However, the Court, has not yet sentenced a defendant of Reanos-

19  Moreno's stature in these Tenderloin DTOs.  Leaders of the organizations charged in related cases are

20  either pending trial or have fled the jurisdiction.  The government, therefore, will highlight the key

21  features of Reanos-Moreno's role as the head of the DTO and the sophistication of his organization.

22          **A.      Reanos-Moreno Sourced Drugs from Southern California and with Erazo "Cooked"
                     Crack that the DTO Sold.**

23

24          Intercepted calls indicate that Reanos-Moreno routinely received resupplies of drugs from

25  couriers who ferried the narcotics from Southern California to Oakland.  The Court previously sentenced

26

27          [1] Based on defense's lack of objections to the PSR and that Reanos-Moreno has not attempted to
    complete a safety valve proffer, the government understands that defense does not challenge the
28  applicability of the "leader/organizer" enhancement or the 60-month mandatory minimum.

UNITED STATES' SENTENCING MEMO.
NO. 19-0381-01 CRB

Nicolas Soria, one of those couriers, who in 2019 drove pound to kilogram quantities of drugs to Reanos-Moreno in the Bay Area. *See* Dkt. 294, Gov't Sent. Memo at 4-5. Law enforcement stopped Soria after a July 2019 meeting with Reanos-Moreno. At the time, Soria possessed half a kilogram of cocaine and $18,000 in cash. *Id.* at 2.

Cocaine was one of the many types of drugs that Reanos-Moreno sourced and distributed through his organization. The DTO also sold heroin, methamphetamine, and cocaine base, commonly referred to as "crack." On June 21, 2019, Reanos-Moreno called Erazo and asked if she had "made any of that yet." Dkt. 1, Compl. ¶ 231. Erazo responded that she had "just started weighing it." *Id.* Reanos-Moreno then instructed Erazo to "weight out four of them." *Id.* Erazo noted that she had to "make that sugar." *Id.* She said she had to "come and cook it" and "wait for it to dry." *Id.* Based on their training and experience, agents believe that Erazo was in the process of converting or "cooking" powder cocaine into cocaine base/crack. Typically, that involves boiling cocaine and baking soda in water and then waiting for the substance to harden and crystallize. *Id.* ¶ 232. Being able to "cook" cocaine base rather than buying precooked crack allows a distributor to save on supply costs while diversifying the types of drugs that he or she can sell. PSR ¶ 31. That Reanos-Moreno directed Erazo on how much to package ("weight out four of them") further shows that he was calling the shots.

**B.**  **The Housing System Allowed Reanos-Moreno to Maintain Control Over His Street-Level Dealers**

The housing system in Oakland formed the structural backbone of Reanos-Moreno's DTO. In addition to sourcing drugs, he sourced houses and apartments in the East Bay where the organizatin's street-level dealers lived. Street-level dealers interested in working for Reanos-Moreno asked him to find a particular type of housing. For example, an unknown male using a phone number ending in -9281 (UM-9281) asked if Reanos-Moreno knew of a "house available for three" that was "not too expensive." Dkt. 1, Compl. ¶ 99. Reanos-Moreno instructed UM-9281 to tell him what they needed and he would see, meaning see what's available. *Id.* The individual clarified that he was looking for a studio for three individuals and asked about pricing. *Id.* Reanos-Moreno discussed average prices for studios in the area. *Id.* During another call, co-defendant Franklin Rodriguez-Garcia noted that the woman he was

UNITED STATES' SENTENCING MEMO.
NO. 19-0381-01 CRB

1   working for at the time paid for utilities such as electricity and water at the place where he and other

2   dealers lived.  *Id.* ¶¶ 117-19.  Rodriguez-Garcia asked whether Reanos-Moreno "would be willing to do

3   the same."  *Id.* ¶ 118.  Reanos-Moreno initially indicated that "[t]hose bills are separate," but then said

4   he may be able to help the dealers pay for electricity.  *Id.*  These types of negotiations allowed Reanos-

5   Moreno to build his workforce.

6   As a condition of the housing, the street-level dealers were required to purchase drugs for resale

7   from Reanos-Moreno.  He threatened to kick dealers out of the DTOs housing if they failed to be

8   adequately productive for the organization.  On January 29, 2019, Reanos-Moreno called an unknown

9   male using a phone number ending in -3574 (UM-3574) and stated, "[D]ude, I was calling you to see if

10  you are going to work or if you are going to move out because I need to know so I can move in other

11  people."  *Id.* ¶ 103.   As explained in the Complaint, "work" was a code word commonly used by

12  members of the DTO to refer to drugs sales.  *See id.* ¶ 50.  In essence, during this conversation, Reanos-

13  Moreno asked UM-3574 if the dealer was going to get to work selling Reanos-Moreno's drugs because

14  if not the dealer needed to leave the DTOs housing so that Reanos-Moreno could move other dealers

15  into the house.  Five days later, Reanos-Moreno texted UM-3574 saying, "[L]ook if you don't like the

16  work then move out of there…"  *Id.* ¶ 110.  The following day, Reanos-Moreno again texted saying that

17  he was trying to find another place for UM-3574 and others; then Reanos-Moreno cautioned, I am not

18  going to look so that you guys can work with someone else."  *Id.* ¶ 111.  He went on to say,

19          I will be honest with you[.] [Y]our lawyer cannot do anything because you
            do not have a contract and if I get one because I am the one on the contract
20          it will not go well for you guys here and everything[,]  [I] know the laws
            but I'm not like that[,] a bad person[.]  I pay money for each apartment for
21          you and for you to work with someone else it's not right[.]  [Y]ou know
            what I mean right that you will always have problems[?]
22

23  During these series of texts, Reanos-Moreno illustrated the power he exerted over these street-

24  level dealers.  Either they sold drugs for the organization, or they moved.  Because Reanos-Moreno's

25  name was on the lease, the dealers had no legal recourse to fight eviction.  And if the dealers tried to

26  take Reanos-Moreno to court, he warned that it would "not go well for you guys here."  As stated above,

27  unlike most of the street-level dealers working for the organization, Reanos-Moreno had, and continues

28

7

1  to have, legal permanent resident status.  That allowed him to rent these apartments more easily than

2  undocumented dealers and provided him with leverage and a threat to hold over those who worked for

3  him.  At the end of the text message he specifically emphasized, "You know what I mean right that you

4  will always have problems[?]"  Reanos-Moreno appears to insinuate that he was familiar with California

5  law and that in any legal battle the dealers' immigration statuses would be revealed.  Reanos-Moreno

6  used his legal immigration status, his knowledge of real estate in the area, and his ability to pay upfront

7  costs such as deposits on apartments as a means of both enticing street-level dealers to work for his

8  organization and then holding their feet to the fire to ensure that they sold enough drugs or else they

9  would lose their housing or face potential legal jeopardy.

10        C.      **Reanos-Moreno Intentionally Provided His Street-Level Dealers with Small
                  Quantities of Drugs at a Time to Minimize Potential Legal Consequences.**

11

12        As part of the underlying investigation, agents executed search warrants at two of the DTOs

13  redistributor houses in Oakland located on 91st Avenue (the "91st Avenue House") and 103rd Avenue

14  (the "103rd Avenue House").  PSR ¶¶ 26-30.  Conversations between Reanos-Moreno and Erazo

15  revealed that the dealers were intentionally provided with small quantities of drugs at a time; if the

16  dealers were caught with lower drug quantities, the legal consequences would be less severe.  Certainly,

17  Reanos-Moreno remained undeterred by the law enforcement raids on both DTO locations.  Instead of

18  stopping or slowing his drug trafficking activity, he simply moved the dealers from one location to

19  another one of the DTO's apartments.

20        By June 2019, agents had identified the 91st Avenue and 103rd Avenue Houses as being part of

21  Reanos-Moreno's network.  On June 29, 2019, agents saw Arteaga arrive at the 91st Avenue House, go

22  in for a short amount of time and then leave, presumably having just dropped off a supply of drugs.  Dkt.

23  1, Compl. ¶¶ 207-08.  Once Arteaga drove away, agents executed a search warrant at the house.  *Id.*

24  ¶ 209.  There, they found co-defendants Rodriguez-Garcia and Cesar Estrada Cruz and seized baggies of

25  drugs from several rooms in the house as well as in a barbeque pit in the backyard.  *Id.*  ¶¶ 207-217.  Lab

26  results revealed the presence of at least 10.44 grams of fentanyl, 25.03 grams of pure methamphetamine,

27  14.58 grams of heroin, and 18.54 grams of crack.  *Id.* ¶¶ 211, 214-15.  Later that day, Erazo told

28

UNITED STATES' SENTENCING MEMO.
NO. 19-0381-01 CRB

1    Reanos-Moreno that "that the narcos raided the house over there on 91st." *Id.* ¶ 217.  Reanos-Moreno

2    expressed surprise and the two spent the rest of the evening trying to determine what happened and how

3    police ("the narcos") learned of the drug house.  *Id.*

4         Two days later, agents executed a search warranted at the 103rd Avenue House.  Once more,

5    officers only entered after seeing Arteaga stop by the home, presumably to provide a drug resupply.  *Id.*

6    ¶¶ 233-36.  Agents found co-defendants Brayan Martinez, Allen Funez Osorto, and Reanos-Moreno's

7    cousin, Josue Perdomo Moreno, living at the house.  *Id.* ¶¶ 237-42.  As they had after the raid on the

8    91st Avenue House, Reanos-Moreno and Erazo discussed what happened later that evening.  Reanos-

9    Moreno said they would "have to see if a lot was dropped off… with the little bit he gave, that little bit,

10   let's see" *Id.* ¶ 245.  In response Erazo exclaimed, "Oh yes, well yeah you know they sell by twenties

11   (20's) and the twenties (20's) are small, you get me? Maybe he gave like a twenty (20), uh, that is barely

12   anything." *Id.*  This discussion reveals Reanos-Moreno's and Erazo's understanding that criminal

13   consequences and the severity of legal risk is related to the volume of drugs that police catch you with.

14   Reanos-Moreno appeared to be saying that they first needed to understand what quantity of drugs

15   Arteaga dropped off.  Since it was the DTOs practice to provide individual dealers with a "little bit,"

16   perhaps they could wait and see if law enforcement would even pursue charges or further action ("with

17   the little bit he gave, that little bit, let's see."  Erazo confirmed that these dealers typically sold drugs in

18   baggies worth $20 each, a relatively small amount, an amount that she characterized as "barely

19   anything."  This conversation revels not only Reanos-Moreno's risk calculation in terms of whether or

20   not to be concerned by law enforcement scrutiny, but also shows his deep understanding of criminal

21   consequences and the intentionality in structuring the DTO in such a way that at any one time a street-

22   level dealer possessed a small enough quantity to claim that he or she was a mere small-time peddler

23   rather than a consistent daily drug dealer.

24         Reanos-Moreno and Erazo then joked that it was as if there was a "helicopter" on top of Reanos-

25   Moreno.  PSR ¶ 30.  The two made light of the fact that law enforcement appeared to be on to Reanos-

26   Moreno.  But even this second raid did not stop Reanos-Moreno from operating his drug ring.  He

27   simply moved the dealers from the 103rd Avenue House to a location in Oakland on High Street where

28

9

1   Arteaga previously lived.  In August 2019, agents arrested Martinez, Funez Osorto, and Perdomo

2   Moreno at the High Street location and once more seized drugs and cash from the apartment.

3   Fundamentally, Reanos-Moreno thought that if he continued providing his dealers with small amounts at

4   a time, even if law enforcement made arrests, the consequences would be minimal and therefore there

5   was no reason to end his operation.

6          **D.      A 115-Month Sentence Appropriately Balances the Aggravating and Mitigating
               Aspects of Reanos-Moreno's Conduct.**
7

8          Reanos-Moreno's leadership of a vast drug network that pumped drugs onto the streets of this

9   District for over a year, the control he exerted over the street-level dealers, and his unrelenting criminal

10  conduct despite law enforcement attention require the imposition of a significant custodial sentence.

11  Because of the volume of drugs sold by the DTO and Reanos-Moreno's role in the organization, the

12  low-end of the Guidelines is above 11 years in prison.  The government recognizes, however, that

13  Reanos-Moreno has no prior criminal convictions and has never spent more than five days in jail

14  previously.  Considering that Reanos-Moreno has not served a prior prison sentence, a sentence beyond

15  11 years may be greater than necessary to promote the statutory sentencing factors such as specific

16  deterrence.  Further, while Reanos-Moreno is by far the most culpable defendant within this prosecution,

17  his conduct should be considered in context with the organizations charged in the related cases, in

18  particular the Viera-Chirinos DTO charged in Case No 19-0367 CRB.  While agents intercepted

19  numerous calls between members of the Viera-Chirinos DTO discussing purchasing and transferring

20  firearms, they did not intercept any similar discussions between Reanos-Moreno and those working for

21  his organization.  As this Court well-knows, drug trafficking organizations often protect their workers

22  and their profits by carrying and using firearms.  That Reanos-Moreno did not appear to promote the use

23  of firearms or violence in furtherance of the conspiracy is a mitigating factor in comparison to other

24  prominent DTOs that operated in the Tenderloin during the time of the investigation as well as today.

25         Because this Court has yet to sentence a leader/organizer of any of the Tenderloin DTOs charged

26  in the five related cases, there are no direct comparisons with respect to the sentences of similarly

27  situated defendants.  This Court sentenced Arteaga, who served as Reanos-Moreno's right-hand man

28

UNITED STATES' SENTENCING MEMO.
NO. 19-0381-01 CRB

and courier for a period of approximately six months, to 36 months in custody.  In one of the related cases, the Court sentenced Jorge Enrique Viera-Chirinos and Cilder Velasquez, the main runners and managers for the leaders of the Viera-Chirinos DTO, to 60 months and 48 months in custody respectively (Enrique was subject to a 60-month mandatory minimum).  While these are the highest sentences imposed to date on defendants charged in this series of cases, the conduct of these individuals and the time period that they were involved in the criminal activity falls far below that of Reanos-Moreno.  Reanos-Moreno stands in a class of his own and his actions require a significantly higher penalty.

In weighing the sentencing factors and the specific aggravating and mitigating aspects of Reanos-Moreno's conduct, the government recommends the imposition of a 115-month sentence, which constitutes a 15% downward variance from the low-end of the advisory Guidelines range.  Probation recommends a further downward variance to 83 months.  Given Reanos-Moreno's role and the need to promote respect for the law and general deterrence in a neighborhood plagued by open-air drug trafficking, the further variance is unwarranted.  This Court must send a message that leading this type of organization results in severe consequences.

## IV.    CONCLUSION

The government respectfully recommends the imposition of a sentence of 115 months in prison, 4 years of supervised release, a $100 special assessment, and forfeiture of $25,288 seized from Reanos-Moreno's residence at the time of his arrest in August 2019.

DATED:  June 3, 2022                                              Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney


_____/s_____
SAILAJA M. PAIDIPATY
Assistant United States Attorney

UNITED STATES' SENTENCING MEMO.
NO. 19-0381-01 CRB